**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **OBIE D. WEATHERS, III**, | § | |
| **TDCJ No. 999396,** | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| **V.** | § | **CIVIL NO. SA-06-CA-868-XR** |
| | § | |
| **WILLIAM STEPHENS, Director,** | § | |
| **Texas Department of Criminal Justice,** | § | |
| **Correctional Institutions Division,** | § | |
| | § | |
| Respondent. | § | |

**MEMORANDUM OPINION AND ORDER**

Petitioner filed this federal habeas corpus action pursuant to 28 United States Code §2254

challenging his May, 2001 Bexar County conviction in cause no. 2000-CR-2916 for capital murder

and his sentence of death for the fatal shooting of Ted Church during the course of a robbery.  For

the reasons set forth below, Petitioner is entitled to neither federal habeas corpus relief nor a

Certificate of Appealability from this Court.

**I. Background**

A.  The Offense

On the evening of February 4, 2000, Petitioner entered Pierce's Ice House, a tavern in San

Antonio, Texas, holding a handgun and wearing a pillow case over his head in which he had cut eye

holes.[1]  Petitioner informed the black patrons of the bar to remain calm and proceeded to rob the

---

[1] Shortly after his arrest on February 15, 2000, Petitioner gave a written statement which was admitted into evidence at the guilt-innocence phase of Petitioner's capital murder trial in which he described the events which led up to the robbery at Pierce's Ice House, as well as the actual robbery and fatal shooting of Ted Church and which provided in pertinent part, as follows:

I left the old man's trailer after about 10 or 15 minutes and then decided I was going to rob the ice house right behind the old man's trailer.  I just noticed that - - I just noticed it after I left the old man's trailer.  I didn't know if there would be security there so I grabbed a pillowcase from a clothesline.

bar's white patrons.[2]   After robbing the white patrons, Petitioner escorted the waitress to the cash

---

> I cut some holes in the pillowcase for eye holes and put the pillowcase over my head.  I used a key to do it.  I went in the front door and there was a white lady, two old dudes and two or three black dudes in the bar.  I wasn't brandishing the gun, I wasn't in their faces with it but I held it up so they could see it.  I told all the black folks to just mind their own business and then I robbed the place.  I took some money from a white dude and some from the cash register.  It was about a hundred and something dollars.  There was some white guy sitting down at the bar and I knew he was going to do something.  He was acting like he was drunk.  I started backing away to leave when the white guy grabbed me and started wrestling with me kind of like y'all did when y'all arrested me only y'all got the job done.  He started wrestling me and I just let loose with the gun about two of three times.  I was kind of scared, that's why I shot the man.  My – my mind was gone at the time so that's why I shot him.  To get him off me so I could leave.  After that I pretty much went straight home.

Statement of Facts from Petitioner's trial (henceforth "S.F. Trial"), Volume 16, testimony of Daniel Gonzales, at pp. 197-98.  Petitioner's written statement was admitted into evidence during Petitioner's trial as State Exhibit no. 19A.  *Id.*, at p. 194.  For unknown reasons, however, the Exhibit Volume from Petitioner's trial erroneously reports that State Exhibit 19A was a blow-up of the Petitioner's written statement.  *See* S.F. Trial, Volume 23.  In fact, State Exhibit 19B was a blow-up of Petitioner's statement given February 15, 2000.  A hard copy of a redacted version of Petitioner's written statement of February 15, 2000 does appear in the exhibit volumes from Petitioner's trial (specifically S.F. Trial, Volume 23), however, marked during a pretrial hearing as State Exhibit 10A.  A copy of Petitioner's complete statement given February 15, 2000 also appears among the pretrial exhibits as State Exhibit no. 10 in S.F. Trial, Volume 23.

[2] The waitress and other bar patrons present during the robbery and fatal shooting of Ted Church testified during the guilt-innocent phase of Petitioner's capital murder trial.

The waitress, Lena Diaz, testified in pertinent part that (1) a person wearing a pillowcase over his head opened the door to the ice house and, initially, just stood there, (2) everyone thought it was a joke, (3) then the man said it was a robbery and she saw he was holding a gun, (4) she could see through the holes in the pillowcase that it was a young man with a baby face and short black hair with dark brown eyes and a thin mustache, (5) the robber told the three black men present - Tommie, Bones, and Roger - that they were cool because they were black and that he only wanted the money from "the white mother fuckers," (6) she and two of the bar patrons - Ted and Curly - were white, (7) the robber directed her to go to a table and she did, (8) the robber directed her, Ted, and Curly to empty their pockets, (9) when she placed thirty-six cents on the table, the robber asked whether that was a joke, (10) the robber said he didn't want their wallets only their money, (11) the robber asked who was working and she identified herself, (12) the robber directed her to go to the cash register, (13) she did so, opened the register, and took out all the money, (14) the robber told her to get the money under the till, (15) she explained there was no till and handed the robber all the paper money, (16) she then pulled out the drawer from the cash register and began walking toward the robber, (17) at that point, her legs gave out from fear and she stumbled, (18) the robber pointed his gun at her face as she fell to her knees directly in front of the robber, (19) the robber demanded to know what the fuck she was trying to do, (20) at that moment, Ted lashed out at the robber with the back of his hand and began wrestling with the robber for control of the gun, (21) the instant Ted moved toward the robber, the shooting started, (22) Ted continued to struggle with the robber after the first shot was fired, (23) a total of four shots were fired as the two men struggled with each other, moving toward the door of the ice house, (24) three shots were fired almost immediately after Church moved toward the robber, (25) the last shot was fired as both men were right at the door, struck Church about belt high in the abdomen, and Church fell as the robber went out the door, (26) one of the bar patrons had placed a 911 call during the robbery before the shooting started, (27) medical personnel arrived very swiftly, (28) she was in shock immediately after the shooting but could see Ted was bleeding from the side of the mouth, his head, and his stomach, and (29) the gun the robber used resembled a picture of a Luger admitted into evidence.  S.F. Trial, Volume 15, testimony of Lena Diaz, at pp. 42-91.

Two of the bar patrons present that night gave similar, albeit far less detailed, accounts of the same events described by the waitress.  S.F. Trial, Volume 16, testimony of Maynard (Curley) Langdon, at pp. 12-33; Volume 16, testimony of Tommie Franklin, at pp. 34-52.  The owner of the bar testified that he checked the cash register the morning after the robbery and determined approximately two hundred eighty dollars had been taken in the robbery.  S.F. Trial,

register and directed her at gun point to open the machine and remove the drawer.[3]  When the

waitress stumbled while carrying the cash drawer toward him, Petitioner pointed his gun at her head.[4]

At that moment, bar patron Ted Church swung at, and grabbed, Petitioner.[5]  The two men struggled

from the end of the bar toward the door.[6]  During their struggle, Petitioner shot Church twice in the

head and once in the abdomen.[7]  Petitioner exited the establishment with more than two hundred

dollars.[8]  Church was taken to the hospital within minutes of the arrival of police and emergency

medical personnel but, despite multiple surgeries, died weeks later from irreparable damage to his

pancreas resulting from his abdominal gunshot wound.[9]

---

Volume 16, testimony of James Byars, at pp. 58-59.  Mr. Byars also testified that, the morning after the robbery and shooting (1) he discovered a .22 shell casing and what appeared to be a human tooth on the floor behind a chair, (2) he telephoned police, and (3) a detective arrived to collect the items shortly thereafter.  *Id.*

[3] S.F. Trial, Volume 15, testimony of Lena Diaz, at pp. 51-57.

[4] *Id.*, at pp. 57-59.

[5] *Id.*, at pp. 58-60.

[6] *Id.*, at pp. 59-60.

[7] The paramedic who treated Ted Church at the scene of the shooting testified in pertinent part that (1) Church had been shot twice in the head and once in the abdomen, (2) there was a possible exit wound in the back right side of Church's abdomen, (3) the gunshot wounds to Church's head were in the left cheek with a possible exit wound near the left ear and in the left temple, (4) Church was combative when they arrived at the scene and also appeared to be confused, (5) Church was spitting up and coughing up blood, (6) they knew Church was gravely injured, (7) Church was placed on a heart monitor, given oxygen and IV fluids, and taken to Brooke Army Medical Center ("BAMC") - a level one trauma hospital, and (8) Church had what appeared to be powder burns on his shirt and left temple.  S.F. Trial, Volume 16, testimony of Alexander Guerrero, at pp. 3-10.

[8] The waitress testified she believed there was slightly less than two hundred dollars in the cash register before the robbery.  S.F. Trial, Volume 15, testimony of Lena Diaz, at p. 86.  The bar owner testified that when he reviewed the cash register tape the following morning he calculated the amount of cash missing as approximately two-hundred eighty dollars.  S.F. Trial, Volume 16, testimony of James Byars, at p. 59.

[9] One of the surgeons who treated Church at BAMC testified (1) the bullet from Church's abdominal gunshot wound transversed several loops of the small intestine, injured the duodenum, and transected the pancreas at the head, (2) Church suffered profuse bleeding, (3) any injury to the pancreas, which is surrounded by the duodenum, is very severe, (4) Church's pancreas was damaged beyond repair and leaked pancreatic fluid, i.e. digestive fluid throughout Church's abdominal cavity, (5) as a result, Church suffered from abdominal sepsis which required multiple surgeries in a effort to clean out the infection in the abdomen, (6) Church was given vasopressars to help maintain his blood pressure,

B.  Indictment

On June 1, 2000, a Bexar County grand jury indicted Petitioner in cause no. 2000-CR-2916

on a single count of capital murder, to wit, intentionally causing the death of Ted Church on or about

February 4, 2000 by shooting Church with a deadly weapon, i.e., a handgun, while in the course of

committing and attempting to commit the robbery of Church.[10]

C.  Guilt-Innocence Phase of Trial

The guilt-innocence phase of Petitioner's capital murder trial commenced on April 24, 2001.

In addition to the testimony summarized above, the prosecution presented evidence showing (1)

---

which can damage the heart and lungs, (7) after several surgeries doctors at BAMC could no longer maintain Church's blood pressure, Church's pancreas was still leaking fluid, and Church's lungs were weakening due to the vasopressors, (8) Church's kidneys shut down and Church was no longer responsive, (9) Church's family made the decision to discontinue the vasopressors, (10) when the vasopressors were removed, Church's blood pressure fell and he died, (11) no bullet was ever recovered from Church's abdomen, suggesting that bullet wound was through and through, (12) Church's death resulted from the gunshot wound to his abdomen, (13) there was also an entry wound to Church's left temple and an entry wound to Church's left cheek with a possible exit wound  by the left ear, and (14) Church received the best medical care available at BAMC.  S.F. Trial, Volume 15, testimony of Dr. Lois Fiala, at pp. 113-34.  Copes of Church's voluminous BAMC medical records were admitted into evidence during the guilt-innocence phase of Petitioner's capital murder trial as State Exhibit no. 48 and appear in S.F. Trial, Volumes 23 through 27.

The medical examiner who performed Church's autopsy testified (1) Church's body was x-rayed but no projectile was ever found inside his abdomen, (2) Church's pancreas was damaged so badly it was dying and falling apart, (3) many of Church's organs failed, including his liver - which literally fell apart as did the pancreas, (4) Church's heart showed a history of previous heart attacks, (5) Church's body showed signs of adult respiratory distress syndrome - something common when one is placed on a ventilator for a long period, as was Church, (6) he could not determine the range from which the shots which struck Church had been fired, (7) examination of Church's heart tissue suggested Church had a heart attack while at BAMC, likely from the stress of multiple surgeries, (8)  the cause of Church's death was homicide, specifically a gunshot wound to the abdomen, (9) Church suffered three gunshot wounds, the most serious of which was to the abdomen, which entered the left side of the abdominal wall, passed through the abdominal cavity, causing injuries to the bowels and hemorrhaging of the pancreas into the abdominal cavity, (10) another gunshot wound entered over the left temple and went through the left ear and exited the scalp but did not enter the skull or cause significant injuries, and (11) a second gunshot wound entered the left cheek and injured the jaw/mandible and multiple teeth, and (12) other injuries to Church's abdomen may have been obscured by his multiple surgeries.  S.F. Trial, Volume 15, testimony of Dr. Randall Frost, at pp. 177-98.  The voluminous medical records recording the medical treatment Church received at BAMC were admitted into evidence as State Exhibit no. 48 and appear in S.F. Trial, Volumes 23-27. The medical examiner's report from Church's autopsy, performed March 3, 2000, was admitted into evidence as State Exhibit no. 49 and appears in S.F. Trial, Volume 27.

[10] Transcript of pleadings. motions, and other documents filed in Petitioner's state trial court proceeding (henceforth "Trial Transcript"), at p. 2.  Additional copies of Petitioner's indictment also appear at pages 61 and 112 among the state court records from Petitioner's first state habeas corpus proceeding, i.e., WR-64,302-01 (henceforth "First State Habeas Transcript").

shortly before committing the robbery and fatal shooting of Church at Pierce's Ice House, Petitioner

beat and robbed an elderly man (Ernest Leonard Johnson) who resided close to Pierce's Ice House,[11]

(2) the description of the clothing worn by the assailant who assaulted Johnson matched the clothing

---

[11] Ernest Leonard Johnson testified without contradiction at the guilt-innocence phase of Petitioner's trial that (1) in February, 2000, he lived in a trailer behind Pierce's Ice House, (2) one evening he was taking a nap when he was awakened by a black man standing inside his trailer with a gun, (3) the black man told Johnson to "get up you white mother fucker or I'll blow your brains out or blow your head off," (4) Johnson did not move so the black man struck Johnson, (5) when Johnson informed his attacker that he could not move quickly because he'd had back surgery, the black man replied "shut up and call me boss man," (6) the black man demanded money and Johnson gave him all he had - one dollar and ninety cents, (7) the black man kept asking for money and struck Johnson repeatedly with his gun, his fists, a guitar case, and with a broom handle, breaking the broom handle over Johnson twice in the process, (8) Johnson was terrified and begged the man not to shoot him, (9) Johnson's assailant was not wearing a mask or anything else covering his face, (10) Johnson later identified Petitioner from a photo array shown him by police, (11) the black man picked up and handled Johnson's knife, (12) the black man partially smoked one of Johnson's cigars and put the remainder of the cigar on the top of Johnson's refrigerator, (13) at one point, the black man shoved Johnson into a closet, injuring Johnson's knee, (14) Johnson suffered numerous bruises and knots to his head, back, and arms from trying to protect himself, as well as a bloody knee, (15) at one point during the assault, a neighbor of Johnson's named Nancy walked by and the black man demanded to know who she was, (16) when Johnson informed his assailant that she was a neighbor, the black man closed Johnson's door, (17) after robbing and assaulting Johnson, the black man threatened to return and kill Johnson and his family if Johnson called the police, and (18) after the black man left, Johnson, who did not have a telephone in his trailer, turned off the lights and kept low.  S.F. Trial, Volume 17, testimony of Ernest Leonard Johnson, at pp. 79-96.

Nancy Rodriguez testified without contradiction that (1) she lived in a trailer behind Pierce's Ice House close to Johnson's trailer, (2) Johnson lived by himself, (3) on the date in question, she walked by Johnson's trailer and heard a loud voice that was not Johnson's coming from inside Johnson's trailer, (4) Johnson's windows were open, (5) she heard what sounded like a black man arguing with Johnson, (6) it was uncharacteristic for Johnson to argue with anyone, (7) she was able to see into Johnson's trailer somewhat and could make out a black man holding a stick in his hand, (8) she got a pretty good look at the black man's face, (9) she later picked out Petitioner's photo from a photo array shown her by police, (10) she also identified Petitioner in open court as the black man she had seen inside Johnson's trailer, (11) Petitioner was wearing a black flannel shirt and had short hair, (12) she overheard the black man asking Johnson who she was, (13) later, after she returned to her own trailer, her door handle jiggled, and (14) shortly after she walked past Johnson's trailer, she heard gunshots and saw flashing lights.  S.F. Trial, Volume 17, testimony of Nancy Rodriguez, at pp. 10-36.

In his written statement given February 15, 2000, Petitioner stated, in pertinent part, as follows:
I took my gun and I walked through the trail right behind the school and jumped the fence to then trailers on W.W. White Road.  I walked to this one trailer and I didn't see no cars there so I walked right to the door.  It was unlocked so I opened it and went inside.  I saw the - - I saw this old man and he was laying on a couch right as you got in - - as you get in the door.  I pointed the gun at him and told him to give me the money.  After he got up I quit pointing the gun at him and he said he didn't have no money.  I started looking at a guitar he had there and I was going to take it but decided not to when he said he had just bought it.  I never hit the old man even though I was there for about 10 or 15 minutes.  I stayed in there a good little while but couldn't find nothing to take.  I did smoke a cigar while I was there.  It was nasty tasting.  I took a - - I took a knife while I was there because I smoke blunts and I was going to use it to smoke cigars later on but I ended up dropping it in the trailer park after I left.  I left the old man's trailer after about 10 or 15 minutes and then decided I was going to rob the ice house right behind the old man's trailer.
S.F. Trial, Volume 16, testimony of Daniel Gonzales, at pp. 197-98.

5

worn by the person who robbed Pierce's Ice House and shot Ted Church,[12] (3) Johnson and another

eyewitness both identified Petitioner as Johnson's assailant from a police photo array,[13] (4) while

executing search warrants for Petitioner's sister's apartment on February 14 and 15, 2000, police

found a plaid flannel shirt\jacket and a pair of tennis shoes which matched the descriptions of the

clothing worn by both Johnson's assailant and the robber who shot Church,[14] (5) when police

detectives went to arrest Petitioner at his place of employment on February 15, 2000, Petitioner

violently resisted arrest and attempted to flee, injuring both of the officers who arrested him,[15] (6)

DNA testing performed on a pillowcase with holes cut in it found just outside the Ice House and a

partially smoked cigar found inside Johnson's trailer home established (a) Ted Church could not be

ruled out as a possible source of the DNA contained on the blood stains found on the pillowcase and

---

[12] Nancy Rodriguez testified the black man she saw in Johnson's trailer wore a black flannel shirt.  S.F. Trial, Volume 17, testimony of Nancy Rodriguez, at p. 22.  Ernest Johnson described his assailant as wearing khaki slacks with blue and yellow tennis shoes and being neatly dressed S.F. Trial, Volume 17, testimony of Ernest Leonard Johnson, at p. 84.  The waitress whom Petitioner robbed at the Ice House described the robber as wearing a flannel plaid shirt, two-toned tennis shoes.  S.F. Trial, Volume 15, testimony of Lena Diaz, at pp. 48-49.

[13] S.F. Trial, Volume 17, testimony of Nancy Rodriguez, at pp. 19, 24; Volume 17, testimony of Ernest Leonard Johnson, at p. 86.

[14] The waitress at the Ice House identified a photograph admitted into evidence as State Exhibit 13 as showing a flannel shirt matching that worn by the robber.  S.F. Trial, Volume 15, testimony of Lena Diaz, at p. 69.  She also testified the robber wore two-toned tennis shoes.  *Id.*, at p. 48.  A San Antonio Police evidence technician identified a pair of khaki pants and a black and white plaid, long-sleeve shirt (admitted as State Exhibit no. 36) as items he collected from the residence of Petitioner's sister on February 14, 2000 and a pair of two-toned athletic shoes (admitted as State Exhibit no. 40) as items he collected from the same residence the following day.  S.F. Trial, Volume 15, testimony of Willie Smith, at pp. 142-49.  A pair of San Antonio Police Detectives also identified the blue and white tennis shoes admitted as State Exhibit no. 40 as having been discovered at the residence of Petitioner's sister (where Petitioner was living at that time) on February 15, 2000, i.e., the second time police searched that residence.  S.F. Trial, Volume 16, testimony of John Marshall, at pp. 90-91; Volume 16, testimony of Thomas Matjeka, at pp. 108-12, 139.

[15] A San Antonio Police Detective and a security guard at West Telemarketing both testified the Petitioner attempted to flee, attempted to grab one officer's handgun, and otherwise violently resisted the efforts of the officers and the security guard to secure Petitioner in handcuffs, which efforts succeeded only after a fourth individual assisted in restraining Petitioner and after Petitioner had destroyed one officer's glasses and delivered several blows to the officers. S.F. Trial, Volume 16, testimony of Thomas Matjeka, at pp. 115-28; Volume 16, testimony of Wilson Hairston, at pp. 152-60.

(b) Petitioner could not be excluded as a possible source of the DNA found on the partially smoked cigar,[16] and (7) following his arrest, Petitioner gave a voluntary written statement in which he confessed he had assaulted an old man, robbed the white patrons of the Ice House, and shot a bar patron who tried to stop him from leaving the bar.[17]  The defense presented only one witness at the guilt-innocence phase of trial, Petitioner's mother, who testified Petitioner (1) had been in Special Education classes in elementary school, (2) dropped out of school his senior year of high school, (3) moved out of his parents' home about a month before his arrest, (4) had suffered greatly when his grandmother was killed in a car accident in 1997, but (5) appeared to be doing well despite the fact he was under a lot of pressure in the weeks before the murder.[18]  After deliberating less than three hours, on April 30, 2001, the jury returned its verdict, finding Petitioner guilty beyond a reasonable doubt of capital murder as charged in the indictment.[19]

## D.  Punishment Phase of Trial

The punishment phase of Petitioner's capital murder trial commenced on May 1, 2001.  The prosecution presented evidence showing (1) on November 29, 1995, while attending Poe Middle

---

[16] A DNA serologist from the Bexar County Criminal Investigation Laboratory testified without contradiction that (1) Petitioner could not be excluded as a possible source of the DNA found on the partially consumed cigar and (2) while Petitioner could be excluded as a possible source of the blood stains found on the pillowcase, Ted Church could not be excluded.  S.F. Trial, Volume 17, testimony of Amy Yeatman, at pp. 135-38, 143-44, 150.

[17] A San Antonio Police Detective testified without contradiction that he gave Petitioner his *Miranda* warnings and thereafter interviewed Petitioner, who subsequently gave a written statement which Petitioner executed in front of two civilian witnesses.  S.F. Trial, Volume 16, testimony of Daniel Gonzales, at pp. 179-201.  One of the civilian witnesses testified she witnessed Petitioner execute his written statement on February 15, 2000.  S.F. Trial, Volume 17, testimony of Angelique Perez, at pp. 5-10.
The prosecution also presented an expert witness, i.e., a firearms examiner from the Bexar County Crime Lab, who testified all of the .22 caliber shell casings found inside the Ice House had been fired by the same weapon and Luger manufactured a model of semi-automatic handgun matching that described by several witnesses which could have fired those shells.  S.F. Trial, Volume 17, testimony of Jamie Becker, at pp. 104-13, 117.

[18] S.F. Trial, Volume 18, testimony of B.D. Viola Weathers, at pp. 11-19.

[19] S.F. Trial, Volume 18, at pp. 66; Trial Transcript, at pp. 187-88.

School, Petitioner phoned in a fake bomb threat which resulted in the evacuation of all buildings on

campus and a search for explosive materials[20]; (2) on April 3, 1997, while attending Sam Houston

High School, Petitioner followed an older female student into the girls' room and sexually assaulted

her[21]; (3) on May 6, 1998, Petitioner violently assaulted a different female student at Sam Houston

High School, grabbing her by the neck and throwing her over a table, knocking computer equipment

off the table, all while the classroom teacher attempted to get Petitioner to release his grip on the

young woman's throat[22]; (4) on December 8, 1998, Petitioner was arrested on his high school campus

---

[20] A San Antonio Police Officer who responded to the bomb threat went to a nearby convenience store where he obtained a videotape recording showing Petitioner in close proximity to the pay phone from which the bomb threat was called in. S.F. Trial, Volume 19, testimony of Casey Campos, at pp. 23-31. Another youth who attended Poe Middle School testified he was present when Petitioner phoned in the bomb threat, the threat forced the evacuation of the campus, and he later admitted to law enforcement officers what they had done. S.F. Trial, Volume 19, testimony of Antron Ware, at pp. 32-42. The convenience store manager testified she saw four youths congregating near the pay phone just outside her store's front door on the morning of the bomb threat but could not identify which one placed the call. *Id*, testimony of Alberta Berlanga, at pp. 41-50. The principal of Poe Middle School in 1995 testified that, in addition to making the bomb threat, Petitioner (1) was frequently disruptive in class but not in a loud manner, (2) instead, Petitioner would talk back and did not do what he should, (3) on one occasion, Petitioner urinated in a hallway heat register, causing a bad smell, (4) Petitioner later worked with the school's janitor for a week, (5) Petitioner's parents were responsible and cooperative and Petitioner came from a loving family, (6) Petitioner was not particularly hyper and was never referred for testing for ADHD, (7) she saw Petitioner a lot, which she attributed to his large size and the fact, as a tall kid, Petitioner was easier for adults to identify than some other students, (8) Petitioner was not a major or chronic problem while attending Poe Middle School, and (9) she has no information suggesting Petitioner was ever diagnosed as ADD, S.F. Trial, Volume 20, testimony of Betty Austin, at pp. 3-19.

[21] The female student in question testified without contradiction that (1) while she was having a conversation with a friend in a hallway, Petitioner offered her money to let him see her female organ and she refused his offer, telling him "just get away from me," (2) she entered the girls' room, and Petitioner followed her, (3) Petitioner grabbed her and said "bitch, you know you want me," (4) Petitioner put his hands inside her underwear but did not penetrate her female organ, (5) she felt violated and scared, (6) when someone else entered the girls' room, Petitioner fled, (7) she did not report the incident immediately or seek medical treatment but, instead, went immediately home instead of back to class, and (8) she reported the incident a couple days later and dropped out of high school because she could not feel safe in school. S.F. Trial, Volume 19, testimony of D___ M___, at pp. 75-93.

[22] The teacher who witnessed and attempted to breakup the assault testified without contradiction that (1) Petitioner moved from his assigned seat to a seat next to a female student named C___ R___ and struck C___ R___ with a wad of paper money several times, (2) he asked Petitioner to stop several times, (3) Petitioner stopped but then started again, (4) he asked Petitioner to leave the room but Petitioner refused to do so, (5) he asked C___ R___ to move to another seat across the room, (6) when C___ R___ moved, Petitioner followed her across the room and struck her very hard on the top of her head, (7) C___ R___ stood up and pushed Petitioner away from her, (8) Petitioner came around the tables separating them, grabbed C___ R___ by the neck and began choking her, (9) he asked Petitioner to stop but Petitioner refused to do so, (10) he reached the two students and attempted to pry Petitioner's hands off C___ R___'s neck but was unable to do so, (11) Petitioner threw C___ R___ over a table, knocking over some of the computers and

for possession of marihuana and received a probated sentence for that offense[23]; (5) on October 8,

1999, Petitioner and an accomplice attempted to burglarize a habitation but were arrested after a

neighbor of the elderly female victim followed Petitioner and his accomplice and the police located

the pair at a nearby fast food restaurant and, on January 6, 2000, Petitioner pleaded guilty to that

---

monitors, (12) only then was he able to get between the two students and did Petitioner finally let go of the girl's neck, (13) after he let go of C___ R___'s neck, Petitioner climbed over a table and left the room, (14) the assault lasted for a couple of minutes and he was afraid C___ R___ would be seriously injured, (15) during Petitioner's time in his computer keyboarding class, Petitioner would not follow the class rules, (16) he spoke with Petitioner's mother about Petitioner's attitude but Petitioner remained disobedient when he returned to class, (17) Petitioner had a bad attitude in class, showed very little interest in learning, never did any work in class, and never wanted to do what he was supposed to do, (18) Petitioner was always very aggressive toward female students, (19) Petitioner appeared to want to cause trouble but a lack of maturity did not appear to be a problem for Petitioner, and (20) after the choking incident described above, Petitioner never returned to his class.  S.F. Trial, Volume 19, testimony of Manuel Reyes, at pp. 94-106.  The victim of Petitioner's assault testified that (1) on the day in question, while she was minding her own business, Petitioner approached her with a wad of cash in his hand, said every woman could be bought, and slapped her with the wad of cash, (2) when she was moved to the opposite side of the room by the teacher, Petitioner came over to her side of the room and struck and choked her, (3) she grabbed a keyboard and struck Petitioner with it as he choked her, (4) Petitioner put her on a table, pushed up her dress, and got between her legs, while he continued to choke her, (5) Petitioner then threw her over the tables and into the electrical plugs and she was shocked, (6) she threw keyboards and other equipment at Petitioner as he approached her again, (7) Petitioner resumed choking her and she was on the verge of passing out and could not see, when Petitioner finally released her throat, (8) she received a busted lip and bruises to her inner thighs and legs during the assault, during which she was scared, and (9) Petitioner called her a crazy bitch during the assault.  S.F. Volume 19, testimony of C___ R___, at pp. 56-70.  A San Antonio Independent School District police officer took photographs of C___ R___'s injuries immediately after the incident and testified (1) C___ R___ showed signs of injury to her mouth, lip, and neck, (2) when Assistant Principal Phillip Rodriguez informed Petitioner that he was suspended, Petitioner responded "that's why I can't stand white people," (3) Petitioner was verbally combative every time he encountered Petitioner, (4) Petitioner seemed to have a problem with authority while attending Sam Houston High School, and (5) Petitioner's reputation for telling the truth was bad.  S.F. Trial, Volume 19, testimony of Darnell Wright, at pp. 106-11.

[23] The Assistant Principal at Sam Houston High School during the three years Petitioner attended the school, testified (1) Petitioner was a bright student who grew more and more defiant as he grew older, (2) Petitioner's reputation for telling the truth was bad, (3) Petitioner was manipulative and even when caught red-handed, Petitioner would present an excuse for his misbehavior, (4) Petitioner did yell and get in his face but never became violent in his presence, perhaps because he was roughly the same size as Petitioner, (5) he was aware Petitioner had been taken out of Special Education by his mother but had no knowledge that had been done against the recommendations of school officials, (6) despite his problems, Petitioner managed to reach the eleventh grade, could do the work assigned but chose not to do so, which suggested Petitioner was capable of doing something right, (7) Petitioner was defiant and did not like to follow rules, (8) by Petitioner's junior year, he always let people know when he was dealing with Petitioner because he was never certain whether Petitioner was going to "go off," (9) on one occasion, Petitioner exploded at a white female teacher who asked Petitioner for a hall pass, saying he hated all white women, and (10) Petitioner possessed marijuana on school grounds.  S.F. Trial, Volume 19, testimony of Phillip Rodriguez, at pp. 115-27.  The Judgment reflecting the revocation of Petitioner's probated sentence for possession of marijuana was admitted into evidence as State Exhibit no. 99 and appears in S.F. Trial, Volume 27.

9

offense and received a probated sentence[24]; (6) on January 19, 2000, while on probation from his

attempted burglary conviction, Petitioner burglarized another home and took a Play Station game

console which he later pawned[25]; (7) on February 2, 2000, Petitioner burglarized another home and

_____

[24] Myrtle Edwards testified without contradiction that (1) on October 8, 1999, while she was addressing correspondence, two black males, one of whom she identified as Petitioner, approached her front door, which was open except for a latched storm door, (2) Petitioner attempted to pull open the storm door but could not because it was latched, (3) Ms. Edwards called out to the two men but initially got no response, (4) when she called out again, asking them what they wanted, they advised her they were looking for someone, (5) when a car drove past her front door, the two men walked away from her home toward the street, (6) shortly thereafter, Ms. Edwards heard a series of loud bangs from the rear of her home which made her jump out of her chair and the sounds were so forceful they rattled her living room chandelier, (7) Ms. Edwards walked into her den and yelled out, at which time she saw one of the two men jump over the fence in her backyard, (8) she unlocked her backdoor and walked outside, (9) when she did so, she observed that her back screen door had been propped open and the door frame of her back door had been cracked, (10) the gate to the fence around her backyard was always locked, (11) she telephoned a neighbor who helped her contact police, (12) the husband of her neighbor attempted to stop the two men as they were getting away, and (13) within thirty minutes, the police apprehended the two young men and brought them back to her residence, where she identified them. S.F. Trial, Volume 19, testimony of Myrtle Edwards, at pp. 134-50.
    Brandon Winfrey testified without contradiction that (1) he pleaded guilty to attempted burglary for his role in the attempted burglary of Ms. Edwards' residence on October 8, 1999 and received a probated sentence, (2) at the time of Petitioner's capital murder trial, Winfrey was facing a motion to revoke his probated sentence which was the subject of a possible plea bargain involving his testimony against Petitioner, (3) he was an acquaintance of Petitioner from their high school, where they had played freshman football together, (4) on October 8, 1999, he decided to skip school when he ran into Petitioner, (5) Petitioner informed Winfrey that he planned to burglarize a house down the street from their homes, (6) Petitioner said he had already burglarized another house on the same street and had obtained a gun which he stashed in a back alley, (7) they approached Ms. Edwards' house and asked for someone with the letter "R" in their name, (8) Petitioner tried to open the front door but it was locked, (9) they then went around to the back of the house and jumped the fence into the back yard, (10) Petitioner said he would keep the woman quiet by beating her or shooting her with the gun they had with them, (11) Petitioner attempted to kick in the back door but it didn't budge, (12) Petitioner ripped the screen off the back door but was unable to kick in the back door, (13) after Petitioner tried a third time to kick in the back door, they both ran away down an alley, (14) they went down a second alley when they were spotted by someone in a pickup truck which began pursuing them, (15) they stopped briefly near a fence at a Wendy's restaurant to catch their breath, (16) they took off again when they saw a police car, (17) when multiple police officers turned into the Wendy's parking lot and drew their weapons, they surrendered, (18) they both pleaded guilty to the attempted burglary, and (19) the prosecution had made no firm promises regarding Winfrey's motion to revoke to induce his trial testimony. S.F. Trial, Volume 19, testimony of Brandon Winfrey, at pp. 150-68. Frank Levy testified (1) his wife received a call from Myrtle Edwards on October 8, 1999 and he pursued a pair of young men in his pickup truck, (2) he later directed police in the direction the two men had run, (3) when he encountered Ms. Edwards shortly thereafter, she was excited and shaken up, and (4) police brought two young men back to Ms. Edwards' home and she identified both men. S.F. Trial, Volume 19, testimony of Frank Levy, at pp. 169-75. The Judgment dated January 6, 2000 imposing a term of community supervision on Petitioner for his role in the attempted burglary of Myrtle Edwards' home was admitted into evidence as State Exhibit no. 100 and appears in S.F. Trial, Volume 27.

[25] A forty-nine year old, female, Laotian immigrant testified through an interpreter that (1) she was home alone eating in her kitchen on January 19, 2000 when she heard what sounded like an ax breaking down her door, (2) she ran into her bedroom and locked the door, (3) she listened and heard what sounded like someone inside her home opening doors and drawers, (4) she heard the intruder get a knife from a drawer, (5) the intruder attempted to get inside her bedroom by banging on the door and using the knife on the lock of her bedroom door, (6) she opened her bedroom

took multiple firearms, including a .22 caliber Luger pistol which he used to fatally shoot two people

the next two days[26]; (8) on February 3, 2000, Petitioner robbed and fatally shot an elderly woman

after breaking into her residence[27]; (9) on February 4, 2000, immediately before robbing

---

window, pushed the screen outward, slipped outside, and ran down the street, (7) she ran to a gas station on W.W. White Road and asked the attendant to call police, and (8) later she discovered a Play Station video game console was missing from her home. S.F. Trial, Volume 20, testimony of Ay Thanasouk, at pp. 172-89. Her nephew testified that (1) he left his aunt for about half an hour on the evening of January 19, 2000 to go pick up his cousin from work, (2) when he returned home around 9:15 there was no one home, (3) oddly, though, when he pulled into the driveway, he saw someone inside peek out a window, (4) both locks on the front door were locked, (5) when he went inside, he found no one, (6) his aunt's bedroom door had been kicked down, (7) his bedroom and his cousin's bedroom were both a mess, (8) a Play Station game console had been taken from the house which bore his cousin's name "Saylet Thanasouk" etched into the top of the device, (9) police brought the game console back from a pawn shop a few days later, and (10) his aunt returned about thirty minutes after he arrived back at their home. S.F. Trial, Volume 20, testimony of Souriya Thanasouk, at pp. 190-97; Volume 21, testimony of Souriya Thanasouk, at pp. 56-59. A pawn shop employees who knew Petitioner testified (1) Petitioner pawned a pair of Play Station game consoles at the pawn shop where she worked on January 20, 2000, (2) Petitioner came alone to pawn the items and explained one of the game consoles belonged to his girlfriend, (3) one of the game consoles bore a foreign name written in marker across the top of the game console, and (4) Petitioner signed a pawn ticket in her presence. S.F. Trial, Volume 20, testimony of Tracy Pearson, at pp. 20-30.

[26] A San Antonio Police patrol officer testified (1) he was dispatched to the scene of a residential burglary on the morning of February 3, 2000 and learned from the home owner that several firearms had been hidden throughout the house and were now missing, (2) the items taken included a .45 caliber Colt pistol, a .22 caliber Luger pistol, a .22 caliber Magnum pump rifle, and a .22 caliber long pump rifle, (3) the .22 caliber Luger pistol was made by Stoger Arms, (4) the point of entry into the residence was the back door, and (5) no fingerprints were found at the scene. S.F. Trial, Volume 20, testimony of Jeffrey Burks, at pp. 95-101. The home owner testified (1) he left for work between 9:30 PM and 11 PM on February 2, 2000, (2) when he returned home the next morning between eight and nine AM, he discovered his back door had been kicked or pried open and the door frame was splintered, (3) several of his firearms were stolen, including a .22 caliber Luger pistol similar to State Exhibit 19B, which had been fully loaded, and (4) the lock on his back door was busted, all drawers had been pulled out throughout his home, their contents scattered all about, and everything had been torn out of his closets. *Id.*, testimony of Larry Krpec, at pp. 101-16. A San Antonio Police Detective investigator testified he was unable to locate any fingerprints at the crime scene. *Id.*, testimony of David Ochs, at pp. 117-82. The homeowner identified his .22 caliber Luger pistol, which was among the items stolen from his home, as being similar in appearance to the weapon identified by the waitress at Pierce's Ice House as the weapon the robber used to shoot Ted Church on February 4, 2000. S.F. Trial, Volume 20, testimony of Larry Krpec, at p. 107 (identifying State Exhibit no. 19B as similar to his stolen .22 caliber Luger); Volume 15, testimony of Lena Diaz, at p. 72 (describing State Exhibit 19B as almost identical to the gun used by the robber). A firearms and tool mark expert testified (1) the .22 caliber shell casings found at both Pierce's Ice House after the robbery and shooting of Ted Church and at the home of Norma Petrach after the discovery of her body had been fired by the same weapon and (2) the shell casings and slugs found at both locations were from the same brand of copper coated hollow point ammunition. S.F. Trial, Volume 21, testimony of Jamie Becker, at pp. 62-63. Detective Gonzales testified the brand of spent ammunition found at both locations matched the type of ammunition which had been loaded in the .22 Luger when it was stolen from Larry Krpec's home. S.F. Trial, Volume 21, testimony of Danny Gonzales, at pp. 48-50.

[27] The next door neighbor of Norma Petrach testified (1) Norma was in her late eighties yet still lived alone in her home, (2) Norma was crippled with arthritis and could hardly walk, (3) she got Norma's newspaper and mail and took out Norma's trash, (4) on the morning of February 4, 2000, she noticed the gate between Norma's garage and house was open, which was unusual, (5) the screen door on Norma's back door was propped open with a plastic jug of blue

11

Pierce's Ice House and shooting Ted Church, Petitioner not only beat and robbed Ernest Leonard

Johnson but also sexually assaulted him[28]; and (10) during his pretrial detention at the Bexar County

---

liquid, (6) she left Norma's newspaper on the back stoop and went home, (7) when she called Norma, there was no answer, and (8) she then called the San Antonio Police Department. S.F. Trial, Volume 20, testimony of Jeanne Brown, at pp. 136-49. A San Antonio Police Officer testified (1) she was dispatched to Norma Petrach's residence on the morning of February 4, 2000, (2) the back screen door was propped open with a jug of blue/green liquid, (3) she pushed the back door open and announced her presence but heard no response, (4) when she entered the home, she saw the walls and floor were covered in blood, (5) she exited the home and directed the neighbor who had come with her to return to her own home, (6) she then re-entered the home, where she found Norma Petrach's bloody body lying on the kitchen floor with a trail of blood from the bedroom into the kitchen where Norma had apparently fallen, (7) she called for the homicide unit and exited the residence once more, (8) when she examined the rear door frame, it had been busted open from the outside inward, and (9) the bedroom and kitchen were a mess but the rest of the house was clean. *Id.*, testimony of Dee Smith, at pp. 149-65. The medical examiner who performed the autopsy on Norma Petrach testified without contradiction (1) Norma sustained a contusion to the left forehead, (2) the cause of her death was a gunshot wound to the right arm which severed the right brachial artery and led to massive external bleeding, (3) the fatal bullet entered her body from front to back about fourteen inches down from the top of her head, three inches below her arm pit, passed just inside the humerus in a slightly downward trajectory, and went through the right brachial artery, (4) she bled to death within fifteen to twenty minutes, (5) Norma was otherwise fairly healthy, (6) had she received prompt medical attention or first aid in the form of a tourniquet or if 911 had been called promptly, her life may have been saved, (7) had the bullet missed her artery, she would likely have survived, (8) it was unlikely given the position of her injuries that she was lying in bed when she was shot, and (9) it was more likely she was sitting up when she was shot. *Id.*, testimony of Dr. Robert Bux, at pp. 199-214.

A San Antonio Police Detective testified without contradiction that (1) Petitioner gave a written statement on February 15, 2000, in which he claimed someone named "Old School" had shot Norma Petrach while Petitioner remained outside her home, (2) Petitioner later gave a second statement in which he admitted that he alone had burglarized Petrach's home and had shot her, (3) Petitioner claimed the shooting was an accident and he had fired in the direction of a scream the instant he kicked in the back door, (4) no matches to Petitioner were found among the fingerprints recovered from the Petrach home, and (5) the only blood recovered from that crime scene belonged to the victim. S.F. Trial, Volume 21, testimony of Danny Gonzales, at pp. 36-55. Petitioner's second statement was admitted into evidence and read in open court. *Id.*, at pp. 45-48. For unknown reasons, the court reporter did not include the Petitioner's second statement among the trial exhibits found in S.F. Trial, at Volumes 23-27. In his second statement, Petitioner admitted that, after he shot Norma Petrach, he demanded she give him money and she did so. *Id.*, at pp. 46-47. A firearms and tool mark expert testified without contradiction that the .22 caliber shell casing found in Norma Petrach's bedroom had been fired by the same weapon which fired the .22 caliber shell casings recovered from the Pierce Ice House after the shooting of Ted Church. S.F. Trial, Volume 21, testimony of Jamie Becker, at pp. 60-65.

[28] Ernest Leonard Johnson returned to the stand during the punishment phase of Petitioner's capital murder trial and testified without contradiction that, after Petitioner beat and robbed him, Petitioner forced Johnson at gunpoint to remove his pants, bend over, and submit to Petitioner shoving a plastic broom handle into Johnson's anus and forcing Johnson thereafter to place the soiled broom handle in his mouth. S.F. Trial, Volume 20, testimony of Ernest Leonard Johnson, at pp. 122-35. On cross-examination, Johnson admitted he had not gone to the hospital after the police arrived at the scene following Church's shooting. *Id.*, at p. 126.

Adult Detention Center, Petitioner assaulted a fellow inmate with a chair while the other inmate was playing dominoes and, in a separate incident on June 1, 2000, struck a guard in the chest.[29]

The defense called five witnesses at the punishment phase of trial: (1) Petitioner's former employer at a seafood restaurant, who testified Petitioner (a) worked for him for three years, was "an excellent employee" with a "great work history," (b) worked great with other employees, © worked his way up to become the youngest employee ever promoted to supervisor because of his skills, (d) was let go because he began missing work and became a little disobedient, but (e) was rehired shortly thereafter because of his excellent work record[30]; (2) the wife of Petitioner's deceased minister, who testified (a) Petitioner and his family attended her late husband's church, (b) Petitioner was always very respectful and obedient to her and got along well with other children, © Petitioner served as a junior usher greeting people and pointing them to seats, and (d) Petitioner's family and their church had shown Petitioner the way to salvation[31]; (3) Petitioner's cell mate at the BCADC

---

[29] A Bexar County Deputy Sheriff testified (1) on June 1, 2000, while Petitioner was housed in administrative segregation, Petitioner requested in a whisper that the guard pass an envelope from Petitioner to another inmate in a nearby cell, a clear violation of BCADC rules, (2) he refused to do so, opened Petitioner's cell door, and demanded to know what Petitioner's problem was, (3) Petitioner took a swing at him but missed with his first swing, which also violated BCADC rules, (4) Petitioner swung a second time struck him in the chest, causing a bruise, (5) he pulled a distress pin on his uniform, thereby summoning a Special Emergency Response Team which subdued and secured Petitioner, and (6) Petitioner was taken to the nurse's station for evaluation by BCADC medical staff. S.F. Trial, Volume 20, testimony of Frank Rodriguez, at pp. 37-64. A SERT member testified he operated the video camera which recorded the efforts of the SERT team on June 1, 2000 to subdue and secure Petitioner and transport Petitioner to the infirmary. *Id.*, testimony of Steve Lisherness, at pp. 65-75. The video recording was played in open court and included Petitioner's vocal assertions that the guard had swung at him first and he had been kicked in the head and leg but also Petitioner's admission he had asked the guard to pass an envelope to another inmate. *Id.*, at pp. 70-75. Another BCADC inmate testified that (1) when he questioned Petitioner about missing commissary items, Petitioner became upset, (2) the next day, while he was playing dominoes with other inmates, Petitioner approached him from behind, grabbed a chair, and struck him over the head with the chair, (3) as a result of the assault, he sustained (a) a wound over his eye which required four stitches and left him with a scar over his eye and (b) a wound to his sideburn area which required two stitches, and (4) he got up after Petitioner knocked him down with the chair and Petitioner swung at him again. S.F. Trial, Volume 20, testimony of Glen Wilson, at pp. 75-94.

[30] S.F. Trial, Volume 22, testimony of Moral Hill, at pp. 6-13.

[31] *Id.*, testimony of Henrietta Griffin, at pp. 13-22.

on June 1, 2000, who testified (a) he had been Petitioner's cell mate for three weeks before that date and had never seen Petitioner have a problem with the guard in question, (b) when the guard refused Petitioner's request to pass an envelope to another inmate, Petitioner said "bitch" and threw the envelope up in the air, © the guard opened their cell door and asked Petitioner "do you have a problem?", (d) Petitioner stepped back from the open doorway and put his hands behind his back, (e) the guard struck Petitioner in the stomach and Petitioner went down, (f) the guard continued to strike Petitioner and dragged Petitioner out of their cell, (g) the guard then kicked and hit Petitioner, (h) Petitioner did not fight back, (I) a second guard arrived and struck Petitioner, (j) yet another officer ran upstairs and struck and kicked Petitioner for three or four minutes, and (k) he never saw Petitioner threaten the guard or strike the guard[32]; (4) Petitioner's older sister, who testified (a) Petitioner lived with her for a period in 1999 and then returned to reside with her in January, 2000, (b) Petitioner found a job at West Telemarketing right away after he was released from jail and worked there for almost a month before his arrest, (c) she was unaware Petitioner had any problems with his probation, (d) beyond the fact Petitioner was taller and larger than other students, she remembered nothing particularly remarkable about Petitioner's years in elementary school, (e) Petitioner was not disruptive in their home although she had to be very honest and straight-forward with Petitioner, (f) Petitioner demonstrated responsibility by serving as an usher at their church, where Petitioner always complied with church rules, and (g) Petitioner had some disciplinary problems in school and generally does better when he is closely monitored[33]; and (5) a former high

---

[32] S.F. Trial, Volume 22, testimony of John Roberts, at pp. 23-24.  On cross-examination, inmate Roberts denied that a signed statement concerning the same incident was his.  *Id.*, at pp. 34-35.

[33] S.F. Trial, Volume 22, testimony of Stephanie Huff, at pp. 38-55.  On cross-examination, she admitted (1) Petitioner successfully concealed his drug use and possession of weapons from her while they shared an apartment and (2) their parents gave Petitioner a home where he had an opportunity to grow up and be a responsible citizen like her.

school teacher of Petitioner, who testified (a) she taught Petitioner English his sophomore year, (b) in her classroom, Petitioner sat in his chair and was a "yes, ma'am, no ma'am student" - a "teacher pleaser" who fed on praise, (c) reading was a struggle for Petitioner and writing was a challenge for him as well, (d) Petitioner did not tend to get frustrated but would continue working despite his difficulties, (e) Petitioner always put forth his best effort, and (f) she did not place Petitioner in with other students who could not master the work.[34]

On May 4, 2001, after deliberating less than an hour, the jury returned its verdict at the punishment phase of Petitioner's capital murder trial, finding (1) unanimously and beyond a reasonable doubt there was a probability the Petitioner would commit criminal acts of violence which would constitute a continuing threat to society and (2) unanimously, taking into consideration all of the evidence, including the circumstances of the offense and the Petitioner's character, background, and personal moral culpability, there were insufficient mitigating circumstance(s) to warrant that a sentence of life imprisonment rather than a death sentence be imposed.[35]

---

*Id.*, at pp. 55-56.

[34] S.F. Trial, Volume 22, testimony of Jeannine Foster, at pp. 58-66.  On cross-examination she testified Petitioner was always neat and properly attired for school, his family was loving and caring, she felt certain Petitioner had passed her sophomore English class, and while it took Petitioner longer than other students, Petitioner was fully capable of reading and writing English.  *Id.*, at pp. 66-70.

[35] Trial Transcript, at pp. 203-05; S.F. Trial, Volume 22, at pp. 102-03.  The court reporter's records indicate the jury recessed to begin its punishment phase deliberations at approximately 1:34 PM on May 4, 2001.  S.F. Trial, Volume 22, at p. 102.  A jury note with a time-stamp of 2:32 PM on May 4, 2001 reveals the jury informed the trial court it had reached answers to the two special issues.  Trial Transcript, at pp. 192-93.

E.  Direct Appeal

Petitioner appealed his conviction and sentence.[36]  In an unpublished opinion issued October 22, 2003, the Texas Court of Criminal Appeals affirmed Petitioner's conviction and sentence, rejecting all of Petitioner's points of error on the merits.  *Weathers v. State*, 74,144, 2003 WL 22410067 (Tex. Crim. App. Oct. 22, 2003).  Petitioner did not thereafter seek review by the United States Supreme Court.

F.  First State Habeas Corpus Proceeding

Petitioner filed his first state habeas corpus application on April 17, 2003, asserting twenty-one claims for relief, including claims of ineffective assistance by his trial counsel and multiple challenges to the facial constitutionality of the Texas capital sentencing statute.[37]  The state trial court

---

[36] Attorney Vincent D. Callahan filed Petitioner's appellant's brief on June 21, 2002, raising six points of error, consisting of arguments that (1) the trial court erred in denying the defense's motion to suppress Petitioner's custodial statements, taken in violation of Article 38.22 of the Texas Code of Criminal Procedure, (2) Petitioner's trial counsel rendered ineffective assistance by failing to request a jury instruction at the guilt-innocence phase of trial limiting the jury's consideration of evidence of certain extraneous bad acts and requiring the jury to determine beyond a reasonable doubt Petitioner had committed those acts before the jury could consider such evidence, (3) the trial court erred in denying Petitioner's motion to suppress his custodial statements taken after Petitioenr invoked his right to counsel, (4) the Texas death penalty violates the Eighth Amendment's prohibition against cruel and unusual punishment, and (5) the trial court erred in failing to grant the defense's request at the guilt-innocence phase of trial for an instruction on the lesser-included offense of felony murder.  *Appellant's Brief*, at pp. 10-28.

[37] Attorney Richard Langlois filed Petitioner's first state habeas corpus application, arguing as grounds for relief that (1) Petitioner was entitled to DNA testing of certain materials, (2) the trial court erred in failing to provide the jury with adequate definitions of key terms included in the capital sentencing special issues, (3) the lack of definitions of those key terms rendered Petitioner's punishment phase jury charge unconstitutional under the Eighth and Fourteenth Amendments, (4) Articles 44.251(a) and 37.071, §2(e) of the Texas Code of Criminal Procedure are facially unconstitutional, (5) proportionality review of a Texas capital sentence is required by the Due Process Clause and the Supreme court's holding in *Honda Motor Co. v. Oberg*, (6) the Texas statutory definition of "mitigating evidence" is unconstitutionally narrow because it limits that term to evidence reducing a defendant's moral blameworthiness, (7) the Texas mitigation or *Penry* special issue is facially unconstitutional because it is open-ended in nature and fails to limits the jury's discretion, (8) Article 37.071 of the Texas Code of Criminal Procedure is unconstitutional in that it fails to assign a burden of proof on the prosecution to disprove the existence of mitigating evidence warranting a life sentence, (9) the Texas death penalty is cruel and unusual under the Texas Constitution, (10) the Texas death penalty is cruel and unusual under the Eighth Amendment, (11) Article 37.071 of the Texas Code of Criminal Procedure's twelve/ten rule violates the Constitution because it fails to inform the jury of the effect of a single holdout juror, (12) Petitioner's trial counsel rendered ineffective assistance by (a) failing to conduct a meaningful investigation for unspecified mitigating evidence (in violation of the Texas Constitution), (13) Petitioner's trial counsel rendered ineffective assistance by failing to conduct a meaningful investigation for unspecified mitigating evidence (in violation of the United States Constitution),

held an evidentiary hearing in Petitioner's first state habeas corpus proceeding on May 31, 2001 during which the state trial court heard testimony from Petitioner's lead trial counsel, Michael Granados.[38]   The state habeas trial court also received into evidence the academic records from Petitioner's school years which had been attached to Petitioner's first state habeas corpus

---

(14) Petitioner's custodial statements were involuntary under the United States Constitution, (15) Petitioner's custodial statements were involuntary under the Texas Constitution, (16) Petitioner's custodial statements were taken in violation of Article 38.22 of the Texas Code of Criminal Procedure, (17) Article 37.071 of the Texas Code of Criminal Procedure violates the rule announced in *Apprendi v. New Jersey*, (18-20) the trial court's refusal to give a jury instruction regarding the lesser-included offense of felony murder violates the United States Constitution, the Texas Constitution, and Articles 1.05, 1.141, 36.46, and 36.15 of the Texas Code of Criminal Procedure, and (21) Petitioner's trial counsel rendered ineffective assistance by failing to seek a limiting jury instruction and a definition of reasonable doubt relating to evidence of extraneous bad acts allegedly committed by Petitioner and failing to object to the admission of the testimony of Ernest Leonard Johnson.

[38] The Statement of Facts from the evidentiary hearing held during Petitioner's first state habeas corpus proceeding appears at pages 194-237 of the transcript of pleadings, motions, and other documents filed in Petitioner's first state habeas corpus proceeding (henceforth "First State Habeas Transcript").  Attorney Granados testified without contradiction during the Petitioner's first state habeas hearing, that (1) the defense's theory of the case was that Petitioner was an inept criminal who had shot Ted Church accidentally during a botched robbery attempt and that the fatal shooting of Norma Petrach had been a reflexive reaction, (2) he met with Petitioner's mother and sister and had an investigator who assisted in investigating the case and Petitioner's background, (3) the defense called an employer and teacher of Petitioner, (4) Dr. Sparks evaluated Petitioner prior to trial and found adjustment disorder and depression, (5) based upon his conversations with Petitioner, he believed Petitioner had rapidly become addicted to crack cocaine and spiraled out of control shortly before the two fatal shootings, (6) Petitioner had never been diagnosed with any psychiatric problems, including mental retardation or any learning disabilities, (7) he obtained Petitioner's school records and learned Petitioner had good years and bad years but, when Petitioner applied himself, Petitioner did well in school, (8) Petitioner's problems in school were more behavioral in nature than about an inability to learn, (9) Petitioner wrote to him from jail and communicated very well, (10) he saw nothing in his dealings with Petitioner or Petitioner's background which suggested to him that Petitioner was intellectually disabled or that further inquiry into Petitioner's intellectual capabilities was warranted, (11) he did not believe that a defense premised upon Petitioner's addiction to crack cocaine would be favorably received by a Bexar County jury, (12) the defense team discovered evidence showing Petitioner could be focused, productive, and hard working when he applied himself, and presented that evidence at trial, (13) he found nothing in Dr. Sparks' report of Petitioner's school records suggesting Petitioner suffered from a personality disorder, (14) Petitioner cooperated with the defense team's investigation, (15) he worked for two years as a teacher's aide with learning disabled children prior to becoming an attorney and was familiar with learning disabilities, (16) Petitioner's employer said Petitioner was an outstanding employee, (17) petitioner's former teacher Dr. Foster said Petitioner was a normal student, and (18) he saw nothing which suggested to him that Petitioner suffered from behavioral problems but, rather, felt Petitioner's addiction to crack cocaine had been the cause of Petitioner's downfall.  Statement of Facts from the evidentiary hearing held in Petitioner's first state habeas corpus proceeding (henceforth "S.F. First State Habeas Hearing"), testimony of Michael Granados, at pp. 6-41.  Petitioner's first state habeas counsel did not call either the attorney who served as Petitioner's co-counsel at trial (Russell Mitchell) or the defense team's investigator (Gilbert Carrosco) to testify during the evidentiary hearing.

application.[39]   In an Order issued March 1, 2006, the state trial court (1) concluded Petitioner's challenges to the constitutionality of the Texas capital sentencing scheme were procedurally defaulted because of Petitioner's failure to raise those claims on direct appeal and, additionally, without merit, (2) concluded Petitioner's trial counsel did investigate Petitioner's background, family, and social history and presented substantial mitigating evidence at trial, (3) found Petitioner failed to present any evidence showing there was any additional or "new" mitigating evidence available at the time of Petitioner's trial which could have been discovered by Petitioner's defense team through additional investigation, and (4) concluded Petitioner failed to demonstrate that his trial counsel's failure to investigate whether Petitioner suffers from ADD was objectively unreasonable

---

[39] S.F. First State Habeas hearing, at p. 41 (admitted as Defendant's Exhibit no. 1).  The Petitioner's school records appear at pages 239-64 of First State Habeas Transcript.  Among the more significant information contained in those records are the fact (1) Petitioner earned grades of A in both Government and Economics in Summer School in 1997 (*Id.*. at p. 240); (2) as an eighth grader at Poe Middle School, Petitioner's first semester grades included scores of 70 in Reading Improvement and 75 in U.S. History and Citizenship and grades ranging from 91 to 58 in his other classes (*Id.*, at p. 241); (3) Petitioner earned grades of A in Physical Science during both Summer School sessions in 1998 (*Id.*, at p. 242); (4) Petitioner earned grades ranging from 90 in PE to 50 in Math during the first six weeks of the 1995-96 school year at Poe Middle School with four grades in the seventies (*Id.*, at p. 246); (5) the second six weeks of the 1995-96 school year at the same school, Petitioner earned grades ranging from 92 in PE to 60 in U.S. History with four grades in the seventies (*Id.*, at p. 246); (6) while attending the Navarro Achievement Center as an eighth grader, Petitioner earned grades of 92 in Reading, 92 in English Language Arts, 74 in Math, 80 in U.S. History and Citizenship, and 88 in Computer Literacy (*Id.*, at pp. 248-49); (7) on a Texas Assessment of Academic Skills test administered in March, 1998, while Petitioner was attending Sam Houston High School, Petitioner failed to meet minimal expectations in Writing and Mathematics but obtained perfect scores on three of the six areas in the Reading category and earned scores of 7/8, 11/16, and 5/8 in the remaining three Reading areas to pass that portion of the test (*Id.*, at p. 253); (8) during the 1996-97 school year, while a ninth grader at Sam Houston High School, Petitioner earned semester grades of 75 and 72 in English 1, 70 and 73 in English 2 R, 82 and 70 in Algebra, 76 and 74 in Physical Science, 90 and 50 in World Geography, 100 and 80 in PE, 82 and 72 in MG, and 65 and 79 in CSG (*Id.*, at pp. 256, 259); (9) during the 1997-98 school year, his sophomore year in high school, Petitioner earned semester grades of 70 and 70 in English 3, 71 and 61 in ALGI-4, 66 in Physical Science, 90 and 80 in PE, 70 in Keyboarding, and 79 and 18 in BCIS 1 (*Id.*, at p. 259); and (10) during the 1998-99 school year, his junior year at Sam Houston High School, Petitioner earned semester grades of 72 and 60 in Geometry, 70 in Theater Production I, 74 in Health, 50 in U.S. History, 51 and 11 in English 4, 64 in Food Production Management Lab, and 100 in Teen Leadership (*Id.*, at pp. 257, 259).  Thus, Petitioner's academic records admitted into evidence during his first state habeas corpus proceeding showed Petitioner progressed well into his junior year in high school with less than stellar but mostly passing grades which he supplemented through Summer school course work.

or "prejudiced" Petitioner within the meaning of the *Strickland* analysis.[40]  The Texas Court of Criminal Appeals adopted the trial court's findings and denied state habeas corpus relief in an unpublished Order.  *Ex parte Obie D. Weathers III*, WR-64,302-01, 2006 WL 2615531 (Tex. Crim. App. Sept. 13, 2006).

## G.  Initial Proceedings in this Court

Petitioner filed his initial federal habeas corpus petition in this Court on September 13, 2007 (ECF nos. 18 & 19).  On September 20, 2007, Petitioner filed a motion to stay and hold his cause in abeyance to permit Petitioner to return to state court and exhaust available remedies on a claim that he was immunized from execution under the Supreme Court's holding in *Atkins v. Virginia*, 536 U.S. 304 (2002), which held the Eighth Amendment precludes the execution of mentally retarded capital murderers (ECF no. 20).  In an Order issued October 10, 2007 (ECF no. 22), this Court granted Petitioner's motion and stayed this cause.

## H.  Second State Habeas Corpus Proceeding

On April 30, 2014, Petitioner filed his second application for state habeas corpus relief in which he asserted his *Atkins* claim.[41]  The state trial court held an evidentiary hearing on Petitioner's

---

[40] First State Habeas Transcript, at pp. 293-312.  Judge Juanita Vasquez-Gardner, the same state judge who presided over Petitioner's trial, signed the findings of fact and conclusions of law in Petitioner's first state habeas corpus proceeding.

[41] Transcript of pleadings, motions, and other documents filed in Petitioner's second state habeas corpus proceeding, i.e., WR-64,302-02 (Henceforth "Second State Habeas Transcript"), at pp. 1-44.  As grounds for relief, Petitioner argued (1) his death sentence violates the rule announced in *Atkins*, (2) his first state habeas counsel rendered ineffective assistance by failing to raise an *Atkins* claim during Petitioner's first state habeas corpus proceeding, and (3) Equal Protection principles require that Petitioner be heard on the merits of his *Atkins* claim.  *Id.*

Accompanying Petitioner's second state habeas corpus application were a voluminous set of exhibits, including (1) a September 5, 2007 report by a Dr. Reed suggesting that Petitioner be tested for intellectual disability and academic deficiencies (Second State Habeas Transcript, at pp. 134-37); (2) a pair of affidavits from Dr. Jeannine C. Foster dated September 10, 2007 and June 9, 2009 stating Petitioner made good effort in her classes but needed additional direction and assistance to complete assignments, was a poor reader, had a limited vocabulary, had difficulties with grammar, punctuation, and sentence and paragraph structure, was socially isolated from other students, but always dressed nicely in non-gang-associated clothing (Second State Habeas Transcript, at pp. 142-46); (3) an affidavit from Petitioner's

*Atkins* claim on May 13-16, 2013 and August 5-6, 2013, during which the state trial court heard testimony from (1) Dr. Joann Murphey, a psychologist who tested Petitioner twice using standardized IQ test instruments, (2) Petitioner's sixth grade reading teacher, (3) Petitioner's home economics teacher at Sam Houston High School, (4) a vocational rehabilitation consultant, (5) Petitioner's mother, (6) Dr. John Sparks, a retired psychiatrist who examined Petitioner for competency to stand trial in 2000 or 2001, and (7) Petitioner's former employer at a seafood restaurant.[42]   The state habeas court also admitted into evidence a number of affidavits attached to the Petitioner's pleadings as well as more than twenty hours of recorded telephone conversations between Petitioner and his family and acquaintances made during Petitioner's detention at the Bexar

_____

former employer recanting his trial testimony about Petitioner's capabilities as an employee (Second State Habeas transcript, at pp. 148-49); (4) a pair of affidavits from Petitioner's mother dated September 4, 2007 and November 28, 2008 stating Petitioner constantly needed assistance academically, could not dress himself while attending elementary school, was placed in Special Education in elementary school, could only follow simple instructions, had difficulty telling time, could not manage his bank account, was devastated by the death of his grandmother in 1997, and dropped out of school in the twelfth grade (Second State Habeas Transcript, at pp. 151-58); (5) an unverified report dated May 17, 2007 from mitigation specialist Ann M. Matthews stating Petitioner reached crawling, walking, and talking milestones at a normal age, was an active toddler, was in Special Education classes from grades three through five, was deeply affected by the deaths of his maternal grandmother and a neighborhood friend, may have had ADHD, may have mild mental retardation, and may suffer from a major depressive disorder or bi-polar disorder (Second State Habeas Transcript, at pp. 160-69); (6) a pair of affidavits from  attorneys addressing the proper scope of an investigation for mitigating evidence in a capital case (Second State Habeas Transcript, at pp. 176-98); (7) a verified report from a clinical psychologist Dr. John H. Smith purportedly diagnosing Petitioner with "major depressive disorder with psychotic features" despite the fact the psychologist never examined Petitioner and relied upon unspecified information furnished by Petitioner's federal habeas counsel (Second State Habeas Transcript, at pp.  200-11); and (8) Petitioner's TDCJ disciplinary records showing Petitioner was cited on numerous occasions for exposure, public masturbation, refusing to obey an order, starting fires, and threatening an officer (Second State Habeas Transcript, at pp. 274-305).

      In an unpublished Order issued April 18, 2012, the Texas Court of Criminal Appeals remanded Petitioner's subsequent state habeas corpus application to the trial court for consideration of the allegations contained therein.  *Ex parte Obie D. Weathers III*, WR-64,302-02, 2012 WL 1378105  (Tex. Crim. App. Apr. 18, 2012).

      [42] The verbatim transcription by the court reporter or statement of facts from Petitioner's second state habeas corpus proceeding fills eight volumes, i.e., Volumes 3 of 12 through 11 of 12, and are referenced henceforth as "S.F. Second State Habeas Hearing."  State District Judge Ray J. Olivarri presided over Petitioner's second state habeas corpus proceeding.  The testimony of the witnesses during the lengthy evidentiary hearing held during Petitioner's second state habeas corpus proceeding will be discussed in detail below in connection with Petitioner's *Atkins* claim.

County Adult Detention Center between November 8, 2012 and May 12, 2013.[43]  In an Order issued September 19, 2013, the state trial court (1) found Petitioner's recorded telephone conversations established Petitioner's vocabulary and use of language showed no signs of sub-average intelligence, (2) found Petitioner's notes written to jail medical providers were well crafted, (3) found credible Dr. Sparks' responses to various hypothetical questions inquiring as to the capabilities of persons with mental retardation, (4) found credible Dr. Sparks' testimony that a person with untreated ADHD might appear to be mentally retarded, (5) found credible Dr. Sparks' testimony that, when he interviewed Petitioner, he found Petitioner was able to function and communicate within the average range, (6) found Petitioner's mental health expert failed to interview a broad range of people who knew Petitioner well in his youth to determine whether Petitioner suffered from adaptive deficits, (7) found Petitioner appears to be of at least average intelligence and may suffer from antisocial personality disorder, and (8) concluded under a preponderance of the evidence standard that Petitioner had failed to carry his burden of establishing he is mentally retarded.[44]  The Texas Court of Criminal Appeals adopted all but one of the trial court's findings and conclusions and denied Petitioner's second state habeas corpus application in an unpublished Order.  *Ex parte Obie D. Weathers III*, WR-64,302-02, 2014 WL 1758977 (Tex. Crim. App. Apr. 30, 2014).[45]

---

[43] The twenty-plus hours of telephone conversations are recorded on a CR-ROM included in the state court records from Petitioner's most recent state habeas corpus proceeding and marked as "State Exhibit 6."  This Court has exhaustively reviewed the entire set of more than ninety individual conversations recorded on that computer diskette. The contents of those conversations will be discussed in detail below in connection with Petitioner's *Atkins* claim.

[44] The state habeas trial court's factual findings and conclusions of law are found at pages 536-68 of the transcript of pleadings, motions, and other documents filed in Petitioner's second state habeas corpus proceeding (henceforth "Second State Habeas Transcript").

[45] In a concurring opinion, two judges of the Texas Court of Criminal Appeals concluded that Petitioner had satisfied the burden of showing he is intellectually disabled under a preponderance of the evidence test but concluded Petitioner was not entitled to state habeas relief because he had failed to show same by clear and convincing evidence, i.e., the legal standard those judges felt applicable in a successive or subsequent state habeas proceeding.  *See Ex parte*

I. Return to this Court

On November 7, 2014, Petitioner filed his amended federal habeas corpus petition arguing (1) the Supreme Court's holding in *Atkins* precludes his execution, (2) his trial counsel rendered ineffective assistance by failing to conduct a meaningful investigation into Petitioner's background for mitigating evidence, (3) the state trial court failed to adequately define key terms employed in the Texas capital sentencing scheme's special issues, (4) Articles 44.251(a) and 37.371, §2(e) collectively violate the Eighth Amendment because they do not permit meaningful appellate review of the jury's answer to the mitigation special issue because the mitigation or so-called *Penry* special issue is open-ended in nature, (5) the Texas statutory definition of "mitigating evidence" is unconstitutionally narrow, (6) the open-ended nature of the *Penry* special issue results in Texas capital sentencing juries unconstitutionally exercising unfettered discretion whether to impose the death penalty, (7) the Texas capital sentencing scheme improperly fails to place the burden of proof on the prosecution in connection with the *Penry* special issue to disprove the existence of sufficient

---

*Obie D. Weathers III*, 2014 WL 1758977, *1-*6 (concurring statement of Price, J., and Johnson, J.).  Two other judges issued a separate concurring opinion in which they also applied a clear and convincing evidence standard in concluding Petitioner had failed to demonstrate he is intellectually disabled, focusing particularly on the lack of evidence showing Petitioner suffers from deficits in adaptive behavior attributable to intellectual disability:

> In sum, the evidence of applicant's living and communicative skills supports the court's findings of "little" evidence of mental retardation in favor of applicant's possessing "at least average intelligence" and showing "signs of Antisocial Personality Disorder." This support was adequate for the court to disbelieve Dr. Murphey's assessment, based on applicant's ABAS–II scores, that he was deficient in social, academic, and communication adaptive functions. In particular, applicant's letters and recorded calls directly portrayed an individual capable of learning and communicating about abstract concepts, including the various aspects and meanings of Picasso's *Guernica* or whether the collection at The Guggenheim Museum contained any signed works by Jackson Pollock, a detailed plan for receipt of a package in prison to be sent by a third party, and calculating his available funds to plan for an anticipated purchase of a high-cost television for his jail cell. I also agree with Dr. Murphey that the facts of applicant's crimes, which included the sexual assault of an elderly man with a broomstick handle during a robbery of the man's house after which applicant forced him to taste the object, could support the coexistence or alternative existence of an antisocial personality disorder, which would explain his adaptive deficits on a basis other than mental retardation.

*Ex parte Weather*s, 2014 WL 1758977, *9 (concurring statement of Alcala, J., and Cochran, J.).

mitigating evidence to warrant a life sentence, (8) the Texas twelve-ten rule improperly fails to inform the jury of the effect of a single holdout juror at the punishment phase of trial, and (9) the Texas capital sentencing special issues violate the Supreme Court's holding in *Apprendi v. New Jersey* and *Ring v. Arizona* (ECF no. 57).

On March 10, 2015, Respondent filed his answer, arguing therein that (1) Petitioner had failed to establish during his second state habeas corpus proceeding that he is "intellectually disabled" within the meaning of that term as used in the DSM-V, (2) Petitioner procedurally defaulted on several aspects of his new and unexhausted ineffective assistance claims, (3) Petitioner's trial counsel cannot reasonably be faulted for failing in 2001 to anticipate the Supreme Court's 2003 holding in *Atkins*, (4) Petitioner procedurally defaulted on all of his challenges to the Texas capital sentencing scheme by failing to present those same claims on direct appeal, (5) all of Petitioner's constitutional challenges to the Texas capital sentencing scheme have been rejected by the Fifth Circuit - many repeatedly so, and (6) several of Petitioner's challenges to the Texas capital sentencing scheme seek the adoption of new rules of constitutional criminal procedure, all of which are foreclosed in this federal habeas corpus action by the Supreme Court's holding in *Teague v. Lane* (ECF no. 63).

On April 23, 2015, Petitioner filed his reply to Respondent's answer and argued, among other things, that (1) Dr. Sparks was unqualified to render an opinion regarding whether Petitioner was intellectually disabled because he had not conducted standardized testing on Petitioner nor evaluated Petitioner for deficits in Petitioner's adaptive functioning and (2) Petitioner's first state habeas counsel rendered ineffective assistance by failing to present an *Atkins* claim during Petitioner's initial state habeas corpus proceeding (ECF no. 65).

## II. <u>AEDPA Standard of Review</u>

Because Petitioner filed his federal habeas corpus action after the effective date of the AEDPA, this Court's review of Petitioner's claims for federal habeas corpus relief is governed by the AEDPA. *Penry v. Johnson*, 532 U.S. 782, 792 (2001). Under the AEDPA standard of review, this Court cannot grant Petitioner federal habeas corpus relief in connection with any claim that was adjudicated on the merits in state court proceedings, unless the adjudication of that claim either: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Brown v. Payton*, 544 U.S. 133, 141 (2005); *Williams v. Taylor*, 529 U.S. 362, 404-05 (2000); 28 U.S.C. § 2254(d).

The Supreme Court has concluded the "contrary to" and "unreasonable application" clauses of 28 U.S.C. Section 2254(d) (1) have independent meanings. *Bell v. Cone*, 535 U.S. 685, 694 (2002). Under the "contrary to" clause, a federal habeas court may grant relief if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or (2) the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Brown v. Payton*, 544 U.S. at 141; *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) ("A state court's decision is 'contrary to' our clearly established law if it 'applies a rule that contradicts the governing law set forth in our cases' or it 'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.'"). A state court's failure to cite governing Supreme Court authority does not, *per se*, establish the state court's decision is "contrary to" clearly established federal law: "the state court

need not even be aware of our precedents, 'so long as neither the reasoning nor the result of the state-court decisions contradicts them.'" *Mitchell v. Esparza*, 540 U.S. at 16.

Under the "unreasonable application" clause, a federal habeas court may grant relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case. *Brown v. Payton*, 544 U.S. at 141; *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). A federal court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *McDaniel v. Brown*, 558 U.S. 120, 132-33 (2010) ("A federal habeas court can only set aside a state-court decision as 'an unreasonable application of...clearly established Federal law,' § 2254(d) (1), if the state court's application of that law is 'objectively unreasonable.'"); *Wiggins v. Smith*, 539 U.S. at 520-21. The focus of this inquiry is on whether the state court's application of clearly established federal law was objectively unreasonable; an "unreasonable" application is different from a merely "incorrect" one. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under the AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable - a substantially higher threshold."); *Wiggins v. Smith*, 539 U.S. at 520; *Price v. Vincent*, 538 U.S. 634, 641 (2003) ("it is the habeas applicant's burden to show that the state court applied that case to the facts of his case in an objectively unreasonable manner").

As the Supreme Court has explained:

Under the Antiterrorism and Effective Death Penalty Act, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."

*Bobby v. Dixon*, ___ U.S. ___, ___, 132 S. Ct. 26, 27, 181 L. Ed. 2d 328 (2011) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).

Legal principles are "clearly established" for purposes of AEDPA review when the holdings, as opposed to the dicta, of Supreme Court decisions as of the time of the relevant state-court decision establish those principles. *Yarborough v. Alvarado*, 541 U.S. 652, 660-61 (2004) ("We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'"); *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). Under the AEDPA, what constitutes "clearly established federal law" is determined through review of the decisions of the United States Supreme Court, not the precedent of the federal Circuit Courts. *See Lopez v. Smith*, ___ U.S. ___, ___, 135 S. Ct. 1, 2, 190 L. Ed. 2d 1 (2014) (holding the AEDPA prohibits the federal courts of appeals from relying on their own precedent to conclude a particular constitutional principle is "clearly established").

The AEDPA also significantly restricts the scope of federal habeas review of state court fact findings. 28 U.S.C. §2254(d)(2) provides federal habeas relief may not be granted on any claim that was adjudicated on the merits in the state courts unless the state court's adjudication of the claim resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Wood v. Allen*, 558 U.S. 290, 301 (2010) ("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."); *Williams v. Taylor*, 529 U.S. at 410 ("[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law."). Even if reasonable minds reviewing the record might disagree about the factual finding in question (or the implicit credibility determination underlying the factual finding), on habeas review, this does

not suffice to supersede the trial court's factual determination. *Wood v. Allen*, 558 U.S. at 301; *Rice v. Collins*, 546 U.S. 333, 341-42 (2006).

In addition, Section 2254(e)(1) provides a petitioner challenging state court factual findings must establish by clear and convincing evidence that the state court's findings were erroneous. *Schriro v. Landrigan*, 550 U.S. at 473-74 ("AEDPA also requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'"); *Rice v. Collins*, 546 U.S. 333, 338-39 (2006) ("State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'"); *Miller-El v. Dretke,* 545 U.S. 231, 240 (2005) ("[W]e presume the Texas court's factual findings to be sound unless Miller-El rebuts the 'presumption of correctness by clear and convincing evidence.'"); 28 U.S.C. §2254(e)(1). It remains unclear at this juncture whether Section 2254(e)(1) applies in every case presenting a challenge to a state court's factual findings under Section 2254(d)(2). *See Wood v. Allen*, 558 U.S. at 300 (choosing not to resolve the issue of Section 2254(e)(1)'s possible application to all challenges to a state court's factual findings); *Rice v. Collins*, 546 U.S. at 339 (likewise refusing to resolve the Circuit split regarding the application of Section 2254(e)(1)).

However, the deference to which state-court factual findings are entitled under the AEDPA does not imply an abandonment or abdication of federal judicial review. *See Miller-El v. Dretke*, 545 U.S. at 240 (the standard is "demanding but not insatiable"); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief.").

Finally, in this Circuit, a federal habeas court reviewing a state court's rejection on the merits of a claim for relief pursuant to the AEDPA must focus exclusively on the propriety of the ultimate decision reached by the state court and not evaluate the quality, or lack thereof, of the state court's written opinion supporting its decision.  *See Maldonado v. Thaler*, 625 F.3d 229, 239 (5th Cir. 2010) (federal habeas review of a state court's adjudication involves review only of a state court's decision, not the written opinion explaining the decision), *cert. denied*, 132 S. Ct. 124 (2011); *Pondexter v. Dretke*, 346 F.3d 142, 148 (5th Cir. 2003) (holding the precise question before a federal habeas court in reviewing a state court's rejection on the merits of an ineffective assistance claim is whether the state court's ultimate conclusion was objectively reasonable), *cert. denied*, 541 U.S. 1045 (2004); *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (*en banc*) (holding a federal court is authorized by §2254(d) to review only a state court's decision and not the written opinion explaining that decision), *cert. denied*, 537 U.S. 1104 (2003).

### III. *Atkins* Claim

A.  The Claim

In his first claim in his amended federal habeas corpus petition, Petitioner argues his execution is precluded under the Supreme Court's holdings in *Hall v. Florida*, ___ U.S. ___, 134 S. Ct. 1986, 188 L. Ed 2d 1007 (2014), and *Atkins v. Virginia* because Petitioner is intellectually disabled.[46]

---

[46] Amended Petition for Writ of Habeas Corpus, filed November 7, 2014 (ECF no. 57) (henceforth "Amended Petition"), at pp. 13-61.  The term "intellectually disabled" has replaced the term "mentally retarded" in the parlance of both mental health professionals and the Supreme Court. *See, e.g., Hall v. Florida*, ___ U.S. at ___, 134 S. Ct. at 1990:
> Previous opinions of this Court have employed the term "mental retardation." This opinion uses the term "intellectual disability" to describe the identical phenomenon. See Rosa's Law, 124 Stat. 2643 (changing entries in the U.S. Code from "mental retardation" to "intellectual disability"; Schalock et al., The Renaming of *Mental Retardation* : Understanding the Change to the Term *Intellectual*

B.  State Court Disposition

Petitioner presented this same claim as his first ground for relief in his second state habeas

corpus application.[47]  After holding a lengthy evidentiary hearing, the state habeas trial court found

credible the expert testimony of Dr. Sparks, who evaluated Petitioner for competency to stand trial

in 2000 or 2001, rejected the expert opinion testimony of Petitioner's mental health expert Dr.

Murphey, relied upon the recordings of Petitioner's telephone conversations and other evidence to

reject Petitioner's claim he exhibits deficits in intellectual functioning and adaptive functioning, and

found Petitioner had failed to carry his burden of establishing by a preponderance of the evidence

that he is intellectually disabled.[48]  The Texas Court of Criminal Appeals adopted all but one of the

trial court's factual findings and denied Petitioner's second state habeas corpus application.[49]

C.  Clearly Established Federal Law: The Legal Definition of "Intellectual Disability"

Whether Petitioner is intellectually disabled is a question of fact.  *Henderson v. Stephens*, 791

F.3d 567, 579 (5th Cir. 2015); *Matamoros v. Stephens*, 783 F.3d 212, 216 (5th Cir. 2015).  In

---

*Disability,* 45 Intellectual & Developmental Disabilities 116 (2007).  This change in terminology is
approved and used in the latest edition of the Diagnostic and Statistical Manual of Mental Disorders,
one of the basic texts used by psychiatrists and other experts; the manual is often referred to by its
initials "DSM," followed by its edition number, e.g., "DSM–5."  See American Psychiatric
Association, Diagnostic and Statistical Manual of Mental Disorders 33 (5th ed. 2013).
The Fifth Circuit has likewise adopted the new nomenclature for the same terms.  *See, e.g., Matamoros v. Stephens*, 783
F.3d 212, 214 n.1 (5th Cir. 2015) (explaining that court now uses the term "intellectually disabled" to describe the
condition once recognized as "mentally retarded.").

[47] Second State Habeas Transcript, at pp. 8-38.

[48] Second State Habeas Transcript, at pp. 537-66.  A more detailed discussion of the state habeas trial court's
findings and conclusions and the evidence presented during Petitioner's second state habeas corpus proceeding is set
forth below.

[49] The Texas Court of Criminal Appeals expressly rejected the state trial court's finding that Dr. Murphey's
testimony suggested her testing of Petitioner showed him to be within the range of error for not being intellectually
disabled.  *Ex parte Obie D. Weathers III*, 2014 WL 1758977, *1.

*Maldonado v. Thaler*, 625 F.3d at 232-33, the Fifth Circuit described the standard to be applied in

reviewing a Texas court's finding of no intellectual disability under *Atkins* as follows:

> In *Atkins v. Virginia,* 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335, the Supreme Court held that the Eighth Amendment forbids the execution of mentally retarded persons. The *Atkins* Court, however, "le[ft] to the State [s] the task of developing appropriate ways to enforce the constitutional restriction upon their execution of sentences." *Id.* at 317, 122 S. Ct. 2242 (alterations and internal quotation marks omitted). The relevant standard in Texas was set out by the TCCA in *Ex parte Briseno*, 135 S.W.3d 1, 7 (Tex.Crim.App.2004). The *Briseno* court held that mental retardation claims should be adjudicated under the framework established by the American Association on Mental Retardation (AAMR), in conjunction with the standard supplied by the Texas Persons with Mental Retardation Act, Tex. Health & Safety Code § 591.003(13) (" 'Mental retardation' means significantly subaverage general intellectual functioning that is concurrent with deficits in adaptive behavior and originates during the developmental period."). As quoted in *Atkins,* the AAMR supplies the following definition of mental retardation:
>
>> Mental retardation refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18.
>
> *Atkins,* 536 U.S. at 309 n. 3, 122 S.Ct. 2242 (quoting AAMR, *Mental Retardation: Definition, Classification, and Systems of Supports* (9th ed.1992)). Briefly stated, *Briseno* requires three elements for a finding of mental retardation: (1) significantly subaverage intellectual functioning (generally, a full-scale IQ score of 70 or below); (2) deficits in adaptive functioning; and (3) onset before age 18. *See Briseno,* 135 S.W.3d at 7.
>
> In *Briseno,* the TCCA made clear that although the determination of whether an applicant meets this three-prong standard requires careful consideration of the relevant psychological standards-and expert testimony obviously assists with this assessment-the ultimate determination as to mental retardation must be made by the court, based on what the Constitution requires. The TCCA explained:
>
>> Although experts may offer insightful opinions on the question of whether a particular person meets the psychological diagnostic criteria for mental retardation, the ultimate issue of whether this person is, in fact, mentally retarded for purposes of the Eighth Amendment ban on excessive punishment is one for the finder of fact, based upon all of the evidence and determinations of credibility.

*Id.* at 9.

With regard to the first prong of the *Atkins* analysis, the Supreme Court has held that, because of the imprecision in IQ testing, a court must consider the standard error of measurement ("SEM") when assessing intellectual disability.[50]  *See Hall v. Florida*, ___ U.S. at ___, 134 S. Ct. at 2000:

> The legal determination of intellectual disability is distinct from a medical diagnosis, but it is informed by the medical community's diagnostic framework.  *Atkins* itself points to the diagnostic criteria employed by psychiatric professionals.  And the professional community's teachings are of particular help in this case, where no alternative definition of intellectual disability is presented and where this Court and the States have placed substantial reliance on the expertise of the medical profession.
>
> By failing to take into account the SEM and setting a strict cutoff at 70, Florida "goes against the unanimous professional consensus." APA Brief 15.  Neither Florida nor its *amici* point to a single medical professional who supports this cutoff.  The DSM–5 repudiates it: "IQ test scores are approximations of conceptual functioning but may be insufficient to assess reasoning in real-life situations and mastery of practical tasks." DSM–5, at 37.  This statement well captures the Court's independent assessment that an individual with an IQ test score "between 70 and 75 or lower," *Atkins, supra*, at 309, n. 5, 122 S.Ct. 2242, may show intellectual disability by presenting additional evidence regarding difficulties in adaptive functioning.

In *Mays v. Stephens*, 757 F.3d 211, 218 n.17 (5th Cir. 2014), *cert. denied*, 135 S. Ct. 951 (2015), the Fifth Circuit noted, however, the requirement that SEM be considered in evaluating intellectual disability is a two-way street:

> The consideration of SEM as discussed by the Supreme Court [in *Hall*], however, is not a one-way ratchet.  The imprecision of IQ testing not only provides that IQ scores above 70 but within the SEM do not conclusively establish a lack of significantly subaverage general intellectual functioning, but also that IQ scores below 70 but within the SEM do not conclusively establish the opposite.  In other words, a sentencing court may find a defendant to have failed to meet the first prong of the AAMR's definition of intellectual disability even if his IQ score is below 70

---

[50] Petitioner's mental health expert Dr. Joann Murphey testified without contradiction during Petitioner's most recent state habeas corpus proceeding that the standard error of measurement on the IQ test instruments she employed to evaluate Petitioner was plus or minus five points. S.F. Second State Habeas Hearing, testimony of Dr. Joann Murphey, at pp. 53, 57 (Vol. 3, pp. 30, 34).

so long as 70 is within the margin of error and other evidence presented provides sufficient evidence of his intellectual functioning."

Because of the subjectivity of scientific standards and expert testimony, Texas courts employ a series of evidentiary factors commonly known as the *Briseno* factors when engaging in adaptive functioning analysis, i.e., the second prong of *Atkins* analysis:

> [1] Did those who knew the person best during the developmental stage—his family, friends, teachers, employers, authorities—think he was mentally retarded at that time, and, if so, act in accordance with that determination?
> [2] Has the person formulated plans and carried them through or is his conduct impulsive?
> [3] Does his conduct show leadership or does it show that he is led around by others?
> [4] Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable?
> [5] Does he respond coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject?
> [6] Can the person hide facts or lie effectively in his own or others' interests?
> [7] Putting aside any heinousness or gruesomeness surrounding the capital offense, did the commission of that offense require forethought, planning, and complex execution of purpose?

*Henderson v. Stephens*, 791 F.3d at 580-81 (quoting *Ex parte Briseno*, 135 S.W.3d at 8-9); *Matamoros v. Stephens*, 783 F.3d at 218 (quoting *Briseno*).[51]

---

[51] Insofar as Petitioner suggests it was improper, in view of the Supreme Court's recent holding in *Hall v. Florida*, for the state habeas court to employ the so-called *Briseno* factors as part of that court's analysis of his intellectual disability claim, his suggestion is without merit.  The Fifth Circuit has repeatedly recognized the continued vitality of the *Briseno* factors in the aftermath of the Supreme Court's decision in *Hall*.  *See, e.g., Matamoros v. Stephens*, 783 F.3d at 218 (recognizing the Fifth Circuit has rejected the argument that *Hall* renders *Briseno* unconstitutional); *Williams v. Stephens*, 761 F.3d 561, 573 (5th Cir. 2014) (holding the Texas Court of Criminal Appeals' use of the *Briseno* framework to evaluate a claim of intellectual disability was not an unreasonable application of federal law), *cert. denied*, 135 S. Ct. 1735 (2015); *Mays v. Stephens*, 757 F.3d at 218 (the holding in *Hall* "in no way affects this court's reading and application of *Briseno*").

32

D. <u>AEDPA Analysis</u>

    1. <u>Identification of the Issue and Standard of Review</u>

Under the AEDPA, the question properly before this Court is not whether Petitioner is intellectually disabled but, rather, whether the Texas Court of Criminal Appeals' rejection on the merits of Petitioner's *Atkins* claim was objectively reasonable in light of clearly established Supreme Court precedent and the evidence before the state habeas court during Petitioner's most recent state habeas corpus proceeding. This Court's AEDPA review of the state court's finding that Petitioner is not intellectually disabled is highly deferential. *See Henderson v. Stephens*, 791 F.3d at 579:

> Whether a petitioner is intellectually disabled is a question of fact. *Maldonado v. Thaler,* 625 F.3d 229, 236 (5th Cir.2010). Because the state court's decision that Henderson failed to prove that he is intellectually disabled is entitled to AEDPA deference, Henderson cannot obtain federal habeas relief on this claim unless he shows that the TCCA's denial of relief "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The state court's factual determinations are presumed to be correct and may be rebutted only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). "We may not characterize these state-court factual determinations as unreasonable 'merely because [we] would have reached a different conclusion in the first instance.' " *Brumfield v. Cain,* —— U.S. ——, 135 S.Ct. 2269, 2277, —— L.Ed.2d —— (2015) (quoting *Wood v. Allen,* 558 U.S. 290, 301, 130 S.Ct. 841, 175 L.Ed.2d 738 (2010)). "Instead, § 2254(d)(2) requires that we accord the state trial court substantial deference." *Id.* "[E]ven if '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's ... determination.' " *Wood v. Allen,* 558 U.S. at 301, 130 S.Ct. 841 (quoting *Rice v. Collins,* 546 U.S. 333, 341–42, 126 S.Ct. 969, 163 L.Ed.2d 824 (2006)).

    2. <u>The Medical Definition and Diagnosis of "Intellectual Disability"</u>

As the Supreme Court explained in *Hall v. Florida*, "[t]he legal determination of intellectual disability is distinct from a medical diagnosis, but it is informed by the medical community's

diagnostic framework." 134 S. Ct. at 2000. The latest (fifth) edition of the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, which was identified by Dr. Murphey during the latter portion of her extended testimony at Petitioner's most recent state habeas corpus hearing,[52] defines "intellectual disability" as follows:

> Intellectual disability (intellectual developmental disorder) is a disorder with onset during the developmental period that includes both intellectual and adaptive functioning deficits in conceptual, social, and practical domains. The following three criteria must be met:

> A.      Deficits in intellectual functions, such as reasoning, problem solving, planning, abstract thinking, judgment, academic learning, and learning from experience, confirmed by both clinical assessment and individualized, standardized intelligence testing.

> B.      Deficits in adaptive functioning that result in failure to meet developmental and socio-cultural standards for personal independence and social responsibility. Without ongoing support, the adaptive deficits limit the functioning in one or more activities of daily life, such as communication, social participation, and independent living, across multiple environments, such as home, school, work, and community.

> C.      Onset of intellectual and adaptive deficits during the developmental period.

> **Note:** The diagnostic term *intellectual disability* is the equivalent for the ICD-11 diagnosis of *intellectual developmental disorders*. Although the term *intellectual disability* is used throughout this manual, both terms are used in the title to clarify relationships with other classification systems. Moreover a federal statute in the United States (Public Law 111-256, Rosa's Law) replaces the term *mental retardation* with *intellectual disability*, and research journals use the term *intellectual*

---

[52] Dr. Joann Murphey testified during Petitioner's most recent state habeas corpus proceeding on May 13, 2013, May 14, 2013, August 5, and August 6, 2013. Her testimony is found in Volumes 3, 4, 10, and 11 of the verbatim transcription or statement of facts from that hearing (henceforth "S.F. Second State Habeas Hearing"). The entire set of twelve volumes comprising the statement of facts from Petitioner's most recent state habeas corpus proceeding bears a single set of sequential page numbers found in the lower left corner of each page of that voluminous collection. This Court will cite to that set of page numbers when identifying specific testimony but will also include parenthetical references to the particular volume and page numbers within those volumes for the same testimony. Thus, Dr. Murphey's testimony appears at S.F. Second State Habeas Hearing, testimony of Dr. Joann Murphey, at pp. 35-110 (Vol. 3, pp. 12-80); pp. 118-53 (Vol, 4, pp. 6-40); at pp. 503-48 (Vol. 10, pp. 116-61); and at pp. 565-76 (Vol. 11, pp. 5-16). Dr. Murphey discussed the then-new DSM-V on her next-to-last day of testimony. S.F. Second State Habeas Hearing, testimony of Dr. Joann Murphey, at pp. 535-36 (Vol. 10, pp. 147-48).

*disability*.  Thus, *intellectual disability* is the term in common use by medical, educational, and other professions and by the lay public and advocacy groups.[53]

The DSM-5 also provides the following explanation of the diagnostic features of "intellectual disability":

> The essential features of intellectual disability (intellectual developmental disorder) are deficits in general mental abilities (Criterion A) and impairments in everyday adaptive functioning, in comparison to an individual's age-, gender-, and socioeconomically matched peers (Criterion B).  Onset is during the developmental period (Criterion C).  The diagnosis of intellectual disability is based on both clinical assessment and standardized testing of intellectual and adaptive functions.
>
> Criterion A refers to intellectual functions that involve reasoning, problem solving, planning, abstract thinking, judgment, learning from instruction and experience, and practical understanding.  Critical components include verbal comprehension, working memory, perceptual reasoning, quantitative reasoning, abstract thought, and cognitive efficacy.  Intellectual functioning is typically measured with individually administered and psychometrically valid, comprehensive, culturally appropriate, psychometrically sound tests of intelligence.  Individuals with intellectual disability have scores of approximately two standard deviations or more below the population mean, including a margin of measurement error (generally +5 points).  On tests with a standard deviation of 15 and a mean of 100, this involves a score of 65-75 (70 $\pm$ 5).  Clinical training and judgment are required to interpret test results and assess intellectual performance.
>
> Factors that may affect test scores include practice effects and the "Flynn effect" (i.e., overly high scores due to out-of-date test norms).  Invalid scores may result from the use of brief intelligence screening tests or group tests; highly discrepant individual subtest scores may make an overall IQ score invalid. Instruments must be normed for the individual's sociocultural background and native language.  Co-occurring disorders that affect communication, language, and/or motor or sensory function may affect test scores.  Individual cognitive profiles based on neuropsychological testing are more useful for understanding intellectual abilities than a single IQ score.  Such testing may identify areas of relative strengths and weaknesses. an assessment important for academic and vocational planning.
>
> IQ test scores are approximations of conceptual functioning but may be insufficient to assess reasoning in real life situations and mastery of practical tasks. For example. a person with an IQ score above 70 may have such severe adaptive

---

[53] *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5)*, American Psychiatric Association (2013), at p. 33.  The DSM-5 also states "IQ measures are less valid in the lower end of the IQ range." *Id.*

behavior problems in social judgment, social understanding, and other areas of adaptive functioning that the person's actual functioning is comparable to that of individuals with a lower IQ score.  Thus, clinical judgment is needed tin interpreting the results of IQ tests.

Deficits in adaptive functioning (Criterion B) refers to how well a person meets community standards of personal independence and social responsibility, in comparison to others of similar age and sociocultural background.  Adaptive functioning involves adaptive reasoning in three domains:  conceptual, social, and practical.  The *conceptual (academic) domain* involves competence in memory, language, reading, writing, math reasoning, acquisition of practical knowledge, problem solving, and judgment in novel situations, among others.  The *social domain* involves awareness of others' thoughts, feelings, and experiences. empathy, interpersonal communication skills; friendship abilities; and social judgment, among others.  The *practical domain* involves learning and self-management across life settings, including personal care, job responsibilities, money management, recreation, self-management of behavior, and school and work task organization, among others.  Intellectual capacity, education, motivation, socialization, personalty features, vocational opportunity, cultural experience, and coexisting general medical conditions or mental disorders influence adaptive functioning.

Adaptive functioning is assessed using both clinical evaluation and individualized, culturally appropriate, psychometrically sound measures.  Standardized measures are used with knowledgeable informants (e.g., parent or other family member; teacher; counselor; care provider) and the individual to the extent possible.  Additional sources of information include educational, developmental, medical, and mental health evaluations.  Scores from standardized measures and interview sources must be interpreted using clinical judgment.  When standardized testing is difficult or impossible, because of a variety of factors (e.g., sensory impairment, severe problem behavior), the individual may be diagnosed with unspecified intellectual disability.  Adaptive functioning may be difficult to assess in a controlled setting (e.g., prisons, detention centers); if possible, corroborative information reflecting functioning outside those settings should be obtained.

Criterion B is met when at least one domain of adaptive functioning – conceptual, social, or practical – is sufficiently impaired that ongoing support is needed in order for the person to perform adequately in one or more life settings at school at work, at home, or in the community.  To meet diagnostic criteria for intellectual disability, the deficits in adaptive functioning must be directly related to the intellectual impairments described in Criterion A.  Criterion C, onset during the developmental period, refers to recognition that intellectual and adaptive deficits are present during childhood or adolescence.[54]

---

[54] *DSM-5*, at pp. 37-38.

3.  The Evidence Before the State Habeas Court

In support of his assertion that he is intellectually disabled, Petitioner presented the testimony and the written report of Dr. Joann Murphey,[55] who possesses doctorates in both clinical and educational psychology, and who testified, in pertinent part, that (1) she tested Petitioner using the Weschler Adult Intelligence Scale - IV in May, 2011 and she scored Petitioner at 53 for the full scale,[56] (2) based upon her clinical evaluation of Petitioner, she questioned the accuracy of that test score, suggested to Bexar County medical staff that Petitioner was displaying psychotic symptoms, and requested evaluation and possible medication,[57] (3) she tested Petitioner again in August, 2011 using Stanford-Binet Intelligence Scales, Fifth Edition, after Petitioner had received the anti-psychotic medication Risperdal for a two-week period and she scored Petitioner at 65 for the full scale,[58] (4) there is a 95 percent probability Petitioner's "true" full scale IQ is within the range of

---

[55] Dr. Murphey's written report, dated September 20, 2011 (henceforth "Dr. Murphey's Report"), appears at Second State Habeas Transcript, at pp. 86-120.

[56] S.F. Second State Habeas Hearing, testimony of Dr. Joann Murphey, at pp. 510-11 (Vol. 10, pp. 123-24) (Dr. Murphey met with Petitioner for three to four hours on May 1, 2011, administered the WAIS-IV, which had been normed in April or May, 2008); at p. 529 (Vol. 10, p. 142) (Petitioner scored a full scale of 53 on the test administered in May, 2011); at p. 550 (Vol. 10, p. 163) (Petitioner's 53 on the May, 2011 test also showed low for malingering). Dr. Murphey also discussed her initial testing session with Petitioner in her report. Second State Habeas Transcript, at pp. 110-13.

[57] S.F. Second State Habeas Hearing, testimony of Dr. Joann Murphey, at p. 138 (Vol. 4, p. 25) (Petitioner displayed "concrete" and "magical" thinking during the initial testing session); at pp. 527-28 (Vol. 10, pp. 140-41) (after scoring the WAIS-IV, Dr. Murphey concluded the score did not reflect Petitioner's full potential because his thinking had been tangential and "just unusual" during the testing process and she asked that he be evaluated for possible medication); at p. 551 (Vol. 10, p. 164) (Petitioner's thinking appeared to be global and diffused during the initial test session - it jumped around). Dr. Murphey discussed her concerns about the inaccuracy of Petitioner's WAIS-IV score in her report. Second State Habeas Transcript, at pp. 110-13.

[58] S.F. Second State Habeas Hearing, testimony of Dr. Joann Murphey, at pp. 138-39 (Vol. 4, pp. 25-26) (Dr. Murphey re-tested Petitioner using the Standford-Binet instrument after Petitioner has received Risperdal, a low dosage anti-psychotic, for two-to-three weeks and he did significantly better); at p. 148 (Vol. 4, p. 35) (the Stanford-Binet is a the best measure of intellectual deficits); at pp. 528-29 (Vol. 10, pp. 141-42) (after medication, Petitioner said he was thinking more clearly, did consistently better, and had a full scale score of 65). Dr. Murphey details Petitioner's results on the Stanford-Binet test in her report. Second State Habeas Transcript, at pp. 113-15, 118.

scores between 62 and 70,[59] (5) sometime in 2011 she asked Petitioner's mother, sister,

grandmother, a former teacher, a childhood friend, a neighbor and church youth leader, and a former

employer to complete the Adaptive Behavior Assessment System II scale, on which they rated

Petitioner in the categories of "communication, community use, functional academics, home living,

health and safety, leisure, self-care, self-direction, and social,"[60] (6) based upon his IQ test scores and

the ratings furnished by Petitioner's family, friends, neighbor, former employer, and former teacher,

and her review of affidavits and other documents, including some of Petitioner's academic records,[61]

---

[59] This conclusion appears in Dr. Murphey's written report. Second State Habeas Transcript, at p. 114.

[60] S.F. Second State Habeas Hearing, testimony of Dr. Joann Murphey, at pp. 59-60 (Vol. 3, pp. 36-37) (adaptive functioning is very difficult to measure because many persons tested for intellectual disability have never lived independently); at p. 61 (Vol. 3, p. 38) (in assessing independent living skills, an evaluator should try to find a broad number of people who have had interaction with the person being evaluated); at p. 62 (Vol. 3, p. 39) (work experience is a good indicator or a person's independent living skills); at pp. 512-16 (Vol. 10, pp. 125-27) (Dr. Murphey administered an adaptive behavior assessment instrument to a number of people who knew Petitioner during his developmental years, including Petitioner's mother, grandmother, sister, a neighbor, a childhood friend, a former teacher, and former employer, and while there was some variation in the responses, there was also some similarity on some scales); at p. 517 (Vol. 10, p. 130) (Dr. Murphey concluded Petitioner met the criteria for adaptive deficits in multiple areas sufficient for Petitioner to qualify as intellectually disabled). Dr. Murphey's report contains a chart with the actual scores registered by the persons who evaluated Petitioner's adaptive functioning in 2011 and Dr. Murphey's evaluation of those scores. Second State Habeas Transcript, at pp. 115-16, 118-19. Petitioner's former employer, Moral Hill, and former teacher, Sherry Logan, both scored Petitioner higher in almost every category than did Petitioner's family members. *Id.*

[61] Dr. Murphey testified (1) she interview Petitioner mother, grandmother and a former teacher named Jeannine Foster who taught Petitioner in high school, she reviewed Dr. Reed's report on his 2008 testing of Petitioner's IQ, and she reviewed Petitioner's high school records, elementary school records, and elementary grade reports. S.F. Second State Habeas Hearing, testimony of Dr. Joann Murphey, at pp. 94-103, 118-19, 121, 141-42 (Vol. 3, pp. 71-80; Vol. 4, pp. 6-7, 9, 28-29). Dr. Murphey testified she reviewed an affidavit from Petitioner's former employer Moral Hill but did not speak with Mr. Hill or review Mr. Hill's trial testimony and the former teacher whom she interviewed, Dr, Jeannine Foster, was a friend of the Weathers family. *Id.*, at pp. 118-19, 121 (Vol. 4, pp. 6-7, 9). Dr. Murphey also testified she reviewed (1) nursing notes and some progress reports from Pfeiffer Elementary School covering the time period 1989-91, (2) academic withdrawal records from Poe Middle School and Sam Houston High School, (3) the affidavits of Jeannine Foster and Moral Hill, (4) unspecified records from the BCADC and University Health System, (5) unspecified TDCJ medical screening and health summary records, (6) a mitigation review prepared by Ann Matthews, (7) the "affidavits of Karlene Hawkins, Raymond Jones, and Stephanie Huff [This Court notes the only copies of those three purported affidavits included in the record currently before this Court are unsigned and undated. *See* Second State Habeas Transcript, at pp. 169-70, 172, 174], (8) statements of Diane Taylor and Billy Alan, (9) her notes from her clinical interview with Petitioner, (10) the affidavits of attorneys Russell Steddler and John Niland, (11) an affidavit by Dr. John Smith, and (12) Dr. Reed's testing data. *Id.*, at pp. 506-10. 513, 548 (Vol. 10, pp. 119-23, 126, 161). After some initial confusion, Mr. Murphey clarified that she had not interviewed Petitioner's sister but had read her affidavit. *Id*, at p. 201 (Vol. 4, p. 87).

Dr. Murphey concluded Petitioner's overall intellectual functioning and adaptive functioning is consistent with a diagnosis of mild mental retardation,[62] (7) Petitioner shows adaptive functioning deficits in communication, functional academics, and social skills,[63] (8) Dr. Reed concluded after administering an IQ test to Petitioner in 2008 that Petitioner was mildly mentally retarded,[64] and (9) she did not believe Petitioner was "malingering" during either of his testing sessions with her because she tested him using a memory malingering instrument and because Petitioner appeared determined to complete the tasks that were difficult for him.[65]

---

On cross-examination, Dr. Murphey also testified she had not reviewed any part of the record from Petitioner's capital murder trial.  S.F. Second State Habeas Hearing, testimony of Dr. Joann Murphey, at pp. 99, 549 (Vol. 3, p. 76; Vol. 10, p. 162).  She also admitted she had not reviewed any IQ testing performed on Petitioner prior to his eighteenth birthday.  *Id.*, at p.102 (Vol. 3, p. 79).  Dr. Murphey testified there was no indication in Petitioner's school records as to why he had been placed in Special Education classes.  *Id.*, at p. 135 (Vol. 4, p. 22).  Dr. Murphey also testified Petitioner's aggressive, criminal behavior suggested a possible diagnosis of antisocial personality disorder.  *Id.*, at pp. 133-34 (Vol. 4, pp. 20-21).  Dr. Murphey also admitted Petitioner successfully concealed his drug use from his sister while he lived with her.  *Id.*, at p. 202 (Vol. 4, p.88).

[62] S.F. Second State Habeas Hearing, testimony of Dr. Joann Murphey, at .p. 148 (Vol. 4, p. 35) (she concludes Petitioner is mildly mentally retarded); at pp. 517-20 (Vol. 10, pp. 130-33) (Dr. Murphey concludes Petitioner shows adaptive functioning deficits sufficient to support a diagnosis of mild intellectual disability in the areas of communication, functional academics, and social); at pp. 575-76 (Vol. 11, pp. 15-16) (Dr. Murphey concludes Petitioner meets the standard for a finding of intellectual disability under the standards of the American Psychological Association, under the *Briseno* factors, and he is mildly mentally retarded).  These same conclusions are set forth in Dr. Murphey's report.  Second State Habeas Transcript, at pp. 118-20.

[63] S.F. Second State Habeas Hearing, testimony of Dr. Joann Murphey, at pp. 512-19 (Vol. 10, pp. 125-32).

[64] Dr. Murphey testified (1) Dr. Reed concluded Petitioner was mildly mentally retarded despite the Petitioner scoring a 79 on his 2008 IQ test, (2) Dr. Reed employed the "Flynn effect" calculation to scale down Petitioner's 2008 IQ score on a WAIS-III test instrument to a 73, i.e., within the margin for measurement error for the range of intellectual disability, and (3) the "Flynn effect" is a recognized, scientifically approved, procedure for modifying IQ test scores which is based upon the assumption that a population gets smarter over time, thus requiring a re-norming of an IQ test instrument.  *Id.*, at pp. 81-82, 141-42, 147-48, 511, 571 (Vol. 3, pp. 58-59; Vol. 4, pp. 27-28, 34-35; Vol. 10, p. 126; Volume 11, p. 11).  "The so-called 'Flynn effect' is a phenomenon positing that, over time, standardized IQ test scores tend to increase with the age of the test without a corresponding increase in actual intelligence in the general population.  Those who follow the Flynn effect adjust for it by deducting from the IQ score a specified amount for each year since the test was normalized."  *Wiley v. Epps*, 625 F.3d 199, 203 n.1 (5th Cir. 2010).  The Flynn effect has not been accepted in the Fifth Circuit as scientifically valid.  *Gray v. Epps*, 616 F.3d 436, 447 n.9 (5th Cir. 2010), *cert. denied*, 131 S. Ct. 1785 (2011).

[65] S.F. Second State Habeas Hearing, testimony of Dr. Joann Murphey, at pp. 148-49 (Vol. 4) (Petitioner was "highly motivated" during testing, wanted to continue when time was up, and appeared frustrated when he was unable to complete tasks); at pp. 525-26 (Vol. 10, pp. 138-39) (Petitioner did not appear to be malingering, tested low for

Petitioner presented the testimony of a recent divinity school graduate who had served as Petitioner's sixth grade reading teacher.  She testified that Petitioner lacked the capacity to read, had a poor vocabulary, never finished a single book or even a single chapter during the year he was in her classroom, never wrote in his notebook, was unable to speak in abstract terms, and was working at a second grade level when he was in her class.[66]  On cross-examination, the witness testified she never referred Petitioner for IQ testing and could not imagine that she had passed Petitioner.[67]  When confronted with copies of Petitioner's school records showing he had earned grades of 87 and 85 during the two semester Petitioner was in her class, the witness offered no explanation.[68]

Petitioner also presented the testimony of Petitioner's former home high school economics instructor who testified (1) she remembered Petitioner because he always had a smile on his face, was always very happy, was very polite and well-mannered, and was very well dressed and very well groomed, (2) Petitioner struggled to read materials written at the eleventh and twelfth grade levels, (3) his writing was at the fifth grade level, (4) he was exempted from the state-wide TAKS test because of his poor reading skills, (5) when preparing recipes, he struggled to measure amounts of ingredients, (6) as a result, she often let him work in a group with others, (7) he often did not turn in assignments, (8) he earned a 64 in her class but was performing below that level, and (9) he was

---

malingering on memory malingering test, and was very competitive and determined to complete tasks).

[66] S.F. Second State Habeas Hearing, testimony of Cynthia Caruso, at pp. 155-62 (Vol. 4, pp. 41-48).

[67] *Id.*, at pp. 166-68 (Vol. 4, pp. 52-54).

[68] *Id.*, at p. 169, (Vol. 4, p.55).  For unknown reasons, the state failed to seek admission of the Petitioner's school records which it used to impeach Ms. Caruso and which were marked for identification purposes during Petitioner's second state habeas evidentiary hearing as State Exhibit no. 1.  Those records were never admitted into evidence during Petitioner's most recent state habeas corpus proceeding and are not currently before this Court.

neat and picky when it came to his clothing and always wore a starched, ironed shirt.[69]  On cross-examination, Ms. Logan testified Petitioner did not have any behavioral issues in her classroom and admitted she is opposed to the death penalty.[70]

Petitioner called a vocational rehabilitation consultant who testified (1) Petitioner's job at the seafood restaurant where he worked during his high school years was that of a cook helper or prep cook, which was an unskilled job that (a) should have been learned within thirty days of hire, (b) did not require an education, and (c) required only skills which could be learned on the job and (2) she did not know what Petitioner's job duties had been at West Telemarketing.[71]

Petitioner's mother testified Petitioner (1) was in Special Education classes in Elementary and Middle School through the sixth grade, (2) was held back a grade in the third or fourth grade, (3) as a child, took a long time to learn how to put his boots on the correct feet, (4) had problems putting on and lacing his tennis shoes, (5) was hyperactive, often ran around inside the house and broke things, including a ceiling fan when he struck the fan with a broom, (6) did poorly in Sunday School and was unable to understand lessons Sunday mornings even when she went over them with him on Saturday evenings, (7) received no counseling following the sudden death of his maternal grandmother , (8) occasionally drove himself to work at the seafood restaurant but his father usually drove Petitioner, (9) got a learner's permit but never a full driver's license, (10) earned money from

---

[69] S.F. Second State Habeas Hearing, testimony of Sherry Logan, at pp. 173-88, 197-99 (Vol. 4, pp. 59-74, 83-85).

[70] *Id.*, at pp. 188-97 (Vol. 4, pp. 74-83)

[71] S.F. Second State Habeas Hearing, testimony of Tammie C. Donaldson, at pp. 211-40 (Vol. 5, pp. 4-33).

his job simply which disappeared and had hundreds of dollars of overdrafts, (11) served as a usher at church, but (12) lost his job at a fast food restaurant for stealing.[72]

Petitioner's former employer at the seafood restaurant testified (1) he employed Petitioner from 1998-2000 starting when Petitioner was 15 or 16 years old and a student at Sam Houston High School, (2) Petitioner started out as a busboy-waiter but was clumsy and could not take orders well so he transferred Petitioner to the kitchen, (3) initially, Petitioner scaled fish and got stabbed by the scales and fins, (4) Petitioner required additional training before he could work the frier, (5) once others in the kitchen showed Petitioner how to cut fish, he could do so, (6) Petitioner never worked the cash register, (7) once Petitioner caught on, he made Petitioner a supervisor but only supervised two other employees and did not remain in that role very long, (8) he suspended Petitioner for a time for not showing up to work but Petitioner later came back to work, (9) Petitioner became involved in drugs, began coming to work with red eyes, and his work became slower and sloppy, and (10) Petitioner was gullible and influenced by the ex-cons he employed at the restaurant.[73]

The respondent's mental health expert, retired psychiatrist Dr. John C. Sparks, testified in pertinent part that (1) he began practicing psychiatry as a licensed physician in 1953, (2) he served from 1960 to 1980 as an Air Force physician, during which time he dealt with only a few persons classified as mentally retarded, all of whom were family members of military personnel, (3) he worked for Bexar County and University Health System from 1980 until 2006, working primarily with jail inmates, (4) he rarely evaluated persons with mental retardation, (5) when he did encounter a person with borderline mental retardation or who presented a question as to whether the person was

---

[72] S.F. Second State Habeas Hearing, testimony of B.D. Viola Weathers, at pp. 249-305  (Vol. 5, pp. 42-98).

[73] S.F. Second State Habeas Hearing, testimony of Moral Hill, at pp. 474-97 (Vol. 10, pp. 87-115).

mentally retarded, he referred those individuals to licensed psychologists on his staff who conducted standardized testing to determine if the individual qualified as mentally retarded, (6) in 2000 or 2001 he conducted a clinical interview at the request of a trial judge and evaluated Petitioner for competency to stand trial, (7) as part of his standard procedure, he included in his mental status report to the state trial court that he found no evidence to suggest Petitioner was sub-average in his intellectual functioning, (8) he found nothing during his interview to suggest Petitioner was unable to perform outside of the average level for inmates at the Bexar County Jail, i.e., at about the sixth grade level, (9) he did not request any standardized testing of Petitioner's intelligence level, (10) persons with ADHD have difficulty concentrating on any single subject and have difficulty communicating but that condition is treatable, (11) ADHD also predisposes some people to depression disorders, (12) untreated persons with ADHD may appear retarded and are less able to function because they communicate poorly and are difficult to educate, (13) it is difficult to evaluate a person's IQ or academic performance if the person is uncooperative, (14) a WAIS score of 79 indicates a low IQ but not mental retardation, (15) isolation can be very threatening to most of us and persons subjected to isolation could appear limited in their ability to function intellectually, (16) an isolated person could appear psychotic, retarded, anxious, or even schizoid, (17) he is familiar with the DSM's criteria for mental retardation, (18) most people with an IQ below 69 have difficulty communicating with numbers, (19) the manipulation of others requires above-average functioning and would tend to suggest a person is not retarded, (20) the meaning of works of art is a complex subject, (21) the ability to reflect on different meanings and emphasis in works of art reflects higher level functioning, (22) using an electrical outlet to start a fire is a really complex subject, (23) it is unlikely a retarded person would be capable of understanding the consequences of a post-conviction

capital habeas hearing include a life sentence, (24) it is doubtful a retarded person could make a request to a second person to have the second party contact a third person by e-mail to have the third party provide goods to the retarded person, (25) he employed a "basic history" screening form for inmates of the Bexar County jail for his many thousand mental status evaluations, i.e., the cases in which he was requested to evaluate an inmate for sanity and competency to stand trial,[74] (26) he had an inmate fill out the basic history form, in part, to help him gauge the inmate's abilities in terms of reading and writing, as well as to obtain information about the inmate's background, (27) his basic history forms should remain as part of the inmates' jail medical records, (28) since his retirement, he no longer has access to any of those records, (29) he retired from his medical practice in 2006 and is not familiar with the book *Intellectual Disability* published in 2012, (30) he no longer practices medicine, (31) he did not refer petitioner to IQ testing when he interviewed Petitioner because Petitioner was functioning at a level that was average for the jail population, (32) he has no independent recollection of his interview with Petitioner beyond the information contained in his report to the state court, (33) there is a range of mental retardation and eighty-five percent of those with mental retardation fall into the mild range, (34) persons with mild mental retardation can be

---

[74] Petitioner criticizes Dr. Sparks for failing to have his basic history form evaluated by peers and accuses Dr. Sparks of utilizing an improper "protocol" to evaluate patients for mental retardation.   These arguments lack merit. First, Dr. Sparks' basic information sheet was not a protocol for evaluating patients for mental retardation.  Dr. Sparks described the form in a manner consistent with the  personal medical information forms all medical patients routinely fill out prior to seeing a physician.   Dr. Sparks used his basic information form to help him gather information about his patients and to assist him in evaluating their mental status.   S.F. Second State Habeas Hearing, testimony of John C. Sparks, at pp.  399-408 (Vol. 10, pp. 13-21).  Second, insofar as Petitioner argues Dr. Sparks failed to comply with applicable state statues in making a diagnosis of mental retardation, the short answer is Dr. Sparks made no diagnosis that Petitioner was mentally retarded.  On the contrary, Dr. Sparks testified he concluded following his clinical interview with Petitioner there was no basis for referring Petitioner to a staff psychologist for standardized IQ testing or further inquiry into whether Petitioner was mentally retarded because Petitioner was functioning above the intellectual range in which mental retardation might be suspected.  *Id.*, at pp. 323-24 (Vol. 6, pp. 16-17).

educated and acquire academic skills up to about the sixth grade level, and (35) mental retardation can co-exist with other mental disorders.[75]

The almost twenty hours of Petitioner's recorded telephone conversations admitted into evidence during the most recent state habeas proceeding contain a wealth of information which fully supports the ultimate conclusion reached by Dr. Sparks in 2000-01. Those recordings include (1) more than three hours of conversations between Petitioner and the chairman of a college art department, during which Petitioner not only communicates very effectively about art and artists but also displays familiarity with, and discusses, a wide range of topics, including the differences between the conditions of his confinement at the BCADC and the Polunsky Unit[76]; (2) more than

_____

[75] S.F. Second State Habeas Hearing, testimony of John C. Sparks. at pp. 313-39, 399-465 (Vol, 6, pp. 6-32; Vol. 10, pp. 7-78).

[76] The recorded telephone conversations between Petitioner and others are identified in inverse chronological order on State Exhibit 6 by eight-digit identification numbers and date. Petitioner's telephone conversation with Professor Peter M. Charlap of Vassar College appear on State Exhibit 6 as conversations (1) 11677573 (November 9, 2012) during which Petitioner (a) coordinates a visit by Professor Charlap and Petitioner's fellow death row inmate Christopher Anthony Young to make sure he also gets an opportunity to meet with the Professor, (b) explains the BCADC is more restrictive than the Polunsky Unit in terms of book deliveries to inmates, (c) describes the BCADC's security system as "reactive" in nature, explaining the BCADC system molds itself after its experience - different variables come into play and the type of case a BCADC had means a certain type of classification, (d) laments the fact that although he had no disciplinary infractions during his last visit to the BCADC, he is still being classified based upon his sentence, and (e) explains that even though Chris is consumed by his television, he will find a way to get Chris a message from Peter; (2) 11961920 (November 21, 2012) during which Petitioner (a) states he enjoyed their visit, asks about a German artist whose work Peter sent to him, (b) comments that Peter's paintings of his fellow death row inmates make him feel as if the person in the portraits are right there with him, (c) asks what kinds of things artists are doing these days to make their styles unique, and (d) comments that he sees himself as "an infant" when it comes to art; (3) 12026979 (November 24, 2012) during which Petitioner (a) asks if Peter is doing anything else artistically besides working the portraits of his fellow death row inmates, (b) asks if Peter knows the work of Martin Ramirez, (c) explains he has a sister who lives in Dallas and a younger brother with five children living in San Antonio, and (d) when Peter advises that his vehicle is being pulled over by the police, advises Peter to "keep your hands on the steering wheel"; (4) 12614550 (December 17, 2012) during which Petitioner (a) states he sent Peter an envelope with a drawing on it for Peter's wife's birthday, (b) states he received the art Peter sent to him, asks about a picture Peter sent of a woman coming down the stairs, (c) says that Chris explains stuff to him, and (d) expresses confusion when Peter employs the term "spastic" to describe himself; (5) 38233713 (December 20, 2013) during which Petitioner (a) wishes Peter a Happy Birthday, (b) reminds Peter that "tomorrow is the end of the world," (c) advises Peter that Chris is pushing his attorney to "get back," (d) contrasts his current detention facility where he sees people in the street, grass, and trees and smells cars outside the windows with the heavily wooded rural area scenery surrounding the Polunsky Unit, (e) explains his hearing has been reset, and (f) states he expects to go to court in January for his hearing; (6) 38334549 (December 24, 2012) during which Petitioner (a) explains he used wax pencils to do the drawings he sent to Peter, (b) explains the wax pencils allow him

45

four hours of conversations between Petitioner and his family members during which Petitioner

displays ease communicating complex and even abstract concepts and demonstrates awareness of

---

to draw on glass and plastic, (c) states he plans to collect pieces of the wax pencils and to smuggle them into the Polunsky Unit when he returns there because they are contraband at that facility and he wants to use contraband materials to make his art as a statement, (d) asks about the picture of Gerhard Richter's painting of a woman coming down the stairs which Peter sent him, and (e) explains he prefers to do his drawings on big envelopes rather than writing paper because he is allowed to have envelopes; (7) 38443484 (December 27, 2012) during which Petitioner (a) explains Kwanza is a celebration which lasts seven days and that today is a celebration of collective work and responsibility, (b) asks how Peter's latest project is coming, and (c) informs Peter that Chris wants to know what time tomorrow would be a good time for him to call Peter; (8) 38578790 (January 2, 2013) during which Petitioner (a) explains he corresponds with a performance artist in the UK, (b) asks "how do you know if someone is serious about art," (c) states he is a "baby artist," (d) asks if you need a degree to be a serious artist, (e) observes that, after watching a television program on birds, he finds it odd that pigeons are shunned as scavengers while doves are exalted even though the two birds are very similar, and (f) says he finds something in the divergent manner pigeons and doves are treated that seems to apply to the way his art is treated by society; (9) 38670160 (January 6, 2013) during which Petitioner asks about an artist named John Fitzgerald and the artist they discussed during their previous conversation whom Peter quoted as saying "the medium is the message"; (10) 39313697 (January 30, 2013) during which Petitioner (a) explains the Polunsky Unit's policy banning inmate possession of blank postcards, (b) explains that images he wants to draw often come to him slowly like film developing slowly, (c) wonders what technology is doing to us and how it will affect our evolution, (d) discusses a radio program in which scientists discussed what to do to save the human race when our sun runs out of energy millions of years from now, and (e) comments a "great deal of mental energy is being wasted on things that don't matter"; (11) 39878596 (February 20, 2013) during which Petitioner (a) discusses the fact a Texas death row inmate named Robert had his appeal turned down, (b) explains that once a Texas death row inmate's appeals are completed an execution date can be set quickly but it often takes three to five years, (c) comments that he believes waiting so long to set a date creates "false hope," (d) discusses the work of artist Damian Hearst and asks "Who is the artist?  The one who does it or the one who comes up with the idea", (e) refers to a PBS series called "Arts" and states that he listens to NPR "religiously, and (f) comments that fellow death row inmate Eugene entered works of origami in an art contest; (12) 39919313 (February 22, 2013) during which Petitioner (a) comments that, based upon the pictures Peter sent him, the Guggenheim Museum appears larger on the inside than it does from the outside, (b) comments he wanted to be an architect at one time but he found drafting class too rigorous and technical, (c) expresses neither approval nor disapproval for the title "Polunsky Portrait Project" for Peter's current project but observes that "Chris is opinionated about this stuff," (d) explains his attorney is in D.C. arguing a case in the Supreme Court which might set a precedent, (e) states he finds it comforting to have an attorney who might set precedent, (f) explains his attorney is a native of New York like Peter, and (f) jokes the piece of baloney he receives as a meal at the Bexar County Jail makes the television commercial for Red Lobster he recently saw look very good; (13) 39963477 (February 24, 2013) during which Petitioner (a) comments that he did expect the execution of Carl Henry Blue to take place as quickly as it did, (b) comments with reference to their previous conversations about artists who direct others to do their work that he is thinking about how he could communicate to another person how he wanted to create his own art, and (c) states the fact he is confined also confines the resources he has at his disposal; (14) 40045174 (February 27, 2013) during which Petitioner (a)  comments in response to Peter's statement that he recently cut his hand that he worked with a knife in a seafood restaurant kitchen and that cutting yourself "teaches you how to keep your fingers out of the way," (b) comments that the cancer treatment commercials he has seen lately are now using holistic terminology rather than discussing surgery and medication, (c) asks Peter to send him some coffee, (d) discusses an artist who drapes materials over an object and then the material takes on the shape of the object, and (e) comments that he enjoyed a documentary on an artist which discussed both art and politics; and (15) 41796600 (May 9, 2013) during which Petitioner (a) explains he was at the Polunsky Unit for nine days but is now back at the Bexar County Jail, (b) discusses a show he recently saw about concentration camp residents who played music and sang while inside the camp, and (c) discusses using a vacuum to create plastic casts of the doors of museums.

current events and the ability to respond promptly and appropriately during normal conversation,

belying the notion he is intellectually disabled or possesses deficits in terms of his oral

communication skills[77]; and (3) more than eleven hours of conversations between Petitioner

---

[77] The following recorded conversations between Petitioner and his family members shed light on Petitioner's *Atkins* claim: (1) 11695047 (November 10, 2012) during which Petitioner (a) explains to his sister the BCADC inmate trust fund operates separately and independently from the TDCJ's inmate trust fund and (b) explains the need for his family to send him money at the BCADC because he cannot access his TDCJ inmate trust account while being detained at the BCADC; (2) 11751567 (November 13, 2012) during which Petitioner (a) describes his mood as "climbing the hill then going back down the other side," (b) states his attorney is "talking some good talk" and has indicated Petitioner might be at the BCADC until January, (c) indicates he is aware his mother is about to undergo surgery but states he thought her surgery was to be that day, (d) explains that the last time he was at the BCADC a lot of the mail addressed and sent to him at the Polunsky Unit in Livingston was sent back, (e) asks his parents to e-mail his friend Ingrid to tell her he loves her and to tell her he got the coffee she sent him, (f) asks his mother whether the BCADC medical staffer to whom his mother gave Petitioner's prescription glasses took down his name, and (g) asks his mother to forward to him a letter she received from another of his female acquaintances; (3) 11833773 (November 16, 2012) during which Petitioner (a) instructs his parents to have his brother give them the order number of the care package his brother sent to Petitioner earlier in the year the last time Petitioner was housed at the BCADC but which was never delivered, (b) asks about the pain medication his mother received post-surgery, and (c) asks about the duration of her surgery and the size of her surgical wound; (4) 11868085 (November 17, 2012) during which Petitioner (a) reminds his mother it is his sister Renee's birthday, (b) tells his mother to be sure to call Renee before midnight, (c) asks his mother about her post-surgical recovery, (d) asks when his brother is bringing one of his nieces to see him at the BCADC, (e) asks his mother whom she has "to talk to about the serious stuff," (f) urges his mother to find a confidant in whom she can confide, and (g) tells his mother "you not sick, woman" and "It's bad for your spirit to tell yourself you're sick"; (5) 11875487 (November 18, 2012) during which Petitioner (a) describes how he trades food with other BCADC inmates, (b) asks if his parents still have a videotape he shot of a flood in 1998, (c) discusses nature shows he watches on PBS, and (d) notes that Bob Ross died recently; (6) 12055346 (November 25, 2012) during which Petitioner complains to his mother that his last visitors did not bring him any food and jokes he is the skinniest one in their family; (7) 12247066 (December 3, 2012) during which Petitioner explains to his mother that he is exercising in an effort to help his digestion and asks "when was the last time you cried?"; (8) 12571392 (December 16, 2012) during which Petitioner comments that when his mother is scolding him their brief telephone conversations seem like they last an hour; (9) 38237940 (December 20, 2012) during which Petitioner (a) asks his mother if there are any single pretty women at her church with whom he could communicate, (b) comments "it's kind of sad being locked up, momma," (c) during a discussion of cooking observes "there's all kind of natural seasonings in the world," (d) urges his mother to e-mail Ingrid to tell her he is feeling blue, and (f) reminds his mother that "tomorrow is the end of the world"; (10) 38526326 (December 31, 2012) during which Petitioner (a) asks his mother about some old photographs their family took showing children playing in the street and (b) irritates his mother with his money making schemes and advise on how to supplement her income; (11) 38578125 (January 2, 2013) during which Petitioner (a) observes that when he was living at home, he was still a boy and his character and personality had not yet developed, (b) discusses with his mother whether she believes it would be appropriate for the two of them to share a drink now that they are both adults, (c) states that he believes we were created to enjoy life, and (d) asks "why did an all powerful God need us to worship him?"; (12) 39836661 (February 19, 2013) during which Petitioner (a) states he would trade places with homeless people living under the bridge, (b) states he can't stand cold weather, and (c) calculates two times four - the cost of each of their calls; (13) 39897104 (February 21, 2013) during which Petitioner (a) wishes his mother a Happy Birthday, (b) discusses a German chocolate cake he saw on Good Morning America, (c) discusses a PBS series he saw titled "Black in Latin America," and (d) discusses with his father a documentary he saw on black marshal artists; (14) 40100975 (March 2, 2013) during which Petitioner (a) observes that three or four years before after he came across information about a black artist who succeeded, he began to understand what was possible in this life and came to realize he had squandered and wasted his own life, (b) explains it was like waking up and

and a pair of his acquaintances in which Petitioner demonstrates even greater ease of communication

and the ability to socialize freely with two persons of vastly different backgrounds despite the fact

Petitioner possesses the handicaps of being incarcerated and having only a tenth grade education.[78]

---

realizing there is potential in yourself, (c) observes "but in a cell your options are limited," (d) states he has spent thirteen years in a cell wasting his life, (e) states he is happy he woke up and knows "I still have some possibilities - some options," (f) states he hopes "God'll open some doors," (g) asks his mother whether impending federal spending cuts will have a direct effect upon his father's job, (h) states that his attorney "Warren" went to D.C. for a hearing and urges, his (I) mother to call Warren to learn how the hearing went; (15) 41828939 (May 11, 2013) during which Petitioner (a) discusses his attorney's visit to see him and (b) explains he received his television the night he arrived back at the BCADC; and (16) 41860970 (May 12, 2013) during which Petitioner (a) wishes his mother a Happy Mother's Day, (b) explains that he is pushing the limits with BCADC guards to see how far he can get, (c) describes and discusses with his mother a BCADC guard named Cantu with whom his mother may have worked many years before, (d) states that he knows it takes a couple hours to get from San Antonio to Austin and that the trip from San Antonio to Houston is a lot longer, and (e) remarks that a law enforcement officer lived on their street when he was growing up.

[78] Petitioner's conversations with a retired businessman from Arkansas include (1) 11722951 (November 11, 2012) during which Petitioner (a) comments that he feels college football is not really fun unless you can see it, (b) explains he was sent to the BCADC in January so being sent back there again was not a problem for him, (c) states he enjoys the change of scenery because there are things at the BCADC which he can take advantage of which are unavailable at the Polunsky Unit, (d) states he is looking forward to meeting with his attorney, (e) explains he is more free to talk with his acquaintance when he is at the Polunsky Unit than at the BCADC, (f) explains his outgoing mail from the BCADC will move more swiftly than it does at the Polunsky Unit, and (g) states he has been blessed with a good attorney; (2) 11751590 (November 13, 2012) during which Petitioner (a) explains his morning routine of yoga and meditation is easier at the BCADC because he has a slightly larger cell at the BCADC than he has at the Polunsky Unit, (b) comments that having access to shower gel at the BCADC is like going to a spa for him, (c) asks what his acquaintance has planned for the day, (d) comments in response to his friend's recitation of difficulties in his life that "difficult situations help develop your soul," (e) says he believes "everything you're going through is something you need" and this helps him find peace, (f) states that his friend Ingrid has suggested to him that he give thanks for his difficulties when praying, (g) states that when he was growing up he was what everyone wanted him to be but "I wasn't Obie yet," and (h) states "I have fully lived in my situation"; (3) 11804923 (November 15, 2012) during which Petitioner (a) warns that "you got to watch my sense of humor sometimes," (b) explains he stayed at the BCADC nine months the last time he was sent there, (c) states he has a hearing set for January but expects to remain at the BCADC for two months after that, (d) explains the difficult part of being housed at the BCADC is that the cost of living there is higher than at the Polunsky Unit, (e) suggests that his friend may be able to help out with that, (f) jokes "I don't live too ghetto fabulous," (g) explains he has no books or magazines at the BCADC, no reading material to stimulate his mind, (h) explains coffee becomes a form of stimulant or medication for him, (I) when asked about his mental approach to being incarcerated, explains "I can go to my island where it is peaceful and quiet anywhere I am," (j) states he believes it will be "kind of cool to be here for a few months," (k) comments that the staff at the Polunsky Unit tends to remain the same for years while the staff at the BCADC seems include a lot of people who are passing through; (4) 11805679 (November 15, 2012) during which Petitioner explains he had to terminate their previous conversation because of a BCADC policy that all inmates must get off the phone and return to their cells when a new inmate is brought into the cell block; (5) 11901621 (November 19, 2012) during which Petitioner (a) explains he had a visit from a New York art professor who is a friend of his fellow death row inmate Chris, (b) discusses the fact he grew up in a small church which he identified as St. James Baptist Church which was located in a rural area but he resided in San Antonio, and (c) discusses a news item he recently saw in which it was reported that a rap artist was arrested in the same Texas town where Willie Nelson and Snoop Dog had previously been arrested and refers to this as "Texas hospitality"; (6) 12185323 (December 1, 2012) during which Petitioner (a) responds to a question about what he has been doing by saying he has nothing to do but "stare

at the walls and check out the occasional nurse walking by," (b) states that his fellow inmate Chris has a friend who is a professional artist who recently visited him, (c) explains that when he draws something from heart without looking at it, he lets his hand and heart do what they want and not his mind, (d) describes the creative energy he felt as a youngster, (e) explains his head felt "scrambled" as a youth but now he can think clearly, (f) wishes he could be the person he is now back then, (g) explains he has discovered his artistic talents since his arrival in prison, (h) explains he has come to accept his own weirdness, (I) states "fear" is the emotion with which he is most in touch, and (j) states he tries to create things with his art to help him work through his difficulties; (7) 12185342 (December 1, 2012) during which Petitioner (a) explains he last spoke with his family at Thanksgiving and they have not put any money on the phone so he has not been able to speak to them, (b) discusses the fact the BCADC appeared on the television program "Lockup" the previous week and explains that he was not at the BCADC when that episode was filmed last year, (c) describes the interior of the BCADC's administrative segregation unit, (d) states that the National Geographic channel also filmed a documentary inside the BCADC about gangs in jail and suggests that his friend "google it," (e) asks whether it is possible to watch Lockup on line, (f) asks what the "MS" in MSNBC stands for, (g) asks his friend to send him some money so he can purchase lotion, stamps, coffee, deodorant, and other items, (h) explains fifteen dollars should suffice, (I) offers to give his friend a mailing address and web site to which he can send the money, and (j) comments his family is not there as much as he needs them to be; (8) 12387611 (December 8, 2012) during which Petitioner (a) comments in response to his friend's admission that he drives a Cadillac convertible that "people's cars say something about them," (b) thanks his friend for sending the money, (c) comments that his friend's voice sounds like his grandpa's, (d) states that he feels himself getting old, and (e) says he last spoke with his grandfather in 2008; (9) 12443717 (December 11, 2012) during which Petitioner (a) asks his friend to e-mail Ingrid and ask her to send him some coffee and food and for his friend to tell Ingrid that Petitioner loves her and (b) in response to his friend's comment that Ingrid's last e-mail included statements that she was married to Petitioner and that all communications to Petitioner should go through her, "she kind of get that way some times"; (10) 12544982 (December 15, 2012) during which Petitioner comments in response to his friend's statement that he got a response to his e-mail from Ingrid "she fell for it"; (11) 12614765 (December 17, 2012) during which Petitioner (a) asks his friend to send him one of those food care packages that includes chips and soups, and meat sticks and (b) discusses mounting a few pieces of his artwork on illustration boards; (12) 38253357 (December 21, 2012) during which Petitioner (a) states that "today is the end of the world", (b) says he is pretty sane, (c) explains Chris writes for me some times, and (d) discusses his friend's view that Petitioner is arrogant, a term Petitioner says he does not understand; and (13) 38253383 (December 21, 2012) (the final conversation between Petitioner and his acquaintance in Arkansas among the collected recordings) during which Petitioner challenges his friend's observation that he is arrogant.

  The recordings also include a total of 34 conversations between Petitioner and a female acquaintance during (a) which Petitioner furnishes her with emotional support for her difficult domestic situation and (b) enters into what can best be described as a quasi-romantic relationship which at times includes extremely graphic discussions.  The most relevant conversations among these records, heavily sanitized, are as follows: (1) 12428901 (December 10, 2012) during which Petitioner (a) inquires as the exact nature of her relationship with her children's father, (b) in response to her statement that she and her children had been kicked out of her mother's home, observes that her mother's actions may have been directed more at her children's father than at her, and (asks whether she was depressed during a period in which she was homeless; (2) 12448990 (December 11, 2012) during which Petitioner advises her to work things out with the father of her children with regard to child custody before she takes the children and moves out of the home they share; (3) 12524772 (December 14, 2012) during which Petitioner urges her to "keep the stress off" her oldest daughter so her daughter will like school; (4) 38261943 (December 21, 2012) during which Petitioner attempts to apologize for not writing to her for over a year by saying "I can be an a–hole," and "I wasn't at a certain level myself"; (5) 38332576 (December 23, 2012) during which Petitioner (a) observes that she has serious responsibilities in her life, (b) describes her voice as very youthful, (c) says that she seems like a very serious person from her letters, and (d) says he wants to try to understand her; (6) 38332718 (December 23, 2012) during which Petitioner (a) states that he has read *The Lord of the Rings* books, (b) discusses the television series *Game of Thrones*, (c) asks whether her children need her supervision when they are in the bath, and (d) asks her to send pictures with her next letter; (7) 38332806 (December 23, 2012) during which Petitioner (a) says that the dude who sells the drugs is an addict himself, (b) asks how much they can talk to each other every week based upon her finances, and (c) explains that one of the advantages he enjoys while

In addition to the foregoing evidence, the state habeas court also had before it the record from Petitioner's trial, direct appeal, and first state habeas corpus proceeding, as well as (1) a pair of affidavits from Dr. Jeannine Foster, one of Petitioner's and his older sister's former high school teachers and a friend of the Weathers' family, in which she recanted much of her trial testimony concerning Petitioner's behavior in her classroom,[79] (2) a pair of affidavits from Petitioner's mother,[80] (3) a report by mitigation specialist Ann M. Matthews in which she suggested Petitioner might be mildly mentally retarded but in which she also observed, among other things, that (a)

---

staying at the BCADC is that he knows some of the jail officers from his neighborhood and he has more phone access than he had at the Polunsky Unit; (8) 38333873 (December 24, 2012) during which Petitioner suggests that he can add "some emotional stability" to her life; (9) 38334220 (December 24, 2012) during which Petitioner (a) explains his attorney is working on his legal case and is concerned about Petitioner's case becoming too highly publicized, (b) explains it is possible he will get a life sentence, (c) explains it could take another five-to-ten years before there is a final decision in his case or it could come soon, (d) explains that if his current appeal is unsuccessful, he still has "a couple more appeals" left, (e) states he hopes he gets off and has a "pretty hopeful chance right now," and (f) explains that is why, although he wants to establish himself as an artist, he is waiting until after his legal case is resolved to put his artwork on a web site or otherwise seek to have his artwork shown; (10) 38477700 (December 29, 2012) during which Petitioner urges her to use the Internet to shop because it will save her gas money; (11) 38501073 (December 30, 2012) during which Petitioner states "I want you to have some value for me in your life"; (12) 38577590 (January 2, 2013) during which Petitioner suggests that the difficulties she has endured in her life have "made you immune to the BS"; (13) 38594458 (January 3, 2013) during which Petitioner (a) offers to send her a web site address so she can donate money to him and (b) explains she cannot use "J-pay" but can use Western Union to do so; (14) 38854122 (January 13, 2013) during which Petitioner (a) asks her who will watch her children if she separates from her children's father, (b) asks whether her mother is responsible with her children, and (c) explains he is about to go see his shrink; (15) 39338074 (January 31, 2013) during which Petitioner (a) in response to news that her daughter is ill, asks whether her daughter is drinking enough fluids and having regular bowel movements, and (b) responds to her negative comments about hearing that Petitioner may marry someone else; (16) 39786812 (February 16, 2013) during which Petitioner challenges her to explain why she does not like the Harry Potter books; (17) 39918645 (February 22, 2013) during which Petitioner explains that he is working on an art project with someone named Danielle and has asked Danielle to communicate with him through her, (b) asks how her money is holding with regard to a potential visit by her to see him, (c) suggests she schedule her trip so she can be in San Antonio and visit him on Sunday and Tuesday, the two days he has visitation, (d) discusses a woman he saw on Dr. Phil who was addicted to having babies, and (e) discusses a device used to preserve a semen sample for later insemination; (18) 39932645 (February 23, 2013) during which Petitioner states that he kicks himself for not taking more control in his life; and (19) 40044460 (February 27, 2013) during which Petitioner explains that (a) being arrested and locked up the first time was " traumatizing" and (b) the next time he was arrested he was locked up for a week.

[79] Second State Habeas Transcript, at pp. 142-46.

[80] Second State Habeas Transcript, at pp. 151-57.

Petitioner's family informed her Petitioner had reached all developmental milestones at a normal age and had exhibited no obvious delays and (b) by the time he was in eleventh grade, Petitioner "commonly smoked marijuana daily,"[81] (4) a trio of *unsigned* statements from a neighbor of Petitioner, a childhood friend of Petitioner, and Petitioner''s sister,[82] (5) a pair of affidavits from attorneys addressing the proper scope of mitigation investigations in capital cases generally and expressing opinions that Petitioner's trial counsel should have retained the services of a mitigation specialist and an independent mental health expert,[83] and (6) an affidavit from a clinical psychologist based solely on documents and no clinical evaluation suggesting (a) Petitioner's conduct in school did not include violence, (b) all of Petitioner's violent actions occurred following the sudden death of his maternal grandmother in July, 1997, and (c) Petitioner suffers from major depressive disorder with psychotic features and post-traumatic stress disorder.[84]

    4.  Synthesis

---

[81] Second State Habeas Transcript, at pp. 160-67.

[82] Second State habeas Transcript, at pp, 169-70, 172, 174.  The *unsigned* statements of Carolena W. Hawkins, Raymond L. Jones, and Stephanie Huff may not be considered by this Court for any purpose in this federal habeas corpus action.  The Fifth Circuit has authorized the use of summary judgment procedures in federal habeas corpus proceedings. *See Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir.) ("As a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary judgment, applies with equal force in the context of habeas corpus cases."), *cert. denied*, 531 U.S. 851 (2000).  The Fifth Circuit Court of Appeals has never allowed litigants to oppose summary judgments by the use of unsworn materials.  *See, e.g., Provident Life and Acc. Ins. Co. v. Goel*, 274 F.3d 984, 1000 (5th Cir. 2001) (holding district court properly disregarded unsworn expert report)*; Watts v. Kroger Company*, 170 F.3d 505, 508 (5th Cir. 1999) (holding a district court properly struck several handwritten, unsworn, not notarized statements that were not in the form of affidavits); *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994) (refusing to permit a *pro se* litigant to rely upon an unverified pleading and unauthenticated documents to defeat the defendant's motion for summary judgment).  Typically, the only summary judgment evidence relevant in a federal habeas corpus action is that in the record of the petitioner's state pretrial, trial, direct appeal, and state habeas proceedings.  *Rogers v. Quarterman*, 555 F.3d 483, 486 n.1 (5th Cir.), *cert. denied*, 558 U.S. 839 (2009).  The *unsigned* statements of these three witnesses do not constitute proper summary judgment evidence.

[83] Second State Habeas Transcript, at pp. 176-88 & 190-98.

[84] Second State Habeas Transcript, at pp. 200-04.

Petitioner presented (1) the opinion testimony of Dr. Murphey and her IQ test results obtained in 2011 (a full scale score of 53 on the WAIS-IV and a full scale score of 65 on the Stanford-Binet fifth edition, neither of which were apparently reduced pursuant to the Flynn effect), (2) the IQ test results obtained by Dr. Reed in 2008 (i.e., a full scale score of 79 on the WAIS-III reduced to 73 in accordance with the Flynn effect),[85] (3) Dr. Smith's report (which did not include any record of IQ testing by Dr. Smith), and (4) the other testimonial evidence and documents summarized above.[86] Respondent countered primarily with the testimony of Dr. Sparks[87] and more than twenty hours of Petitioner's recorded telephone conversations from the BCADC summarized above.[88]  Conflicting expert testimony, such as was presented to the state trial court during Petitioner's most recent state habeas corpus proceeding, invites a fact-finder to make a credibility determination, not to tally which side produced more experts.  *Williams v. Stephens*, 761 F.3d 561, 572 (5th Cir. 2014), *cert. denied*, 135 S. Ct. 1735 (2015).

---

[85] S.F. Second State Habeas Hearing, testimony of Dr. Joann Murphey, at pp. 141-42, 148, 511 (Vol. 4, pp. 28-29; Vol. 4, p. 35; Vol. 10, p. 124).  Dr. Reed's 2008 test results were reviewed by Dr. Murphey, who discussed them in her own report.  *See Dr. Murphey's Report*, Second State Habeas Transcript, at pp. 108-09.  But no documentation setting forth Dr. Reed's 2008 findings was  admitted into evidence or judicially noticed during Petitioner's most recent state habeas corpus proceeding.  Petitioner did attach a copy of a 2007 report prepared by Dr. Reed to Petitioner's subsequent state habeas corpus application.  Second State Habeas Transcript, at pp. 135-37.  But this September 5, 2007 report merely discusses the need for further IQ testing and clinical evaluation of Petition; it does not report on Dr. Reed's 2008 testing of Petitioner's IQ.  The "exhibit list" accompanying Petitioner's subsequent state habeas corpus application listed "Report of Jesse A. Reed III. P.hD. [sic], June 17, 2008" among the exhibits purportedly accompanying that pleading.  However, the report from Dr. Reed which was actually attached to Petitioner's subsequent state habeas corpus application was Dr. Reed's *September 5, 2007* report.  No copy of Dr. Reed's June 17, 2008 report was ever presented to the state habeas court.  Nor has Petitioner presented a copy of Dr. Reed's June 17, 2008 report to this Court.

[86] Second State Habeas Transcript, at pp. 86-198.

[87] *See* note 75, *supra*, and accompanying text.

[88] *See* notes 76-78, *supra*.

The IQ test results introduced during Petitioner's most recent state habeas corpus proceeding were far from conclusive.  Dr. Murphey testified that she did not believe the full scale 53 score she obtained form Petitioner on May 1, 2011 accurately reflected his capabilities and asked BCADC medical personnel to consider medicating Petitioner prior to re-testing.[89]  BCADC staff were reluctant to do so and only agreed to medicate Petitioner after he made multiple special pleas, his attorney and the state court judge contacted BCADC medical staff, and Petitioner announced new symptoms to BCADC medical staff.[90]  Dr. Murphey expressed much greater confidence in the

---

[89] S.F. Second State Habeas Hearing, testimony of Dr. Joann Murphey, at pp. 138-39, 527-29, (Vol. 4, pp. 30-31; Vol. 10, pp. 140-42); *Dr. Murphey's Report*, Second State Habeas Transcript, at pp. 103-05, 110-13.

[90] *Dr. Murphey's Report*, Second State Habeas Transcript, at pp. 101-05, 110.  This portion of Dr. Murphey's Report recounts the entries of BCADC medical staffers during the period May 5, 2011 through July 21, 2011, which reflect that (1) Petitioner's attorney contacted BCADC staff on or about May 6, 2011 and informed them Dr. Murphey had concluded Petitioner was psychotic and in need of medication; (2) on or about June 1, 2011, BCADC medical staff received a phone call from the courthouse regarding a letter from Dr. Murphey requesting Petitioner be evaluated for possible medication; (3) on June 1, 2011, Petitioner was seen by Dr. Garcia and (a) Petitioner indicated no need for medications, (b) Dr. Garcia concluded Petitioner was "logical, coherent, without disorganized thought and no evidence of responding to internal stimuli," (c) there were no staff incident reports of unusual or bizarre behavior or self destructive behavior, and (d) Dr. Garcia concluded "there is no further psychiatric treatment needed and the patient appears stable, calm and cooperative"; (4) on June 8, 2011, Petitioner (a) reported "his attorney informed him to ask to be 'treated, to proceed with the testing,' " (b) Petitioner was paranoid, reported seeing shadows that take various shapes, and (c) BCADC medical staff recorded a plan to follow up with attorney's request for "treatment"; (5) on June 15, 2011, (a) Petitioner explained to BCADC medical staff it was not his attorney who had asked that he be treated but, rather, Dr. Murphey, (b) Petitioner asked about seeing the psychiatrist and was informed Dr. Taylor would be alerted, and (c) Petitioner was not in any apparent distress; (6) on June 22, 2011, Petitioner asked about seeing Dr. Taylor and was not in any apparent distress; (7) a Psych Progress Note on June 22, 2011 reports (a) Petitioner was seen without an officer in the room, (b) Petitioner was unclear why he wanted to be treated "except that  his attorney wants him treated," (c) Petitioner reported sometimes seeing hallucinations of faceless dogs with wings which did not cause him any distress, (d) a review of TDC records revealed no indication of psychiatric illness or treatment, (e) "May have schizotypal Traits. Does not relate in a way typical of someone who is actually psychotic," and (f) when staff asked for permission to talk to Petitioner's mother about past treatment, Petitioner recommended staff talk with Dr. Murphey or his attorney about past records; (8) on June 28, 2011 Dr. Skop evaluated Petitioner and did not find him flagrantly psychotic but did find (a) "transient psychotic-like symptoms, magical thinking, and mild thought disorganization suggestive of a schizotypal personality *or possibly some regression related to prolonged isolation*," (b) Petitioner reported prior visitations of his deceased grandmother, transient visions of insects and animals, feelings of being levitated, previously thinking his parents were not his parents but had been exchanged with an alien family, and feeling people are talking about him in veiled language, (c) Dr. Skop reported Petitioner "while not grossly disorganized," demonstrated "occasional tangential and loose thought processes," and (d) Dr. Skop concluded "given the symptoms and the importance of accurate testing in his appeal process that it would be reasonable to offer Obie a trial of a low dose antipsychotic such as Risperdal for at least a couple of weeks to see if it would help reduce the symptoms and facilitate accurate testing"; (9) on July 8, 2011, Dr. Murphey contacted Dr. Skop and was informed for optimal results Petitioner should be on medication for at least two weeks prior to testing; (10) Psych Progress Note dated July 21, 2011 reports (a) received notification from Dr. Skop

accuracy of the full scale score of 65 which Petitioner obtained on the Stanford-Binet test instrument when she re-tested him on August 14, 2011.[91]   Dr. Murphey was critical of the full scale score of 79 Petitioner obtained when Dr. Reed tested him in 2008 because (1) Dr. Reed utilized the WAIS-III test instrument which Dr. Murphey characterized as an obsolete test and far less robust than the WAIS-IV, which became available only a few months after Dr. Reed administered the WAIS-III, and (2) Dr. Reed made a scoring error in his evaluation of Petitioner's test scores.[92]   Dr. Murphey also noted (1) Dr. Reed adjusted Petitioner's 79 full scale score downward pursuant to the Flynn effect to a score which fell within the standard error of measurement for the top end of the range for mental retardation and (2) Dr. Reed ultimately concluded  Petitioner was mildly mentally retarded.[93]   Dr. Sparks expressed no opinion regarding the accuracy or efficacy of any of the three IQ tests administered to Petitioner by Dr. Reed or Dr. Murphey but did opine that he observed nothing during

---

[91] yesterday that he had seen Petitioner, (b) Dr. Skop reported "I did not find psychotic symptoms such as those seen in an acute episode of schizophrenia or other primary psychotic disorder.  He did appear to have transient psychotic-like symptoms, magical thinking, and mild thought disorganization suggestive of schizotypal personality or *possibly related to prolonged isolation*.", (c) Petitioner agreed to be medicated only after Dr. Taylor informed him that Judge Vasquez-Gardner had sent a letter stating Petitioner was complaining he had not been getting medication, (d) Petitioner denied ever having taken Risperdal before, and (e) "Diagnostically not straight forward.  However, given second opinion by Dr. Skop and Dr. Taylor's initial interview of possible schizotypal traits, magical thinking, and fleeting hallucinations, and need for accurate psychological testing, will start low dose Risperdal 0.5 mg two times a day." *Id.*, at pp. 101-05 (Emphasis added).  Dr. Skop's suggestions that Petitioner's symptoms were possibly the result of prolonged isolation were fully consistent with Dr. Sparks' testimony regarding the effects of prolonged isolation.  S.F. Second State Habeas Hearing, testimony of John C. Sparks, at pp. 328-29 (Vol. 6, pp. 21-22).  The state habeas court could reasonably have concluded these BCADC medical records supported Dr. Sparks' testimony and supported a finding that Petitioner's poor performance on all of his IQ tests was at least partially the result of Petitioner's prolonged incarceration under isolated conditions rather than an indication of true intellectual disability.

[91] S.F. Second State Habeas Hearing, testimony of Dr. Joann Murphey, at pp. 138-39 (Vol. 4, pp. 25-26) (Dr. Murphey testified Petitioner did significantly better the second time she tested him); at p. 140 (Vol. 4, p. 27( (Dr. Murphey testified Petitioner "presented much better" the second time she tested him); at p. 148 ((Vol. 4, p. 35) (Dr. Murphey described the Stanford-Binet test instrument she used on August 14, 2011 as "the best measure of intellectual deficits"); at pp. 527-30 (Vol. 10, pp. 140-42) (Dr. Murphey testified Petitioner did "consistently better" on the Stanford-Binet test); *Dr. Murphey's Report*, Second State Habeas Transcript, at pp. 113-15.

[92] S.F. Second State Habeas Hearing, testimony of Dr. Joann Murphey, at pp. 147-48 (Vol. 4, pp. 34-35).

[93] *Id.*, at p. 148 (Vol. 4, p. 35); *Dr. Murphey's Report*, Second State Habeas Transcript, at pp. 109-09.

his mental status evaluation of Petitioner in 2000-01 which indicated to him Petitioner was mentally retarded.[94]

The credibility of an expert opinion is dependent primarily upon two factors: first, the experience and qualifications of the person giving the opinion; and second, the quality of the factual information upon which the expert bases his or her opinions.  The parties have identified no basis for questioning Dr. Murphey's credentials, training, or experience.[95]  The state habeas court may, however, have reasonably questioned the validity of Dr. Murphey's conclusions based on the body of information from which she drew her conclusions.[96]  *See Williams v. Stephens*, 761 F.3d at 573 (holding a jury could properly disregard an expert opinion regarding intellectual disability which was based on "incomplete and inaccurate information").

---

[94] S.F. Second State Habeas hearing, testimony of John C. Sparks, at pp. 323-24 (Vol. 6, pp. 16-17).

[95] The parties stipulated to Dr. Murphey's credentials during the evidentiary hearing held in Petitioner's most recent state habeas corpus proceeding.  S.F. Second State Habeas Hearing, testimony of Dr. Joann Murphey, at p. 39 (Vol. 3, p. 16).  Likewise, Petitioner's efforts to challenge Dr. Sparks' qualifications to render an opinion regarding the absence of evidence of mental retardation in 2000-01 are unconvincing.  By 2000, Dr. Sparks had been practicing psychiatry for almost a half century and, while not specializing in the care and treatment of the mentally retarded, had dealt with mentally retarded dependents of military personnel  and inmates at the Bexar County Jail who did qualify as mentally retarded.  As a licensed medical professional, i.e., a psychiatrist with almost fifty years of practical experience diagnosing psychiatric illnesses, Dr. Sparks was amply qualified to render an opinion regarding whether he observed any indications during his clinical interview of Petitioner suggesting Petitioner was mentally retarded.

[96] Dr. Murphey listed all the documents, records, affidavits, and reports she reviewed in preparing her evaluation of Petitioner in her written report.  *See* Dr. Murphey's Report, Second State Habeas Transcript, at pp. 90-109.  She also testified about the same subject extensively.  S.F. Second State Habeas Hearing, testimony of Dr. Joann Murphey, at pp. 92-103, 118-21, 128-29, 148, 506-09  (Vol. 3, pp. 69-80; Vol. 4, pp. 6-9; Vol. 4, pp. 15-16; Vol. 4, p. 35; Vol. 10, pp. 119-22).  Among the material Dr. Murphey listed in her report were three "affidavits" of Carlene Hawkins, Raymond James, and Stephanie Huff.  *Dr. Murphey's Report*, Second State Habeas Transcript, at pp. 105-06.  The "affidavits" presented by Petitioner to the state habeas court purportedly from these same three persons, however, were not executed, signed, or otherwise authenticated.  Second State Habeas Transcript, at pp. 169-70, 172, 174.  While it is common for experts to base their opinions on hearsay evidence, Dr, Murphey based her ultimate conclusions, at least in part, on information which had never been authenticated in any manner.  The state habeas court could reasonably have concluded this fact undermined the credibility of Dr, Murphey's ultimate conclusion that Petitioner is intellectually disabled.

Dr. Murphey did not review any portion of the record from Petitioner's capital murder trial.[97] The record from the punishment phase of a capital murder trial usually furnishes substantial, vital, often compelling, evidence regarding the true capabilities and background of the defendant. Yet Dr. Murphey drew her conclusions without reference to any of the evidence presented during the lengthy punishment phase of Petitioner's capital murder trial. Based upon her testimony before the state habeas court, it is apparent Dr. Murphey did not have a complete and accurate picture of Petitioner's full criminal background at her disposal when she reached her conclusions. For instance, she testified that, other than his capital murder conviction, the only other criminal activity of the Petitioner of which she was aware consisted of "a robbery and death of a woman and a mention of a rape of a male."[98] When questioned on cross-examination about Petitioner's sexual assault of a female Sam Houston High School student (which occurred in April, 1997, prior to the death of Petitioner's maternal grandmother which both Dr. Murphey and Dr. Smith attributed in their reports for so much of Petitioner's emotional and psychological difficulty), Dr. Murphey merely stated she had read about the incident, but she did not furnish any further elaboration.[99] Likewise, Dr. Murphey indicated only that she could "remember a reference" in materials she had reviewed regarding Petitioner's violent assault upon a female classmate in May, 1998 in which Petitioner grabbed his victim by the throat, choked her to the verge of unconsciousness, and threw her over a table.[100] Dr. Murphey also expressly based her opinion upon the affidavit of Dr. Smith, which inaccurately

---

[97] S.F. Second State Habeas Hearing, testimony of Dr. Joann Murphey, at pp. 99, 549 (Vol. 3, p. 76; Vol. 10, p. 162).

[98] S.F. Second State Habeas Hearing. Dr. Joann Murphey, at p. 100 (Vol. 3, p. 77).

[99] S.D. Second State Habeas Hearing, testimony of Dr. Joann Murphey, at p. 133 (Vol. 4, p. 20).

[100] *Id.*

recounted that (1) Petitioner's troubles in school did not include acts of violence and (2) all of Petitioner's disciplinary problems at school and emotional problems arose *after* the sudden death of Petitioner's maternal grandmother in July, 1997.  Dr. Murphey was also apparently unaware of the evidence showing the details of Petitioner's multiple burglaries of residences presented during the punishment phase of Petitioner's capital murder trial, crimes in which Petitioner utilized the same modus operandi of kicking open a door facing the home's backyard and managed to leave the scene without leaving behind any forensic evidence (such as fingerprints, hair, DNA, or fibers) linking him to any of those crimes.[101]   In view of the fact that most of the foregoing offenses occurred prior to or shortly after the date of Petitioner's eighteenth birthday, i.e., the end of Petitioner's developmental period, the state habeas court could reasonably have concluded Dr. Murphey's ultimate opinion was not based upon a complete and fully accurate picture of Petitioner's capabilities demonstrated during his developmental period.

Dr. Murphey also based her opinion, at least in part, on the affidavit and testimony during Petitioner's second state habeas corpus proceeding of Moral Hill, Petitioner's former employer, in which he described Petitioner's work history at his seafood restaurant as nothing short of abysmal.[102] Dr. Murphey did not have the benefit of Mr. Hill's trial testimony, in which he described Petitioner's

_____

[101] The state habeas court could reasonably have concluded the fact Petitioner managed to get away with so many offenses without being caught refuted Dr. Murphey's testimony suggesting Petitioner's offenses were not carefully planned or executed.  S.F. Second State Habeas Hearing, testimony of Dr. Joann Murphey, at pp. 150, 547 (Vol. 4, p. 37; Vol. 10, p. 547).  Of course, Dr. Murphey's opinion on this point was apparently directed exclusively to the three specific crimes which she identified during her testimony at Petitioner's second state habeas hearing, i.e., the capital murder of Ted Church and the robbery and shooting of a woman and the sexual assault of a man.  It is apparent that, when she formulated her opinion concerning Petitioner's intellectual capabilities, Dr. Murphey did not have the benefit of a detailed account of any of Petitioner's other criminal offenses, such the information available through review of the evidence presented during the punishment phase of Petitioner's capital murder trial.  The state habeas court could reasonably have concluded this rendered her opinions of questionable validity.

[102] S.F. Second State Habeas Hearing, testimony of Moral Hill, at pp. 474-502 (Vol. 10, pp. 87-115); Second State Habeas Transcript, at pp. 148-49.

work performance in starkly contrasting, almost glowing, terms.[103]   The state trial court could

reasonably have concluded, therefore, Dr. Murphey's opinion was based, at least in part, on a

recanting affidavit and recanting testimony, both of which are viewed with great skepticism by the

courts. *Graves v. Cockrell*, 351 F.3d 143, 153 (5th Cir. 2003); *May v. Collins*, 95 F.2d 299, 314 (5th

Cir.), *cert, denied*, 504 U.S. 901 (1992).

While Dr. Murphey did review some of Petitioner's school records,[104] she apparently did not

have the opportunity to review those portions of the Petitioner's school records which were admitted

into evidence during the Petitioner's first state habeas corpus proceeding and which showed, among

other things, that (1) Petitioner made a passing grade of at least 70 in both semesters of English his

freshman, sophomore, and junior years at Sam Houston High School,[105] (2) Petitioner earned grades

of A in Government and Economic during Summer School in 1997,[106] (3) Petitioner made grades

of A for two semesters in Physical Science during Summer School 1998,[107] and (4) while attending

the Navarro Achievement Center (an alternative campus) in 1998 as an eighth grader, Petitioner

---

[103] S.F. Trial, Volume 22, testimony of Moral Everett Hill, at pp. 6-13.

[104] Dr. Murphey did identify some of the school records she reviewed in her report, Second State Habeas transcript, at pp. 90-91, but her description of those records does not indicate whether they contained all of the academic grade information contained in the school records admitted during Petitioner's first state habeas corpus proceeding. For unknown reasons, both Petitioner's second state habeas counsel and counsel for the State failed to introduce the school records on which Dr. Murphey based her opinion and which the State used to impeach Ms. Cynthia Caruso.  During her testimony, Dr. Murphey specifically listed withdrawal slips she had reviewed indicating Petitioner was failing all or most of his classes on several occasions when he was withdrawn from his regular campus (possibly for transfer to the Navarro Achievement Center). S.F. Second State Habeas Hearing, testimony of Dr. Joann Murphey, at p. 507 (Vol. 10, p. 120). But she does not indicate in her written report or her testimony whether she ever reviewed any of Petitioner's grade reports from the Navarro Achievement Center or any of the other school records contained among the evidence introduced during Petitioner's first state habeas corpus proceeding.

[105] First State Habeas Transcript, at p. 259.

[106] *Id.*, at p. 240.

[107] *Id.*, at p. 242.

earned grades of 92, 92, 74, 80, and 88 in his academic subjects.[108]   Because she did not review any of the testimony from Petitioner's trial, Dr. Murphey also did not have the benefit of the testimony of (1) Petitioner's middle school and high school principal who testified  without contradiction that Petitioner was "quite capable of doing the assigned work,"[109] (2) the assistant principal of Sam Houston High School who testified without contradiction that Petitioner "was a bright student" who could handle things but chose not to do so and became more and more defiant as he grew older,[110] or (3) Petitioner's sister who testified without contradiction that (a) when Petitioner was released from jail [in January, 2000], he found a job right away at West Telemarketing and worked there for about a month before his arrest [on February 15, 2000],[111] (b) Petitioner was average in terms of maturity and emotional development, (c) Petitioner does better when closely monitored, (d) Petitioner was never disruptive at home, and (e) Petitioner successfully hid his drug use and possession of weapons from her while they shared an apartment.[112]  Dr. Murphey also did not benefit from hearing the trial testimony of Dr. Jeannine Foster, which apparently diverged considerably from the information Dr. Foster related to Dr. Murphey in 2011.[113]   The state habeas court could

---

[108] *Id.*, at p. 248.

[109] S.F. Trial, Volume 19, testimony of Betty Williams, at p. 54.

[110] S.F. Trial, Volume 19, testimony of Phillip Rodriguez, at pp. 118-19, 124-25.

[111] Petitioner presented the state habeas court with no evidence reflecting Petitioner's job duties at West Telemarketing or explaining the circumstances under which Petitioner, then on probation for a felony offense and lacking both a high school diploma and GED, was able to find employment so quickly once he was released from custody in January, 2000.

[112] S.F. Trial, Volume 22, testimony of Stephanie Huff, at pp. 44, 49, 51, 54-56.

[113] At trial, Dr. Foster testified Petitioner was (1) in his chair, a "yes, ma'am, no ma'am" student  who was not disruptive in class, (2) while reading and writing were a challenge for Petitioner he did not get frustrated but kept on trying, (3) he always put forth his best effort, (4) she did not consider Petitioner to be among the students who could master the work assigned, and (5) she was certain Petitioner passed her class.  S.F. Trial, Volume 22, testimony of Jeannine Foster, at pp. 58-70.

reasonably have concluded Dr. Murphey's opinion testimony was based in part upon an incomplete record of Petitioner's academic talents and other information of dubious validity.[114]  In view of the foregoing, the state habeas court could reasonably have determined Dr. Murphey's conclusion that Petitioner displayed deficits in functional academics was not based on a completely accurate view of Petitioner's academic performance and, therefore, not credible.

Dr. Murphey's conclusions that Petitioner did not "malinger" on either the IQ tests she administered in May and August, 2011 must be viewed in proper context.  Dr. Murphey testified that, while motivation and malingering can account for variance in test scores, she did not believe Petitioner was "malingering" because (1) Petitioner put forth what she believed to be genuine and sincere effort to complete each section of the IQ tests she administered and displayed frustration when he was not allowed to continue working beyond the cut off time for a particular section, (2) Petitioner scored low for malingering on the memory malingering test she administered, and (3) there was no apparent inconsistency between Petitioner's scores in different sections of the tests.[115]  Dr.

---

In sharp contrast, in her two affidavits accompanying Petitioner's second state habeas corpus application, however, Dr. Foster painted a very different picture of Petitioner's academic performance and abilities, stating (1) Petitioner required additional instructional directions from her to get him to do the minimum work necessary, (2) he often lacked progression, (3) he was all but isolated from other students by their choice, (4) he failed to turn in assignments in a timely manner, which she attributed to a memory impairment, (5) he displayed frustration through his body language and age inappropriate social skills, (6) his general vocabulary was limited, (7) he was a poor reader at best, (8) he had difficult completing assignments that require extensive writing, (9) he had difficulty with grammar, punctuation, sentence and paragraph structure, and (10) he regularly had difficulty coming to class prepared and completing assignments. Second State Habeas Transcript, at pp. 143-46.

[114] As was true with regard to the recanting affidavit and testimony of Mr. Hill, the state habeas court could reasonably have viewed the credibility of what amounted to a pair of recanting affidavits by Dr. Foster with skepticism. *See Summers v. Dretke*, 431 F.3d 861, 872 (5th Cir. 2005) ("This circuit has long viewed recanting affidavits with 'extreme suspicion.' "), *cert. denied*, 549 U.S. 840 (2006); *Spence v. Johnson*, 80 F.3d 989, 1003 (5th Cir.) (recanting affidavits and witnesses are viewed with extreme suspicion by the courts), *cert. denied*, 519 U.S. 1012 (1996).

[115] S.F. Second State Habeas Hearing, testimony of Dr. Joann Murphey, at pp. 56, 144-45, 148-50, 523-27, 550 (Vol. 3, p. 33; Vol. 4, pp. 31-32; Vol. 4, pp. 35-37; Vol. 10, pp. 136-40; Vol. 10, p. 163).

Murphey's explanation of the memory malingering test she administered did not explain how the Test of Memory Malingering she administered would indicate whether a test subject was deliberately furnishing wrong answers to some test questions.[116]  Furthermore, Dr. Murphey's description of the Petitioner's demeanor during their first testing session, i.e., "concrete," "magical," "tangential," and "just unusual" thinking,  with almost psychotic features,[117] was fully consistent with Dr. Sparks' medical opinion that any person subjected to prolonged isolation could appear psychotic, retarded, or even schizoid.[118]  Dr. Murphey also testified she did not believe Petitioner understood the significance of his IQ testing in 2011,[119] a point at least somewhat refuted by (1) numerous comments made by Petitioner during his recorded telephone conversations with family and acquaintances during his time at the BCADC which demonstrated that, in 2012-13, the Petitioner understood the significance and ramifications of the legal proceeding his lawyer had initiated on his behalf,[120] as well as (2) Petitioner's explanations to BCADC medical staff in 2011 that his attorney

---

[116] *Id.*, at pp. 149-50 (Vol. 4, pp. 36-37); *Dr. Murphey's Report*, Second State Habeas Transcript, at p. 113 ("Obie's score was clearly out of the malingering range and memory appeared to be a strength for him").  Dr. Murphey also testified that she did not believe Petitioner's behavior during their testing sessions was consistent with that of a person who was failing or trying to purposefully do poorly "unless that person was very sophisticated." S.F. Second State Habeas Hearing, testimony of Dr. Joann Murphey, at p. 149 (Vol. 4, p. 36).  However, she later admitted that, after listening to some of Petitioner's recorded telephone conversations, Petitioner had clearly communicated in an above-average manner during some of his conversations. but claimed this only indicated Petitioner could "mask" his intellectual disability. *Id.*, at 554-55 (Vol. 10, pp. 167-68).  The state habeas court could reasonably have found unconvincing Dr. Murphey's assertion that the Petitioner, whom Dr. Murphey identified as both intellectually disabled and displaying deficits in communication skills, could demonstrate above-average skills in one of the adaptive functioning areas in which she testified Petitioner showed deficits.  More simply, the state habeas court could reasonably have chosen not to believe that Petitioner possessed deficits in communication skills but was able to "mask" that fact because he was able to utilize clearly above-average communication skills during his conversations with a variety of family and friends on a wide range of topics.

[117] S.F. Second State Habeas Hearing, testimony of Dr. Joann Murphey, at pp. 138, 527-29 (Vol. 4, p. 25; Vol. 10, pp. 140-42).

[118] S.F. Second State Habeas Hearing, testimony of John C. Sparks, at pp. 328-29 (Vol. 6, pp. 21-22).

[119] S.F. Second State Habeas Hearing, testimony of Dr. Joann Murphey, at p. 143 (Vol. 4, p. 30).

[120] *See* notes 76-78, *supra.*

61

and Dr. Murphey wanted him to be medicated prior to him being re-tested.[121]  Dr. Murphey also

admitted the possibility Petitioner might qualify for a diagnosis of Antisocial Personality Disorder

and that such a diagnosis, if applicable, could impact the ability to properly diagnose Petitioner's true

intellectual capabilities.[122]

Petitioner's recorded telephone conversations reveal he is capable of being extremely

personable and possesses knowledge of, and is able to communicate effectively on, a wide range of

subjects, ranging from popular culture to historical topics.  While his vocabulary reflects a person

with less than a complete high school education, he communicates with an ease and effectiveness

---

[121] *See Dr. Murphey's Report*, Second State Habeas Hearing Transcript, at pp. 101-05, wherein Petitioner is reported to have (1) stated "I just do what Warren says," (*Id.*, at p. 101), (2) indicated he had been advised by his attorney not to discuss his legal situation (*Id.*, at p. 102), (3)  stated that his attorney informed him to ask to be treated to proceed with testing, (*Id.,* at pp. 102-03), (4) stated his attorney told him Dr. Murphey said he needed treatment (*Id.*, at p. 103), (5) informed BCADC medical staff to speak with Dr. Murphey or his attorney regarding his past records (*Id.*, at p. 103), and (6) agreed to be medicated only after being informed that the judge had communicated to the BCADC medical staff that Petitioner was complaining he was not getting his medications (*Id.*, at pp. 104-05).

[122] S.F. Second State Habeas Hearing, testimony of Dr. Joann Murphey, at pp. 133-34, 145, 151 (Vol. 4, pp. 20-21, 32, 38).  The DSM-5 describes antisocial personality disorder as "a pervasive pattern of disregard for, and violation of, the rights of others that begins in childhood or early adolescence and continues into adulthood."  *DSM-5*, at p. 659.  Deceit and manipulation are central features of antisocial personality disorder.  *Id.*   The DSM-5 defines antisocial personality disorder through the following diagnostic criteria:
    A.  A pervasive pattern of disregard for and violation of the rights of others, occurring since age 15 years, as indicated by three (or more) of the following:
        1.  Failure to conform to social norms with respect to lawful behaviors, as indicated by repeatedly performing acts that are grounds for arrest.
        2.  Deceitfulness, as indicated by repeatedly lying, use of aliases, or conning others for personal profit or pleasure.
        3.  Impulsivity or failure to plan ahead.
        4.  Irritability and aggressiveness, as indicated by repeated physical fights or assaults.
        5.  Reckless disregard for safety to self or others.
        6.  Consistent irresponsibility, as indicated by repeated failure to sustain consistent work behavior or honor financial obligations.
        7.  Lack of remorse, as indicated by being indifferent to or rationalizing having hurt, mistreated, or stolen from another
    B.  The individual is at least age 18 years.
    C.  There is evidence of conduct disorder with onset before age 15 years.
    D.  The occurrence of antisocial behavior is not exclusively during the course of schizophrenia or bipolar disorder.
*DSM-5*, at p. 659.

which Dr. Murphey admitted greatly exceeds that of a person functioning at the sixth grade level.[123]

Petitioner's recorded telephone conversations also reveal him to be highly manipulative,

knowledgeable regarding his legal situation, and capable of communicating at a level well above that

of a person with deficits in the adaptive functioning area of communication. Based upon these

recordings, the state habeas court could reasonably have rejected Dr. Murphey's opinion that

Petitioner displays adaptive functioning deficits in the areas of communication and social skills.[124]

The state habeas court could reasonably have questioned the efficacy of the adaptive behavior

scales presented to Dr. Murphey by Petitioner's family and friends. Those persons filled out those

scales in 2011, more than a decade after Petitioner reached the end of his developmental period, at

a time when the persons filling out the Petitioner's adaptive behavior scales undoubtedly were aware

that a diagnosis of intellectual disability was Petitioner's last best hope to avoid execution. Under

---

[123] S.F. Second State Habeas Hearing, testimony of Dr. Joann Murphey, at pp. 553-54 (Vol. 10, pp. 166-67).

[124] The same recordings and the records from Petitioner's TDCJ disciplinary proceedings attached to Petitioner's subsequent state writ application (Second State Habeas Transcript, at pp. 274-305) also support the state habeas court's finding that Petitioner exhibits an antisocial personality. For instance, Petitioner's lengthy criminal record, dating back to Petitioner's assaults on female students at his high school to his assaults on a fellow BCADC inmate and a guard at that facility while awaiting trial for capital murder, all evidence presented during the punishment phase of Petitioner's capital murder trial which Dr. Murphey apparently never reviewed in detail, reflect a pattern of failures to conform to social norms. Petitioner's willingness to say whatever is necessary to get Ingrid and his other acquaintances to send him food or fund his collect telephone calls is evident throughout his recorded telephone conversations. Petitioner's TDCJ disciplinary records reveal he set multiple fires at his TDCJ facility, showing a reckless disregard for his safety and the safety of others. Dr. Murphey noted Petitioner's tendency toward impulsivity in his criminal behavior. S.F. Second State Habeas Hearing, testimony of Dr. Joann Murphey, at pp. 150, 546-47 (Vol. 4, p. 37; Vol. 10, pp. 159-60). Dr. Murphey also noted Petitioner's tendency toward impulsive behavior at school. *Dr. Murphey's Report*, Second State Habeas Transcript, at p. 118 (discussing Petitioner's records which show Petitioner to display "impulsive, self-defeating and non-goal directed behaviors in school"). Petitioner's recorded telephone conversations also display a lack of remorse for the impact of his past criminal conduct on his victims. The state habeas court's finding that Petitioner exhibits an antisocial personality does not rule out the possibility of intellectual disability, however. Both conditions may co-exist in a particular patient. *See DSM-5*, at pp. 37 ("Co-occurring disorders that affect communication, language, and/or motor or sensory function may affect test scores."); p. 38 (individuals with a diagnosis of intellectual disability with co-occurring mental disorders are at risk of suicide); p. 659 (antisocial personality disorder can be characterized by deceitfulness); p. 660 (persons with antisocial personality disorder "are frequently deceitful and manipulative in order to gain personal profit or pleasure").

such circumstances, the state habeas court could reasonably have viewed the information regarding Petitioner's alleged adaptive functioning deficits furnished to Dr. Murphey from such potentially biased witnesses to be less than fully trustworthy.[125]  Dr. Murphey testified she believed Petitioner qualified as intellectually disabled, in part, because, employing the *Briseno* factors, (1) those who knew Petitioner best during his developmental stage felt he was slow, unable to follow directions, and intellectually disabled; (2) Petitioner's criminal offenses reflected impulsive, not carefully planned, activity; (3) Petitioner failed to demonstrate leadership skills; (4) during her first clinical with Petitioner in particular, he asked her inappropriate, personal questions and gave responses to her questions which were "global," "diffused," and "jumped around" and reflected "tangential," "very concrete,"  "magical," and "just unusual" thinking; (5) Petitioner was not capable of lying effectively; and (6) Petitioner's capital offense did not require forethought, planning, or complex execution.[126]  The state habeas court was confronted, however, with evidence which showed (1) the absence of any indication that (a) Petitioner's parents or any of the professional educators who taught Petitioner or served as administrators at Petitioner's schools ever requested Petitioner be tested for intellectual disability or (b) Petitioner's placement in Special Education courses in elementary school

---

[125] For instance, the person who most consistently scored Petitioner higher than the other who completed the ABAS forms furnished by Dr. Murphey was Petitioner's former employer, Moral Hill.  Mr. Hill testified at trial in 2001 in a manner which glowingly described Petitioner as an excellent employee and the youngest person he had ever promoted to the position of supervisor.  Yet, during Petitioner's testimony during Petitioner's most recent state habeas corpus proceeding painted a portrait of Petitioner's skills as an abysmal, ineffective, unreliable employee.  The fact Mr. Hill scored Petitioner higher than almost all of the other persons who completed ABAS forms for Dr. Murphey may have given the state habeas court valid reason to question the accuracy of the other scores furnished to Dr. Murphey from Petitioner's family and friends.

[126] S.F. Second State Habeas Hearing, testimony of Dr. Joann Murphey, at pp. 138 (Vol. 4, p. 25); p. 150 (Vol. 4, p. 37); p. 527 (Vol. 10, p. 140); pp. 545-53 (Vol. 10, pp. 158-66); pp. 574-76 (Vol. 11, pp. 14-16).

was based upon anything other than his violent behavior and possibly undiagnosed ADHD,[127] (2) while Petitioner's capital offense and his related crimes on the evening of February 4, 2000 appear to be impulsive in nature, Petitioner's successful burglaries of multiple residences in the weeks prior to his fatal shootings of Norma Petrach and Ted Church were accomplished without Petitioner leaving behind any forensic evidence linking him to those crimes and without any eyewitnesses being able to identify him as the perpetrator of those burglaries, thus reflecting at least some degree of planning and careful execution, (3) it was Petitioner, and not his accomplice, who placed the telephone call which led to the evacuation of their middle school,[128] (4) Petitioner recruited an accomplice for their unsuccessful attempted burglary of the home of Myrtle Edwards,[129] (5) the absence of any evidence suggesting anyone else showed or taught Petitioner how to break into the residences he successfully burglarized without being observed, (6) Petitioner is fully capable of responding in a rational, appropriate manner to external stimuli, including demonstrating an awareness of a wide range of information unrelated to his keen interest in art, such as the advantages of Internet shopping, many aspects of pop culture, and the need for persons in a vehicle pulled over by law enforcement authorities to keep their hands visible at all times,[130] (7) Petitioner responds coherently, rationally, and on point to oral questions,[131] (8) Petitioner successfully concealed his drug

---

[127] In fact, it appears undisputed at both trial and during Petitioner's most recent state habeas corpus proceeding that Petitioner's parents insisted Petitioner be removed from their school district's Special Education program when he reached middle school.

[128] S.F. Trial, Volume 19, testimony of Antron Ware, at pp. 32-36.

[129] S.F. Trial, Volume 19, Testimony of Brandon Winfrey, at pp. 150-68.   Winfrey also testified, without contradiction, that it was Petitioner who acquired the firearm they planned to use to keep their victim quiet.  *Id.*, at pp. 155-58.

[130] *See* notes 76-78, *supra*.

[131] *Id.*

use from his parents starting in the seventh grade and concealed his drug use and possession of weapons from his sister when he resided with her in 1999 and 2000,[132] (7) during a stay at the Navarro Achievement Center in the eighth grade when Petitioner likely received more intensive supervision than he normally received, Petitioner earned two A's, two B's, and a single C in his academic courses,[133] and (8) when under pressure to earn passing grades in the Summers of 1997 and 1998 in order to advance academically to his sophomore and juniors years of high school, respectively, Petitioner not only earned passing grades, he excelled.[134]   Under such circumstances, the state habeas court could reasonable have concluded that consideration of the *Briseno* factors did not support Dr. Murphey's opinion that Petitioner displays deficits in the adaptive functioning areas of communication, functional academics, and social skills.

### 5. Conclusions

Considering all of the foregoing, the state habeas court could reasonably have questioned whether Petitioner, who was clearly cognizant of the significance of his obtaining a low IQ score in 2012-13, i.e., that he had the possibility of obtaining a life sentence, was motivated to give his best effort on his IQ tests.[135]   In sum, the state habeas court could reasonably have concluded the full scale

---

[132] Dr. Murphey reported Petitioner used marijuana beginning when he was in seventh grade but not heavily until his late teens.  *Dr. Murphey's Report*, Second State Habeas Transcript, at p. 89.  Petitioner's sister testified without contradiction during the punishment phase of Petitioner's trial that he successfully hid both his drug use and possession of weapons from her during the time period they shared an apartment.  S.F. Trial, Volume 22, testimony of Stephanie Huff, at p. 56.

[133] First State Habeas Transcript, at p. 248.

[134] First State Habeas Transcript, at pp. 240, 242.

[135] Collectively, the almost twenty hours of recorded telephone conversations between Petitioner and his family and acquaintances refute any contention that Petitioner possess any deficits in terms of his ability to communicate complex, even abstract, concepts.  Listening to these conversations also convinces this Court that, contrary to Dr. Murphey's assertions, Petitioner is not merely employing big words which he does not fully understand.  The collected recordings demonstrate beyond any doubt that Petitioner (1) communicates easily and freely with those with whom he

IQ test scores Petitioner achieved in 2011 with Dr. Murphey (i.e., 53 and 65) were not fully accurate approximations of Petitioner's true intellectual capabilities.  The state habeas court was also not required to accept Dr. Reed's statistical manipulation of Petitioner's 2008 full scale IQ score of 79 through his use of the "Flynn effect" deduction.  Neither the Fifth Circuit nor the Texas Court of Criminal Appeals has ever accepted the Flynn effect as scientifically valid in the context of analyzing a single IQ test score for an *Atkins* claim.  *See Maldonado v. Thaler*, 625 F.3d at 238 (recognizing neither the Fifth Circuit nor the Texas Court of Criminal Appeals has recognized the Flynn effect as scientifically valid); *In re Cathey*, 451 S.W.3d 1, 12-18 (Tex. Crim. App. 2014) (recognizing the Flynn effect deals with IQ test score averages, not individual scores; recognizing there is considerable debate whether the effect exists at all in terms of the WAIS-III and WAIS-IV tests; recognizing the Flynn effect gains simply reflect the obsolete norms of outdated tests; and holding the state trial court erred in reducing the defendant's IQ score based upon the Flynn effect), *cert. denied*, 135 S. Ct. 2857 (2015).  The state habeas court could reasonably have concluded the 79 score Petitioner achieved in 2008 was a more accurate reflection of Petitioner's true intellectual functioning level than the scores Petitioner achieved in 2011.  *See Williams v. Stephens*, 791 F.3d at 573 (holding a jury properly rejected an *Atkins* claim where the defendant had six IQ scores, two of which fell above the range of standard error of measurement for intellectual disability).  Here, Petitioner presented evidence of three IQ scores, one of which fell above the SEM for intellectual

---

is familiar and (2) possesses social skills sufficient to enable him to convince persons whom he has never met to support him financially during his current incarceration.  These conversations also show that, by 2013, Petitioner was capable of great introspection.  They do not, however, support a finding that Petitioner is intellectually disabled or suffers from deficits in the areas of communication or social skills.  In fact, anyone who listens to all of these conversations would inevitably reach the same conclusion as did the state habeas trial court, the Texas Court of Criminal Appeals, and Dr. Sparks - there is nothing about Petitioner's oral communications or social skills which would lead a rational person to even suspect Petitioner is intellectually disabled.

disability.  In view of all the evidence properly before the state habeas court, that court reasonably concluded Petitioner failed to satisfy Criterion A for demonstrating intellectual disability.  The state habeas court also reasonably concluded Petitioner failed to satisfy  Criterion B by showing deficits in adaptive functioning corresponding to demonstrated intellectual deficits.

The Texas Court of Criminal Appeals' rejection on the merits of Petitioner's *Atkins* claim during Petitioner's most recent state habeas corpus proceeding was neither contrary to, nor involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States nor based on an unreasonable determination of the facts in light of the evidence presented in the Petitioner's most recent state habeas corpus proceeding (which included evidence from Petitioner's trial and first state habeas corpus proceedings).  Petitioner's first claim for relief in his amended petition does not warrant federal habeas corpus relief.

## IV. <u>Ineffective Assistance Claims</u>

A.  <u>The Complaints</u>

In his second  claim in his amended federal habeas corpus petition, Petitioner argues his trial counsel rendered ineffective assistance by (1) failing to conduct a meaningful mitigation investigation, (2) failing to retain the services of a mitigation specialist, (3) failing to retain the services of an independent mental health expert to evaluate Petitioner, (4) failing to discover and present all reasonably available mitigating evidence, including evidence showing (a) Petitioner had learning and behavioral difficulties, including Attention Deficit Disorder and Attention Deficit Hyperactivity Disorder, for which Petitioner's parents refused to have Petitioner evaluated or treated, (b) Petitioner lost the emotional support of his maternal grandmother and mother when his maternal

68

grandmother died suddenly in 1997 and his mother suffered an emotional breakdown, (c) Petitioner thereafter began using drugs, including cocaine, which impaired his thought processes at the time of his capital offense, (d) Petitioner suffers from major depressive disorder with psychotic features and posttraumatic stress disorder, both of which can be treated with medication to reduce Petitioner's aggressiveness and risk of future violent actions, (e) prison staff have managed Petitioner's security needs in an acceptable manner and Petitioner does not present an unusual risk to society, and (f) failing to present evidence showing Petitioner is intellectually disabled, and (5) allowing Petitioner to determine against which venire members the defense would exercise its peremptory challenges, thereby allowing two unacceptable jurors to sit on Petitioner's petit jury when those jurors had recently been the victims of home burglaries and who characterized themselves on their juror questionnaires as willing to impose the death penalty in a wide range of instances.[136]  In his reply brief, Petitioner argues (1) this Court should consider all of the new evidence Petitioner has presented in support of his *Atkins* claim when ruling on Petitioner's second claim herein, i.e., Petitioner's ineffective assistance claim, and (2) this new evidence "transforms" Petitioner's ineffective assistance claim from the one Petitioner presented during his first state habeas corpus proceeding.[137]

## B.  State Court Disposition

In his twelfth and thirteenth grounds for relief in his first state habeas corpus application, Petitioner argued his trial counsel failed to conduct a meaningful mitigation investigation.  Petitioner, however, did not identify any new or additional mitigating evidence which he claims could have

---

[136] *Amended Petition*, at pp. 61-85.

[137] Petitioner's Reply to Respondent's Answer, filed April 23, 2015 (ECF no. 65), at pp. 16-20.

been discovered and developed through a more thorough investigation into Petitioner's background by his defense team.[138]  During the evidentiary hearing held in Petitioner's first state habeas corpus proceeding, Petitioner's former lead trial counsel (attorney Michael Granados) testified without contradiction that (1) Petitioner's defense team retained the services of an investigator who obtained records relating to Petitioner and interviewed Petitioner's family, (2) the defense team had access to the prosecution's file, (3) the defense strategy at trial was to show the Petitioner was an inept criminal who had bungled his crimes and had not deliberately shot either Ted Church or Norma Petrach, (4) he met with Petitioner's mother and sister several times, (5) the defense team also located a co-worker and former teacher, both of whom testified at the punishment phase of trial, (6) based upon his conversations with Petitioner, he believed the Petitioner was addicted to crack cocaine and this addiction spiraled out of control at the time of the capital offense, (7) based upon his review of Petitioner's educational records, his conversations with Petitioner, Petitioner's family, and Petitioner's former teacher, and his own experience as a teacher's aide working with learning disabled children, he believed Petitioner possibly suffered from a learning disability, (8) based upon Dr. Sparks' report, his conversations with Petitioner, Petitioner's written communications from the jail, his review of Petitioner's educational records, and his own experience dealing with learning disabled students, he did not believe there was any need for further investigation into Petitioner's intellectual capabilities or to have Petitioner tested for learning disabilities, (9) based upon the information available to him, it appeared Petitioner's problems in school had been behavioral in nature and did not suggest any intellectual or mental incapabilities, (10) Petitioner had never been diagnosed with any psychiatric problems, (11) Dr. Sparks concluded Petitioner suffered from

---

[138] First State Habeas Transcript, at pp. 23-29.

adjustment disorder with depression but did not suggest Petitioner suffered from a personality disorder or was mentally retarded, (12) he did not find anything in the information available to him, including Petitioner's letters written from jail, suggesting Petitioner suffered from any mental disability which would have been helpful at trial, (13) Petitioner's school records showed that, when he applied himself, the Petitioner did well in school, and (14) the defense team focused on attempting to present evidence which showed Petitioner could be productive, hard working when he applied himself, and that the murders were not deliberate or planned.[139]

The state trial court (1) found Petitioner's trial counsel determined there was nothing to indicate Petitioner was mentally retarded, (2) found attorney Granados determined Petitioner's poor grades resulted from Petitioner not applying himself and Petitioner's abnormalities were behavioral in nature rather than learning, (3) found Petitioner's addiction to crack cocaine was the root of all his difficulties, (4) found attorney Granados' experience was that drug addiction never played well as mitigation in San Antonio, (5) found attorney Granados developed a trial strategy of attempting to show (a) a small set of extreme circumstances took a pair of routine crimes and turned them into capital murders and (b) in a short time Petitioner went from someone who was likeable and doing his best in the work force to someone awaiting transfer to death row, (6) found attorney Granados presented five witnesses, including Petitioner's sister and a former teacher, who furnished testimony designed to support the defense team's trial strategy, (7) concluded Petitioner's trial counsel did investigate for mitigating evidence and presented substantial mitigating evidence to the jury, (8) concluded Petitioner failed to prove he had attention deficit disorder and this condition caused

---

[139] S.F. First State Habeas Hearing, testimony of Michael Granados, at pp. 6-41 (First State Habeas Transcript, at pp. 200-35).

Petitioner's impulsivity or poor judgment, and (9) concluded Petitioner had failed to establish his trial counsel was ineffective.[140]  The state trial court recommended that Petitioner's twelfth and thirteenth claims for relief be denied.[141]  The Texas Court of Criminal Appeals adopted all of the trial court's findings and denied Petitioner's first state habeas corpus application.  *Ex parte Obie D. Weathers III*, WR-64,302-01, 2006 WL 2615531 (Tex. Crim. App. Sept. 13, 2006).[142]

C.   The Constitutional Standard

The Sixth Amendment entitles criminal defendants to "the effective assistance of counsel," *i.e.*, legal representation that does not (1) fall below an objective standard of reasonableness in light of prevailing professional norms and the circumstances of the defendant's case (*Wong v. Belmontes*, 558 U.S. 15, 16-17 (2009); *Bobby v. Van Hook*, 558 U.S. 4, 7 (2009)); and (2) give rise to a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different (*Porter v. McCollum*, 558 U.S. 30, 38-40 (2009); *Wong v. Belmontes*, 558 U.S. at 19-20).

The constitutional standard for determining whether a criminal defendant has been denied the effective assistance of *trial* counsel, as guaranteed by the Sixth Amendment, was announced by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components.  First, the defendant must show that counsel's performance was deficient.  This requires showing that

---

[140] First State Habeas Transcript, at pp. 301-07.

[141] *Id.*, at p. 307.

[142] Petitioner did not include in his second state habeas corpus application any claim of ineffective assistance by his trial counsel, but did argue his first state habeas counsel rendered ineffective assistance by failing to assert an *Atkins* claim as part of Petitioner's initial state habeas corpus application.  Second State Habeas Transcript, at pp. 38-41.

counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

To satisfy the first prong of *Strickland*, i.e., establish that his counsel's performance was constitutionally deficient, a convicted defendant must show that counsel's representation "fell below an objective standard of reasonableness." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003); *Williams v. Taylor*, 529 U.S. 362, 390-91 (2000).  In so doing, a convicted defendant must carry the burden of proof and overcome a strong presumption that the conduct of his trial counsel falls within a wide range of reasonable professional assistance.  *Strickland v. Washington*, 466 U.S. at 687-91.  Courts are extremely deferential in scrutinizing the performance of counsel and make every effort to eliminate the distorting effects of hindsight.  *See Wiggins v. Smith*, 539 U.S. at 523 (holding the proper analysis under the first prong of *Strickland* is an objective review of the reasonableness of counsel's performance under prevailing professional norms which includes a context-dependent consideration of the challenged conduct as seen from the perspective of said counsel at the time).  "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Bobby v. Van Hook*, 558 U.S. at 7; *Strickland v. Washington*, 466 U.S. at 688-89.  It is strongly presumed  counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Strickland v. Washington*, 466 U.S. at 690.

To satisfy the "prejudice" prong, a convicted defendant must establish a reasonable probability that, but for the objectively unreasonable misconduct of his counsel, the result of the proceeding would have been different. *Wiggins v. Smith*, 539 U.S. at 534; *Strickland v. Washington*, 466 U.S. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding. *Strickland v. Washington*, 466 U.S. at 694.

In evaluating Petitioner's complaints about the performance of his counsel under the AEDPA, i.e., those complaints which the state courts have addressed on the merits, the issue before this Court is whether the Texas Court of Criminal Appeals could reasonably have concluded Petitioner's complaints about his trial counsel's performance failed to satisfy either prong of the *Strickland* analysis. *Schaetzle v. Cockrell*, 343 F.3d 440, 444 (5th Cir. 2003), *cert. denied*, 540 U.S. 1154 (2004). In making this determination, this Court must consider the underlying *Strickland* standard. *Id.* In those instances in which the state courts failed to adjudicate either prong of the *Strickland* test (such as those complaints the state courts summarily dismissed under the Texas writ-abuse statute or which Petitioner failed to fairly present to the state courts), this Court's review of the un-adjudicated prong is *de novo*. *See Porter v. McCollum*, 558 U.S. at 39 (holding *de novo* review of the allegedly deficient performance of petitioner's trial counsel was necessary because the state courts had failed to address this prong of *Strickland* analysis); *Rompilla v. Beard*, 545 U.S. at 390 (holding *de novo* review of the prejudice prong of *Strickland* required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins v. Smith*, 539 U.S. at 534 (holding the same).

A habeas petitioner has the burden to prove both prongs of the *Strickland* ineffective assistance standard by a preponderance of the evidence. *Rogers v. Quarterman*, 555 F.3d 483, 489

74

(5th Cir. 2009), *cert. denied*, 558 U.S. 839 (2009); *Blanton v. Quarterman*, 543 F.3d 230, 235 (5th

Cir. 2008), *cert. denied*, 556 U.S. 1240 (2009).   Under the well-settled *Strickland* standard, the

Supreme Court recognizes a strong presumption that counsel rendered adequate assistance and made

all significant decisions in the exercise of reasonable professional judgment.  *Bell v. Cone*, 535 U.S.

685, 698 (2002); *Strickland v. Washington*, 466 U.S. at 690.

D.      Procedural Default & *De Novo* Review of Unexhausted Ineffective Assistance Complaints

Respondent correctly points out Petitioner has failed to exhaust available state remedies with

regard to Petitioner's complaints that his trial counsel rendered ineffective assistance by (1) failing

to retain the services of a mitigation specialist, (2) failing to retain the services of an independent

mental health expert to evaluate Petitioner, (3) failing to discover and present all reasonably

available mitigating evidence, and (4) allowing Petitioner to determine which venire members the

defense would peremptory challenge.   Petitioner procedurally defaulted on these unexhausted

complaints of ineffective assistance.  *See Beatty v. Stephens*, 759 F.3d 455, 465 (5th Cir. 2014)

(Texas petitioner who failed to raise complaint of ineffective assistance by his trial counsel during

his first state habeas corpus proceeding would be precluded under Article 11.071, §5 from returning

to state court to litigate same claim and procedurally defaulted on the claim in a federal habeas

corpus proceeding), *cert. denied*, 135 S. Ct. 2312 (2015); *Trottie v. Stephens*, 720 F.3d 231, 248 (5th

Cir. 2013) (holding petitioner's failure to fairly present factual basis underlying an ineffective

assistance complaint in his state habeas corpus action rendered same ineffective assistance complaint

unexhausted and procedurally defaulted), *cert. denied*, 134 S. Ct. 1540  (2014).

Petitioner cannot satisfy either of the exceptions to the procedural default doctrine because, as explained below, even under *de novo* review, Petitioner's unexhausted ineffective assistance complaints do not satisfy the prejudice prong of the *Strickland* analysis. *See Johnson v. Cain*, 712 F.3d 227, 234 (5th Cir.) ("Where, as here, 'a prisoner fails to exhaust state remedies and the court to which the prisoner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred due to the prisoner's own procedural default,' we are barred from reviewing those claims unless the petitioner 'demonstrate[s] cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate[s] that failure to consider the claims will result in a fundamental miscarriage of justice.'"), *cert. denied*, 134 S. Ct. 431 (2013).  Likewise, Petitioner's unexhausted ineffective assistance claims are not entitled to merits review from this Court under the rule announced in *Martinez v. Ryan* and *Trevino v. Thaler* because Petitioner's unexhausted ineffective assistance claims are insubstantial, i.e., they lack merit. *See Beatty v. Stephens*, 759 F.3d at 465-66 ("To succeed in establishing cause under *Trevino* and *Martinez*, the petitioner must show: (1) that his claim of ineffective assistance of counsel at trial is 'substantial' (i.e., 'has some merit'); and (2) that his habeas counsel was ineffective for failing to present those claims in his first state habeas application.).  Because no state court has addressed the Petitioner's unexhausted ineffective assistance claims, this Court's review of same is necessarily *de novo*. *Porter v. McCollum*, 558 U.S. at 39; *Rompilla v. Beard*, 545 U.S. at 390; *Wiggins v. Smith*, 539 U.S. at 534.

1.   <u>No Deficient Performance</u>

Analysis of Petitioner's unexhausted ineffective assistance complaints begins with recognition that Petitioner's trial counsel presented a substantial amount of mitigating evidence

during the punishment phase of Petitioner's capital murder trial showing, among other things, Petitioner (1) was a hard-working, "excellent" employee during his high school years who was the youngest employee ever promoted to supervisor, (2) served as an usher at his church, was raised to know right from wrong, and was always very respectful, (3) did not initiate the confrontation with a BCADC guard and did not resist the violence inflicted upon him by BCADC personnel in June, 2000, (4) was not disruptive in the home growing up, (5) showed responsibility while working as an usher at his church, (6) grew up in a home where he was taught to be responsible, (7) was under a lot of pressure the week before the murder of Ted Church, (8) was in special education classes in grade school, (9) was a "yes ma'am, no ma'am" student, never disruptive in class, struggled with reading and writing, but was always neat and properly dressed, came from a caring and loving family, and always put forth his best effort in class, and (10) suffered tremendously when his maternal grandmother was killed in an automotive accident in 1997.[143]  Petitioner's trial counsel presented mitigating evidence which tended to "humanize" Petitioner, i.e., portray him in a sympathetic light and show him to be worthy of redemption, but which did not focus the jury's attention on Petitioner's history of drug abuse and physical violence and did not suggest he suffered from intellectual incapabilities which prevented him from learning from his mistakes.

During Petitioner's first state habeas corpus proceeding, his former lead trial counsel testified, in part, that (1) he did not believe mitigating evidence focusing on Petitioner's drug addiction as an excuse for Petitioner's criminal conduct would be helpful in a San Antonio capital murder trial, (2) the defense team's multiple interviews with Petitioner and Petitioner's mother and sister, as well as other potential witnesses, convinced him that Petitioner's problems in school had

---

[143] *See* notes 18, 30-34, *supra*, and accompanying text.

been behavioral and not the result of any mental incapabilities on Petitioner's part, (3) neither Petitioner's written communications from jail, his conversations with Petitioner, nor Petitioner's school records (which showed Petitioner was fully capable of making good grades when he was motivated) suggested Petitioner suffered from intellectual disability, (4) Dr. Sparks' mental status evaluation ruled out mental retardation and Petitioner had no history of psychiatric problems, (5) Dr. Jeannine Foster informed him that Petitioner had been an average student in her class, (6) Petitioner's mother was not called to testify during the punishment phase of trial because Petitioner did not want her present for the punishment phase of trial, and (7) based on the foregoing and his own experience as a teacher's aide working with learning disabled students, he did not believe there was  anything to be gained in terms of mitigating evidence from further inquiry into Petitioner's intellectual capabilities or mental health.[144]  Petitioner has identified no specific facts, much less any evidence, reasonably available at the time of Petitioner's capital murder trial which shows it was objectively unreasonable for Petitioner's defense team to rely upon the expert opinion furnished by Dr. Sparks or the information about Petitioner's performance in school available from Petitioner, his family, his school records, and his former teacher Dr. Foster.  Petitioner's defense team did have the assistance of a court-appointed investigator and did interview Petitioner, his mother and sister, a former teacher, a former church youth leader, and a former employer, all of whom furnished testimony during Petitioner's trial.  Under such circumstances, Petitioner's trial counsel cannot reasonably be faulted for failing to retain the services of a mitigation specialist and independent mental health expert to investigate whether Petitioner suffered from mental retardation.

---

[144] *See* note 139, *supra*, and accompanying text.

"Judicial scrutiny of a counsel's performance must be highly deferential" and ... "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." 466 U.S., at 689, 104 S.Ct. 2052. Thus, even when a court is presented with an ineffective-assistance claim not subject to § 2254(d)(1) deference, a defendant must overcome the "presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Ibid.* (quoting *Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)).

*Bell v. Cone*, 535 U.S. at 698 (quoting *Washington v. Strickland*).

Petitioner's jury was faced at the punishment phase with only two special issues. The first asked whether the evidence showed beyond a reasonable doubt that there was a probability the Petitioner would commit criminal acts of violence which posed a continuing threat to society (the so-called "future dangerousness" special issue). The second special issue asked whether, considering all of the evidence, including the circumstances of Petitioner's offense and the Petitioner's character, background, and personal moral culpability, there was a sufficient mitigating circumstance, or sufficient mitigating circumstances, which warranted the imposition of a life sentence. Thus, unlike capital sentencing juries in many other jurisdictions, Petitioner's jury was not asked to weigh specific aggravating factors against mitigating evidence.[145]

---

[145] Contrary to the argument contained in Petitioner's amended petition, Texas is not a "weighing jurisdiction" where capital sentencing jurors must balance "aggravating" versus "mitigating" factors before rendering a verdict at the punishment phase of a capital trial. *See Hughes v. Johnson,* 191 F.3d 607, 623 (5th Cir. 1999) (Texas is a 'non-weighing state' in that its capital-sentencing scheme does not direct the appellate court or even the jury to 'weigh' aggravating factors against mitigating ones."), *cert. denied*, 528 U.S. 1145 (2000); *James v. Collins*, 987 F.2d 1116, 1120 (5th Cir.) ("Texas, unlike Mississippi's sentencing procedure analyzed in *Stringer,* is not a 'weighing' jurisdiction; *i.e.,* the sentencer is not called upon to weigh mitigating evidence against a list of aggravating circumstances which the state must plead and prove."), *cert. denied,* 509 U.S. 947 (1993); *see also Williams v. Cain,* 125 F.3d 269, 281 (5th Cir. 1997) (discussing the differences between "weighing" and "non-weighing" capital sentencing schemes), *cert. denied*, 525 U.S. 979 (1998).

At the time of Petitioner's 2001 capital murder trial, the rule in *Atkins* was not the law of the land. Evidence which shows a capital murder defendant suffered from mental retardation is highly double-edged in nature in that, while it might be viewed as diminishing the defendant's moral blameworthiness, it also tends to show the defendant cannot learn from his mistakes and, therefore, might pose a substantial risk of future dangerousness. *See Penry v. Lynaugh*, 492 U.S. 302, 324 (1989) ("Penry's mental retardation and history of abuse is thus a two-edged sword: it may diminish his blameworthiness for his crime even as it indicates that there is a probability that he will be dangerous in the future."). Petitioner has alleged no specific facts, nor furnished any evidence, showing it was objectively unreasonable for Petitioner's defense team to forego investigation into whether Petitioner was mentally retarded in anticipation of Petitioner's 2001 capital murder trial. Dr. Sparks had ruled out mental retardation and Petitioner's defense team had an objectively reasonable basis to conclude such an investigation, or one focused on determining whether Petitioner had a learning disability, was unlikely to furnish any truly mitigating evidence, i.e., Petitioner's school records showed him fully capable of earning good grades when he wished to do so, Petitioner's former teacher Dr. Foster described him an average student who had difficulty reading and writing but who nonetheless worked through those problems without becoming frustrated or a problem in her classroom, and Petitioner's former employer gave him a glowing review as an employee - up to the point Petitioner's drug abuse began interfering with Petitioner's job performance.

Insofar as Petitioner argues his lead trial counsel erroneously believed that funding was not available to pay for the services of a mitigation specialist, that argument is *non sequitur*. The first prong of the *Strickland* analysis focuses on the *objective* reasonableness of the strategic and tactical

decisions made by trial counsel, not on the *subjective* correctness of trial counsels' assumptions about the availability of additional investigative resources. *See Hinton v. Alabama,* ___ U.S. ___, ___, 134 S. Ct. 1081, 1088, 188 L. Ed. 2d 1 (2014) ("Under *Strickland*, we first determine whether counsel's representation 'fell below an objective standard of reasonableness.' "); *Loden v. McCarty*, 778 F.3d 484, 494 (5th Cir. 2015) ("To show deficient performance, 'the defendant must show that counsel's representation fell below an objective standard of reasonableness.' " *Reed v. Stephens,* 739 F.3d 753, 773 (5th Cir.2014) (quoting *Strickland* 466 U.S. at 688, 104 S.Ct. 2052). Counsel's performance is judged based on prevailing norms of practice, and judicial scrutiny of counsel's performance must be highly deferential to avoid "the distorting effects of hindsight." *Carty,* 583 F.3d at 258.), *cert. filed June 29, 2015 (no. 15-10)*. Petitioner's defense team included an investigator and conducted an investigation into Petitioner's background which included (1) review of Petitioner's school records, (2) multiple interviews with Petitioner and his mother and sister, review of the mental status evaluation performed by Dr. Sparks, and interviews of Petitioner's former teacher Dr. Foster and former employer Mr. Hill. Petitioner has alleged no specific facts, much less furnished any evidence, showing it was *objectively* unreasonable for his defense team to rely upon the information available through those sources to conclude that further inquiry into Petitioner's mental health and intellectual capabilities would likely prove of little value in terms of producing mitigating evidence. Contrary to the opinions contained in the affidavits of Petitioner's attorney experts,[146]

---

[146] Further undermining the credibility of the declarations and affidavits furnished by Petitioner's trio of attorney experts found at exhibits 9-11 of Petitioner's *Amended Petition* is the absence of any information in those affidavits establishing that any of those attorneys (1) (other than attorney Niland) is licenced to practice law in Texas, (2) has ever tried a capital murder case to a verdict in Texas, (3) has ever tried a criminal case to a jury verdict in Bexar County, Texas, (4) has any familiarity as a practicing attorney with the Texas capital sentencing scheme, which differs considerably from the capital sentencing schemes employed in weighing jurisdictions, (5) ever reviewed the uncontradicted testimony of Petitioner's lead trial counsel given during Petitioner's first state habeas corpus proceeding. (6) were aware that Petitioner's defense team relied upon their review of Dr. Sparks' mental status evaluation, their

*Strickland* does not establish a *per se* rule requiring the retention of a mitigation specialist and an independent mental health expert in every capital murder case.  "The defense of a criminal case is not an undertaking in which everything not prohibited is required.  Nor does it contemplate the employment of wholly unlimited time and resources." *Smith v. Collins*, 977 F.2d 951, 960 (5th Cir. 1992), *cert. denied*, 510 U.S. 829 (1993).

The Supreme Court has emphasized that 'counsel has wide latitude in deciding how best to represent a client....' " *Ward v. Stephens*, 777 F.3d 250, 264 (5th Cir. 2015), *cert. filed May 28, 2015 (no. 14-10033)*; *Clark v. Thaler*, 673 F.3d 410, 427 (5th Cir.) (citing *Yarbrough v. Gentry*, 540 U.S. 1, 5-6 (2003)), *cert. denied*, 133 S. Ct. 179 (2012).  This wide latitude includes the discretion to determine how best to utilize the limited investigative resources available to defense counsel.  *See Ward v. Stephens*, 777 F.3d at 264:

> That trial counsel decided to use its time and resources on mental-health experts, rather than on a professional mitigation specialist or further investigation into Ward's past, may very well reflect counsel's reasonable strategic decision "to balance limited resources" and to focus on expensive clinical psychologists and forensic experts rather than on investigators.  *See Richter,* 131 S.Ct. at 789 ("Counsel was entitled to

---

interviews with Petitioner, his mother and sister, his former teacher Dr. Foster, his former employer Mr. Hill, and others in making their decisions not to seek the assistance of an independent mental health expert or a mitigation specialist, or (7) were aware Petitioner's defense team had the assistance of a court-appointed investigator who interviewed Petitioner's family and helped collect records relevant to Petitioner.  In sharp contrast to the report of Dr. Murphey, none of the three attorneys Petitioner presents as "experts" on the appropriate scope of mitigation investigations in capital cases furnished a clear and precise list of the information on which they based their opinions.  Furthermore, the reliance by all three of these attorneys on the 2003 revisions to the American Bar Association's Guidelines is misplaced for a number of reasons.  First, the Supreme Court has made clear that such Guidelines may inform the *Strickland* analysis but do not govern it.  *See Bobby v. Van Hook*, 558 U.S. 4, 8-9 (2009) (holding the ABA Guidelines and the like are only guides to what reasonableness means, not its definition).  Second, the 2003 version of those Guidelines were a dramatic change from, and greatly expanded the scope of an attorney's duties contained in, similar Guidelines which had been issued in 1989.  *Bobby v. Van Hook*, 558 U.S. at 8.  Third, Petitioner's trial counsel did not have access in 2001 to the 2003 revisions.  In conclusion, none of the three attorney experts sets forth with any specificity the information on which they based their opinions, stating simply that they relied upon unidentified information furnished by Petitioner's current counsel.  For the foregoing reasons, none of these declarations or affidavits furnishes any credible evidence supporting a finding that Petitioner's trial counsel acted in an *objectively* unreasonable manner with regard to the defense team's investigation of Petitioner's background or the defense team's search for potentially mitigating evidence.

formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies.").

Petitioner has failed to allege any specific facts, much less furnish any evidence, showing the decisions by Petitioner's defense team not to pursue an independent mental health evaluation of Petitioner regarding possible mental retardation and not to request a mitigation specialist be appointed to assist the defense team were objectively unreasonable under the circumstances which existed as of the time of Petitioner's 2001 capital murder trial.  Likewise, Petitioner has failed to allege any specific facts showing it was objectively unreasonable for Petitioner's trial counsel to invite Petitioner's input into the defense team's decisions regarding which venire members the defense team should peremptorily strike.  Petitioner's complaints on that point are unsupported by copies of the juror questionnaires from the remainder of the jury venire or any other evidence showing the Petitioner's defense team's use of peremptory strike was objectively unreasonable in view of the totality of the information then available to the defense team.[147]

---

[147] This Court has previously noted the critical importance of review of the juror questionnaires from the entire jury venire when evaluating complaints about the performance of trial counsel during jury selection.  *See Garza v. Thaler*, 909 F. Supp.2d 578, 617 n.93 (W.D. Tex. 2012) ("the failure of petitioner to furnish this Court with the completed questionnaires filled out by petitioner's entire jury venire effectively derives this Court of the ability to rationally evaluate the performance of petitioner's trial counsel under the dual prongs of *Strickland* analysis, particularly under the objective reasonableness standard of the first prong of Strickland.  The objective reasonableness of the extent to which petitioner's trial counsel chose to question individual venire members regarding their views on the death penalty and other subjects necessarily turns, in part, upon the answers those same venire members wrote on their juror questionnaires.  In the absence of the juror questionnaires filled out by the entire jury venire, petitioner has completely failed to carry his burden of proof regarding his Sixth Amendment complaint about the performance of his trial counsel during voir dire."), *CoA denied*, 738 F.3d 669 (5th Cir. 2013), *cert, denied*, 134 S. Ct. 2876 (2014).  Without the ability to review all the juror questionnaires from the entire jury venire, Petitioner's complaint that two of his petit jurors gave some allegedly unfavorable responses proves nothing.  There may very well have been other venire members whose questionnaire answers and individual voir dire examination showed they were even more unfavorably disposed toward the defense than the two individuals identified by Petitioner.  Likewise, Petitioner does not identify any testimony given by either of the two petit jurors which suggests they possessed disqualifying bias or were more unfavorably disposed toward the defense than the venire members whom the defense team actually struck peremptorily.

Finally, Petitioner has failed to allege any specific facts, much less furnish any evidence, showing the decisions by Petitioner's defense team not to pursue mental health evidence as potential mitigating evidence was objectively unreasonable given the very real possibility that presenting mental health evidence (such as that offered by Petitioner during his most recent state habeas corpus proceeding) during the punishment phase of Petitioner's trial could have opened the door to the admission of evidence by the prosecution from its own mental health expert, including evidence based upon court-ordered clinical evaluations of the Petitioner by prosecution experts.   Dr. Murphey's report includes considerable, potentially harmful, information regarding Petitioner's long-term drug abuse and acts of violence during his elementary school years which Petitioner's capital sentencing jury never heard but which would likely have been made known to the prosecution had Petitioner's defense team presented a mental health expert such as Dr. Murphey at the punishment phase of Petitioner's capital murder trial.[148]   *See Trottie v. Stephens*, 720 F.3d at 243 ("a tactical decision not to pursue and present potential mitigating evidence on the grounds that it is double-edged in nature is objectively reasonable, and therefore does not amount to deficient performance." (quoting *Rector v. Johnson,* 120 F.3d 551, 564 (5th Cir.1997))).

The Fifth Circuit has noted that, with respect to the duty to investigate,

---

[148] *See Dr. Murphey's Report*, Second State Habeas Transcript, at p. 87 (Petitioner claimed he was sexually abused by his older sister and physically abused by his mother); at p. 88 (Petitioner claimed he hurt animals and was sexually molested); at p. 88 (Petitioner said he acted up in school to get attention and feel worth something); at p. 89 (Petitioner "smoked weed" since seventh grade but not heavily until his late teens); at p. 89 (Petitioner claims he was not under the influence of drugs or alcohol at the time of his capital offense); at p. 90 (Petitioner was disciplined at elementary school for pushing and hitting other students); at p. 91 (Petitioner described in elementary school records as having a bad temper and tending to push himself against others to provoke fights; at p. 91 (Petitioner described as a capable young man who continues to be disruptive); at p. 91 (school record notes Petitioner has made A's and B's on his assignments but is missing 10 assignments); at p. 93 (Petitioner's aunt described him as quick to lose his temper); at p. 94 (University Health System records reflect Petitioner has no history of mental illness or mental retardation); at pp. 94-95 (Petitioner listed with a history of poly-substance abuse); at p. 97 (Petitioner described in BCADC medical records as experiencing an angry outburst daily); at p. 99 (Petitioner described as irritable).  Petitioner's trial counsel may reasonably have wished to keep this type of evidence away from Petitioner's capital sentencing jury.

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Newbury v. Stephens*, 756 F.3d 850, 873 (5th Cir. 2014) (quoting *Washington v. Strickland*), *cert, denied*, 135 S. Ct. 1197 (2015).

Petitioner has failed to allege any specific facts showing the scope of the investigation for mitigating evidence undertaken by Petitioner's defense team was objectively unreasonable in light of the information reasonable available prior to Petitioner's 2001 capital murder trial. After conducting a *de novo* review, this Court concludes none of Petitioner's unexhausted ineffective assistance claims satisfy the first prong of *Strickland* analysis. Petitioner's trial counsel made objectively reasonable strategic decisions about the scope of their investigation into Petitioner's background after (1) consulting with Petitioner, Petitioner's family, a former teacher, and a former employer of Petitioner, (2) reviewing Dr. Sparks' mental status evaluation, and (3) reviewing Petitioner's school records, none of which indicated to Petitioner's trial counsel that Petitioner was mentally retarded.

### 2. No Prejudice

In evaluating prejudice in the context of the punishment phase of a capital trial, a federal habeas court must re-weigh all the evidence in aggravation against the totality of available mitigating evidence (had the petitioner's trial counsel chosen a different course). *Wong v. Belmontes*, 558 U.S. at 20; *Wiggins v. Smith*, 539 U.S. at 534. *Strickland* does not require the State to "rule out" or negate

85

a sentence of life in prison to prevail; rather, it places the burden on the defendant to show a "reasonable probability" that the result of the punishment phase of a trial would have been different. *Wong v. Belmontes*, 558 U.S. at 27.  The prejudice inquiry under *Strickland* requires evaluating whether there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  "The likelihood of a different result must be substantial, not just conceivable." *Brown v. Thaler*, 684 F. 3d 482, 491 (5th Cir. 2012)(*citing Harrington v. Richter*, 562 U.S. 86 (2011)), *cert. denied*, 133 S. Ct. 1244 (2013).

"To prevail on an ineffective assistance claim based upon uncalled witnesses, an applicant must name the witness, demonstrate that the witness would have testified, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable." *Gregory v. Thaler,* 601 F.3d 347, 352 (5th Cir.), *cert. denied*, 562 U.S. 911 (2010).  "An applicant 'who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial.'" *Id.*

> [W]ithout a specific, affirmative showing of what the missing evidence or testimony would have been, "a habeas court cannot even begin to apply *Strickland*'s standards" because "it is very difficult to assess whether counsel's performance was deficient, and nearly impossible to determine whether the petitioner was prejudiced by any deficiencies in counsel's performance."

*Moore v. Quarterman*, 534 F.3d 454, 468 n.23 (5th Cir. 2008) (quoting *Anderson v. Collins*, 18 F.3d 1208, 1221 (5th Cir. 1994)).

Federal habeas corpus petitioners asserting claims of ineffective assistance based on counsel's failure to call a witness (either a law witness or an expert witness) satisfy  the prejudice prong of the *Strickland* analysis only by naming the witness, *demonstrating the witness was available to testify and would have done so*, setting out the content of the witness' proposed testimony, and showing

the testimony would have been favorable to a particular defense.  *Woodfox v. Cain*, 609 F.3d 774, 808 (5th Cir. 2010); *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009).

The "new" mitigating evidence presented by Petitioner during his most recent state habeas corpus proceeding, including the opinions of Dr. Murphey, Dr. Reed, and Dr. Smith that Petitioner is "mildly mentally retarded," was accompanied by reports containing a veritable cornucopia of potentially harmful factual information regarding Petitioner's background which would have all but guaranteed the jury's answer to the future dangerousness special issue would be favorable to the prosecution.[149]  Thus, Petitioner's "new" mitigating evidence was clearly double-edged in nature. Insofar as Petitioner's experts sought to convince a jury Petitioner suffered from an intellectual disability which reduced his moral blameworthiness and warranted an affirmative answer to the mitigation special issue, the prosecution would have had available at the time of Petitioner's trial Dr. Sparks' contrasting opinion that there was no basis to even suspect mental retardation in Petitioner's case.  Moreover, the two test instruments Dr. Murphey employed in 2011 to measure Petitioner's IQ, i.e., the WAIS-IV and fifth edition of the Stanford-Binet test, were not available at the time of Petitioner's 2001 capital murder trial.[150]  The lone test instrument which has thus far been utilized to measure Petitioner's IQ since the advent of *Atkins* which was available at the time of Petitioner's capital murder trial in 2001 is the WAIS-III, on which Petitioner achieved a full scale score of 79 when Dr. Reed administered that test instrument in 2008.  When the Flynn effect is disregarded, as is required in this Circuit and the courts of Texas, Petitioner's full scale score on the WAIS-III falls

---

[149] *Id.*

[150] The Fifth Edition of the Stanford-Binet test instrument became available in 2003.  The WAIS-IV became available in 2008, after Dr. Reed tested Petitioner with the WAIS-III.

above the range of statical error of measurement for intellectual disability.  Even assuming the availability of Dr. Murphey, Dr. Reed, and Dr. Smith to express the same opinions in 2001 as they offered in their reports and testimony during Petitioner's most recent state habeas corpus proceeding, it is extremely unlikely Petitioner could have presented a compelling argument that he is mentally retarded. Given Petitioner's school records presented during his first state habeas corpus proceeding, it is highly likely any effort to show Petitioner is intellectually disabled would have been met with records showing Petitioner was fully capable of earning passing grades when he was motivated to do, just as Petitioner's trial counsel concluded after reviewing Petitioner's school records and talking with Petitioner, Petitioner's mother and sister, and Dr. Foster.

Under such circumstances, this Court concludes after *de novo* review there is no reasonable probability that, but for the failure of Petitioner's trial counsel to (1) request appointment, or retain the services, of a mitigation specialist, (2) request court-appointment, or retain the services, of an independent mental health expert to evaluate Petitioner for mental retardation, (3) conduct further investigation into Petitioner's background and mental health, and (4) exercise peremptory strikes against any of the persons who served as Petitioner's petit jurors,[151] the outcome of either phase of Petitioner's 2001 capital murder trial would have been any different.  *See Charles v. Thaler*, 736

---

[151] Petitioner has identified two members of his petit jury whom he now alleges should have been struck by his defense team.  Petitioner alleges no facts, and has furnished this Court with no copies of the juror questionnaires completed by any of the other members of Petitioner's jury venire, showing the failure of Petitioner's trial counsel to strike either or both of the jurors in question was objectively unreasonable in light of the expressed views and biases of the other members of Petitioner's jury venire who would have served as jurors in lieu of the two individuals identified by Petitioner.  The evidence at both phases of Petitioner's capital murder trial was overwhelming.  Petitioner signed a written statement admitting he had shot Ted Church while attempting to rob Pierce's Ice House.  After hearing the details of Petitioner's many violent offenses committed prior to the shooting of Ted Church, as well as Petitioner's acts of violence committed during his pretrial detention, the jury reached its verdict at the punishment phase of trial with great swiftness.  Petitioner does not allege any specific facts showing either of the two jurors whom he has identified possessed any disqualifying bias against Petitioner.  There is no reasonable probability that, but for the failure of Petitioner's trial counsel to exercise a peremptory strike against either of the two jurors in question, the outcome of either phase of trial would have been any different.

F.3d 380, 393-94 (5th Cir. 2012) (holding petitioner was not prejudiced within the meaning of *Strickland* by his trial counsel's failure to present double-edged evidence consisting of hospital records showing the petitioner's history of depression and suicide attempts but also Petitioner's history of drug and alcohol abuse), *cert. denied*, 135 S. Ct. 52 (2014); *Gray v. Epps*, 616 F.3d 436, 447-48 (5th Cir. 2010) (federal habeas petitioner failed to satisfy prejudice prong of *Strickland* analysis where his trial counsel failed to present double-edged evidence showing petitioner (1) was dull normal or low average in intellectual functioning, (2) behaved inappropriately and violently at school, (3) was in special education for an unspecified period of time, (4) quit school after ninth grade, (5) was unable to complete basic chores, (6) was learning disabled, (7) was depressed with suicidal ideation at the time of trial, (8) was markedly antisocial with an underdeveloped conscience, (9) could not maintain employment, and (10) had difficulty dealing with his parents' divorce), *cert. denied*, 131 S. Ct. 1785 (2011)).  The evidence presented by the prosecution during the punishment phase of Petitioner's 2001 trial[152] was far too compelling to permit a reasonable probability of a different result on either of the special issues before the jury at the punishment phase of trial had Petitioner presented the double-edged evidence actually available in 2001 which he presented during his most recent state habeas corpus proceeding.  None of Petitioner's unexhausted ineffective assistance claims satisfy the prejudice prong of the *Strickland* analysis.

3. Conclusions

None of Petitioner's unexhausted ineffective assistance claims satisfy either prong of *Strickland* analysis.  Petitioner has procedurally defaulted on these unexhausted claims.  The failure

---

[152] *See* notes 20-29, *supra*, and accompanying text.

of Petitioner's initial state habeas counsel to present any of Petitioner's unexhausted ineffective assistance claims during Petitioner's first state habeas corpus proceeding did not cause the performance of Petitioner's initial state habeas counsel to fall below an objective level of reasonableness.   Petitioner's unexhausted ineffective assistance claims each fail to present a "substantial" basis for relief under the standard set forth in *Martinez v. Ryan* and *Trevino v. Thaler*. *See Beatty v. Stephens*, 759 F.3d at 465-66 ("To succeed in establishing cause under *Trevino* and *Martinez,* the petitioner must show: (1) that his claim of ineffective assistance of counsel at trial is 'substantial' (i.e., 'has some merit'); and (2) that his habeas counsel was ineffective for failing to present those claims in his first state habeas application.).

E.   AEDPA Review of Exhausted Ineffective Assistance Claim

     The state trial court concluded Petitioner's complaint about his trial counsels' alleged failure to conduct a "meaningful" mitigation investigation failed to satisfy either prong of the *Strickland* analysis.   The Texas Court of Criminal Appeals accepted those conclusions and denied state habeas corpus relief during Petitioner's first state habeas corpus proceeding.   Respondent correctly argues this Court is precluded from considering any of the new evidence Petitioner has presented in support of his exhausted ineffective assistance claim in this Court. *See Cullen v. Pinholster*, ___ U.S. ___, ___, 131 S. Ct. 1388, 1401, 179 L. Ed. 2d 557 (2011) (holding a federal habeas petitioner is not entitled to present new evidence supporting a claim in federal court when the state court has ruled on the merits of the underlying claim); *Loden v. McCarty*, 778 F.3d at 493 ("When, as here, a habeas petitioner's claim has been adjudicated on the merits in state court, 'review under § 2254(d)(1) is limited to the record that was before the state court.'"); *Woodfox v. Cain*, 772 F.3d at 368 ("The Supreme Court has clarified that when a claim is adjudicated on the merits, for the purposes of

90

review under § 2254(d)(1), the record is limited to the one before the state court, even if the state court issued a summary affirmance.").

When, as here, a state court has rejected a claim of ineffective assistance on the merits, under the AEDPA, a federal habeas court's review of that ruling is also highly deferential. *See Harrington v. Richter,* 562 U.S. at 101, 131 S.Ct. at 785-86:

> The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsels performance fell below *Strickland*'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams, supra,* at 410, 120 S.Ct. 1495. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.
>
> A state court's determination that a claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" on the correctness of the state court's decision. *Yarborough v. Alvarado,* 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004). And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Ibid.* "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." *Knowles v. Mirzayance,* 556 U.S. 111, 122, 129 S.Ct. 1411, 1413–14, 173 L.Ed.2d 251 (2009) (internal quotation marks omitted).

For the reasons set forth at length in section IV.D. above, the Texas Court of Criminal Appeals reasonably concluded (1) the performance of Petitioner's trial counsel in conducting an investigation into Petitioner's background for mitigating evidence did not fall below an objective level of reasonableness and (2) Petitioner failed to present that state court with any "new" mitigating evidence which Petitioner claimed his trial counsel could have discovered and presented through a more diligent investigation into Petitioner's background and mental health. Having thoroughly

reviewed the entire record from Petitioner's state habeas corpus proceeding, this Court finds Petitioner failed to present the state habeas court with any "new" mitigating evidence which could have been discovered or developed in 2001 by Petitioner's trial counsel through more or better investigation.  The state habeas court reasonably concluded that Petitioner failed to satisfy both the deficient performance and the prejudice prongs of the *Strickland* analysis.  More specifically, the state habeas court reasonably concluded, based upon the uncontradicted testimony of Petitioner's lead trial counsel, that Petitioner's defense team did conduct an investigation for mitigating evidence, did discover mitigating evidence, and presented mitigating evidence which was supportive of the defense's theory of Petitioner's offense and tended to show Petitioner's actions were not those of a hardened criminal but, rather, those of an inept person who lacked the intention to kill.  The state habeas court also reasonably concluded there was no evidence before it showing a reasonable probability that, but for the failure of Petitioner's trial counsel to conduct a more thorough investigation into Petitioner's background and mental health, the outcome of the punishment phase of Petitioner's trial would have been any different.  *See Gregory v. Thaler,* 601 F.3d at 352 ("An applicant 'who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial.'").  The Texas Court of Criminal Appeals' rejection on the merits of petitioner's exhausted ineffective assistance claim was neither contrary to, nor involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States nor based on an unreasonable determination of the facts in light of the evidence presented in the Petitioner's state trial court and state habeas corpus proceedings.  Petitioner's exhausted ineffective assistance claim does not warrant federal habeas corpus relief.

F.  Petitioner's Mistaken Reliance on *Martinez v. Ryan*

Insofar as Petitioner argues his initial state habeas counsel rendered ineffective assistance in failing to present Petitioner's initial state habeas court with an *Atkins* claim and all of the "new" mitigating evidence of intellectual disability, ADHD, post-traumatic stress disorder, and major depressive disorder which Petitioner has presented to this Court, for the reasons set forth above in Section IV.D., Petitioner's arguments are insubstantial and do not satisfy the exception for procedural default set forth in *Martinez v. Ryan* and *Trevino v. Thaler*.  The "new" mitigating evidence presented by Petitioner to this Court is double-edged in nature and pales in comparison to the prosecution's punishment phase evidence.  There is no reasonable probability the outcome of either phase of Petitioner's original trial, or his first state habeas corpus proceeding, would have been different had Petitioner presented the jury or Petitioner's first state habeas court with any or all of Petitioner's "new" mitigating evidence.  Dr. Sparks' testimony, the trial testimony of Petitioner's former teacher Dr. Foster, the trial testimony of Petitioner's former employer Mr. Hill, and Petitioner's own school records would have refuted Petitioner's assertions of intellectual disability had Petitioner attempted to urge an *Atkins* claim during his first state habeas corpus proceeding. Likewise, had Petitioner presented all of his "new" mitigating evidence to the state habeas court during his first state habeas corpus proceeding ( or at least that portion of the "new" evidence which existed as of April, 2003), there is still no reasonable probability the outcome of Petitioner's first state habeas corpus proceeding would have been any different.  This is because the Petitioner's first state habeas trial court found, and the Texas Court of Criminal Appeals adopted the finding, that Petitioner's *Wiggins* claim failed to satisfy either prong of the *Strickland* analysis.  For the reasons

discussed above, this factual finding was reasonable in light of the evidence presented during Petitioner's first state habeas corpus proceeding.

Petitioner has also failed to allege any specific facts showing any substantial portion of the "new" mitigating evidence Petitioner has presented to this Court was reasonably available to Petitioner's initial state habeas counsel at the time said counsel filed Petitioner's first state habeas corpus application in April, 2003.  Neither Dr Murphey nor Dr. Reed had conducted any IQ testing on Petitioner as of that date.  All of the affidavits and statements furnished to this Court by Petitioner in support of his amended petition, or submitted by Petitioner to the state habeas court in support of his subsequent state habeas application, were executed long after April, 2003.

The Constitution does not require appellate counsel to raise every non-frivolous ground that might be pressed on appeal.  *United States v. Fields*. 565 F.3d 290, 294 (5th Cir.), *cert. denied*, 558 U.S. 914 (2009).  Appellate counsel is not ineffective solely because of failure to present every ground urged by the defendant.  *See Jones v. Barnes*, 463 U.S. 745, 751 (1983) ("Neither *Anders* nor any other decision of this Court suggests, however, that the indigent defendant has a constitutional right to compel appointed counsel to press nonfrivolous points requested by the client, if counsel, as a matter of professional judgment, decides not to present those points.").  To prevail on a claim of ineffective assistance by appellate counsel, a petitioner must identify with specificity grounds for relief that he claims should have been included in his appellate brief and demonstrate a reasonable probability that, but for appellate counsel's failure to include those points of error,  the defendant would have prevailed on appeal.  *Smith v. Robbins*, 528 U.S. 259, 285 (2000).  The foregoing principles apply with equal force to assertions of ineffective assistance by a state habeas counsel.

94

Petitioner has failed to allege any specific facts showing there was any information reasonable available in April, 2003 to Petitioner's initial state habeas counsel which would have alerted said counsel to the possible viability of an *Atkins* claim.  On the contrary, the only report by a mental health expert on Petitioner's mental health in existence in April, 2003 which has been presented to this Court is Dr. Sparks' mental status evaluation which concluded Petitioner was *not* mentally retarded.  Petitioner has not alleged any specific facts showing it was objectively unreasonable for Petitioner's initial state habeas counsel to have relied upon Dr. Sparks' evaluation in deciding not to present an *Atkins* claim during Petitioner's initial state habeas corpus proceeding. Nor has Petitioner alleged any specific facts showing a reasonable probability that, but for the failure of his initial state habeas counsel to assert an *Atkins* claim during Petitioner's first state habeas corpus proceeding, the outcome of Petitioner's first state habeas corpus proceeding would have been any different.  Had Petitioner presented his first state habeas court with the same evidence in support of his *Atkins* claim which he presented during his second state habeas court, there is no reasonable probability a different result would have resulted.  Petitioner's *Atkins* claim is insubstantial under *Martinez v. Ryan* and *Trevino v. Thaler*.

Petitioner's complaint regarding his initial state habeas counsel's failure to present all of his "new" mitigating evidence to the state habeas court during his first state habeas corpus proceeding in support of his exhausted ineffective assistance claim is not supported by any specific facts showing any substantial portion of Petitioner's "new" mitigating evidence was reasonably available to Petitioner's initial state habeas counsel as of April, 2003.  Petitioner has failed to allege any specific facts showing that any of the "new" mitigating evidence he has presented to this Court in support of his otherwise exhausted ineffective assistance complaint was available at the time

Petitioner's initial state habeas counsel filed Petitioner's first state habeas corpus application. Thus, Petitioner's complaint that his initial state habeas counsel failed to present the state habeas court with all of his "new" mitigating evidence in support of Petitioner's exhausted ineffective assistance claim fails to satisfy the prejudice prong of the *Strickland* analysis. *Woodfox v. Cain*, 609 F.3d at 808; *Day v. Quarterman*, 566 F.3d at 538.

## V. <u>Procedurally Defaulted Challenges to the Texas Capital Sentencing Scheme</u>

### A. <u>The Claims</u>

In his third through ninth claims in his amended petition, Petitioner presents a series of facial challenges to the constitutionality of the Texas capital sentencing scheme.[153]

### B. <u>State Court Disposition</u>

Petitioner did not raise any of these facial constitutional challenges to the Texas capital sentencing scheme in his direct appeal. Instead, Petitioner presented these claims for the first time as his second through eleventh claims for relief in his first state habeas corpus application.[154] The state habeas trial court concluded Petitioner procedurally defaulted on each of these claims for relief by failing to assert them on direct appeal but concluded, in the alternative, that all of these claims lacked merit.[155] The Texas Court of Criminal Appeals adopted the state trial court's findings and denied Petitioner's first state habeas corpus application. *Ex parte Obie D. Weathers III*, WR-64,302-01, 2006 WL 2615531 (Tex. Crim. App. Sept. 13, 2006).

---

[153] *Amended Petition*, at pp. 86-115.

[154] First State Habeas Transcript, at pp. 9-22.

[155] First State Habeas Transcript, at pp. 295-300.

C. Procedural Default

In Texas, claims which are based upon the trial record must generally be raised on direct appeal, rather than in a subsequent state habeas corpus proceeding.  *See Dorsey v. Quarterman*, 494 F.3d 527, 532 (5th Cir. 2007) (recognizing the Texas Court of Criminal Appeals has held that record based claims not raised on direct appeal will not be considered in state habeas corpus proceedings and the Fifth Circuit has held this state procedural rule firmly established since at least 1998), *cert. denied*, 552 U.S. 1232 (2008); *Busby v. Dretke*, 359 F.3d 708, 718-19 (5th Cir.) (recognizing the Texas Court of Criminal Appeals' decision in *Ex parte Gardner*, 959 S.W.2d 189, 199 (Tex. Crim. App. 1996), *clarified on reh'g* (Feb. 4, 1998), firmly established the rule in Texas that record-based claims not raised on direct appeal will not be considered in a subsequent state habeas corpus proceeding), *cert. denied*, 541 U.S. 1087 (2004).  The state habeas court held during Petitioner's first state habeas corpus proceeding that he procedurally defaulted on his third through ninth claims herein by failing to present those claims in his direct appeal.

The Supreme Court has recognized exceptions to the doctrine of procedural default where a federal habeas corpus petitioner can show either (1) "cause and actual prejudice" for his default or (2) that failure to address the merits of his procedurally defaulted claim will work a "fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Harris v. Reed*, 489 U.S. 255, 262 (1989).

To establish "cause," a petitioner must show either that some objective external factor impeded the defense counsel's ability to comply with the state's procedural rules or that petitioner's trial or appellate counsel rendered ineffective assistance. *Coleman v. Thompson*, 501 U.S. at 753;

*Murray v. Carrier*, 477 U.S. 478, 488 (1986) (holding that proof of ineffective assistance by counsel satisfies the "cause" prong of the exception to the procedural default doctrine).  In order to satisfy the "miscarriage of justice" test, the petitioner must supplement his constitutional claim with a colorable showing of factual innocence. *Sawyer v. Whitley*, 505 U.S. 333, 335-36 (1992).  In the context of the punishment phase of a capital trial, the Supreme Court has held that a showing of "actual innocence" is made when a petitioner shows by clear and convincing evidence that, but for constitutional error, no reasonable juror would have found petitioner eligible for the death penalty under applicable state law. *Sawyer v. Whitley*, 505 U.S. at 346-48.  The Supreme Court explained in *Sawyer v. Whitley* this "actual innocence" requirement focuses on those elements which render a defendant *eligible* for the death penalty and not on additional mitigating evidence that was prevented from being introduced as a result of a claimed constitutional error. *Sawyer v. Whitley*, 505 U.S. at 347.

Petitioner does not allege any facts, much less furnish any evidence, showing his state *appellate* counsel rendered ineffective assistance by failing to assert during Petitioner's direct appeal any of the constitutional challenges to the Texas capital sentencing statute raised in Petitioner's third through ninth claims herein.  Likewise, Petitioner has failed to allege any facts showing that he is "actually innocent" of his capital offense within the meaning of that term as used by the Supreme Court in *Sawyer v. Whitley.*  For the reasons set forth in Section III above, Petitioner's assertion that he is intellectually disabled does not satisfy the fundamental miscarriage of justice exception to the procedural default doctrine.  Accordingly, Petitioner has alleged no facts sufficient to overcome the Respondent's assertions of procedural default on these procedurally defaulted claims.  Because Petitioner's procedural default on his third through ninth claims herein occurred during Petitioner's

direct appeal, and not during Petitioner's initial state habeas corpus proceeding, the Supreme Court's holdings in *Martinez v. Ryan* and *Trevino v. Thaler* are inapplicable.

D.  Alternatively, No Merit on *De Novo* Review

Alternatively, Petitioner's third through ninth claims herein are all without arguable merit, primarily because Petitioner erroneously contends the Texas capital sentencing scheme mandates a "weighing" of aggravating factors against mitigating factors.  As explained above, however, Texas is not a weighing jurisdiction.

In his third claim, Petitioner argues the state trial court was required to define the terms "probability," "criminal acts of violence," "continuing threat to society," "moral blameworthiness," "personal moral culpability," and "mitigating circumstances," included in the Texas capital sentencing special issues.  The Fifth Circuit has repeatedly rejected the exact same arguments raised by Petitioner in his third claim herein.  See, e.g., *Paredes v. Quarterman*, 574 F.3d 281, 294 (5th Cir. 2009) (holding the terms "probability, "criminal acts of violence," and "continuing threat to society" "have a plain meaning of sufficient content that the discretion left to the jury is no more than that inherent in the jury system itself"), *cert. denied*, 562 U.S. 1203 (2011); *Turner v. Quarterman*, 481 F.3d 292, 299-300 (5th Cir.) (rejecting claims the terms "probability, "criminal acts of violence," and "continuing threat to society" were so vague as to preclude a capital sentencing jury's consideration of mitigating evidence), *cert. denied*, 551 U.S. 1193 (2007); *Leal v. Dretke*, 428 F.3d 543, 552-53 (5th Cir. 2005) (listing numerous Fifth Circuit opinions rejecting complaints about the failure of Texas courts to define the terms "probability, "criminal acts of violence," and "continuing threat to society"), *cert. denied*, 547 U.S. 1073 (2006).

In his fourth claim, Petitioner argues the Texas capital sentencing scheme does not permit meaningful appellate review of the jury's answer to the special issues, particularly the mitigation special issue. The Fifth Circuit has repeatedly rejected the same argument. *See, e.g., Sprouse v. Stephens*, 748 F.3d 609, 621-22 (5th Cir.) (recognizing complaints about the inability of the Texas Court of Criminal Appeals to meaningfully review a capital sentencing jury's answers to the special issues lack arguable merit), *cert. denied*, 135 S. Ct. 477 (2014); *Martinez v. Johnson*, 255 F.3d 229, 244-45 (5th Cir. 2001) (upholding the Texas Court of Criminal Appeals' application of the *Jackson v. Virginia* standard to a capital sentencing jury's answer to the future dangerousness special issue), *cert. denied*, 534 U.S. 1163 (2002); *Moore v. Johnson*. 225 F.3d 495, 506-07 (5th Cir. 2000) ("It is just this narrowly cabined but unbridled discretion [in the mitigation special issue] to consider any mitigating factors submitted by the defendants and weighed as the jury sees fit that Texas has bestowed upon the jury. In so doing, Texas followed Supreme Court instructions to the letter. No court could find that Texas had acted contrary to federal law as explained by the Supreme Court, and no benefit will arise from further consideration of the obvious."), *cert. denied*, 532 U.S. 949 (2001).

In his fifth claim, citing cases from weighing jurisdictions, Petitioner argues the Texas statutory definition of "mitigation" is too narrow because it focuses the jury's attention on whether evidence reduces a defendant's moral blameworthiness. The Fifth Circuit has repeatedly rejected this argument. *See, e.g., Sprouse v. Stephens*, 748 F.3d at 622 (denying a CoA on this same issue); *Blue v. Thaler*, 665 F.3d 647, 665-66 (5th Cir. 2011) (Article 37.071 does not unconstitutionally preclude the jury from considering as a mitigating factor any aspect of a defendant's character or record and any of the circumstances of the offense the defendant proffers as a basis for a life sentence), *cert. denied*, 133 S. Ct. 105 (2012); *Beazley v. Johnson*, 242 F.3d 248, 260 (5th Cir.)

("The definition of mitigating evidence does *not* limit the evidence considered under the third special issue (whether mitigating circumstances warrant a life, rather than a death, sentence).  '[V]irtually *any* mitigating evidence is capable of being viewed as having some bearing on the defendant's 'moral culpability' apart from its relevance to the particular concerns embodied in the Texas special issues'."), *cert. denied*, 534 U.S. 945 (2001).

In his sixth claim, Petitioner argues the Texas mitigation special issue is unconstitutional because it is open-ended, unstructured, and affords the jury unbridled discretion to impose or withhold the death penalty.  The Fifth Circuit has repeatedly rejected this argument.  *See, e.g., Turner v. Quarterman*, 481 F.3d at 299 ("at the selection step, the jury must be allowed to make 'an individualized determination' and to consider 'relevant mitigating evidence of the character and record of the defendant and the circumstances of the crime.' *Id.*  In this second step, the jury may even be given 'unbridled discretion in determining whether the death penalty may be imposed.' " (quoting *Tuilaepa v. California*, 512 U.S. 967, 979-80 (1994)); *Woods v. Cockrell*, 307 F.3d 353, 359-60 (5th Cir. 2002) ("It is the eligibility decision that must be made with maximum transparency to 'make rationally reviewable the process for imposing a sentence of death.' *Moore,* 225 F.3d at 506 (quoting *Tuilaepa,* 512 U.S. at 973). On the other hand, a jury is free to consider a 'myriad of factors to determine whether death is the appropriate punishment.  Indeed, the sentencer may be given unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty.' 225 F.3d at 506 (quoting *Tuilaepa*, 512 U.S. at 979-80).  It is the jury's subjective and 'narrowly cabined but unbridled discretion to consider any mitigating factors,' 225 F.3d at 507, that Texas refrains from independently reviewing.  We continue to hold that Texas may correctly do so.").

In his seventh claim, Petitioner argues the Texas capital sentencing scheme unconstitutionally fails to impose the burden of proof upon the prosecution to disprove the existence of mitigating evidence warranting a life sentence.  The Fifth Circuit has repeatedly rejected this argument.  *See, e.g., Blue v. Thaler*, 665 F.3d at 668 ("No Supreme Court or Circuit precedent constitutionally requires that Texas' mitigation special issue be assigned a burden of proof."); *Druery v. Thaler*, 647 F.3d 535, 546 (5th Cir. 2011) ("In *Avila v. Quarterman*, this court rejected a petitioner's argument 'that allowing a sentence of death without a jury finding beyond a reasonable doubt that there were no mitigating circumstances sufficient to warrant a sentence of life imprisonment violated his Sixth and Fourteenth Amendment right to due process and a fair trial.' 560 F.3d 299, 315 (5th Cir.2009). Other decisions have likewise rejected the argument that failure to instruct the jury that the State has the burden of proof beyond a reasonable doubt on the mitigation issue is unconstitutional."), *cert. denied*, 132 S. Ct. 1550 (2012); *Coleman v. Quarterman*, 456 F.3d 537, 542 (5th Cir. 2006) (" '[N]o Supreme Court or Circuit precedent constitutionally requires that Texas's mitigation special issue be assigned a burden of proof.' *Rowell v. Dretke,* 398 F.3d 370, 378 (5th Cir.), *cert. denied,* 546 U.S. 848 (2005).  Reasonable jurists could not debate the district court's decision to deny habeas relief on this claim."), *cert. denied*, 549 U.S. 1343 (2007).

In his eighth claim, Petitioner argues the Texas twelve/ten rules unconstitutionally fails to inform a capital sentencing jury of the effect of a single holdout juror in violation of Supreme Court holdings from weighing jurisdictions.  The Fifth Circuit has repeatedly rejected this same argument. *See, e.g., Sprouse v. Stephens*, 748 F.3d at 623 ("Clear Supreme Court and Fifth Circuit precedent forecloses granting a COA on this issue."); *Blue v. Thaler*, 665 F.3d at 669-70 ("the Supreme Court held in *Jones v. United States* that 'a failure to instruct the jury as to the consequences of deadlock'

in no way affirmatively misleads the jury about its role in the sentencing process.  This Court has concluded that *Jones* insulates the 10–12 Rule from constitutional attack.  And it has also held that the 10–12 Rule passes constitutional muster independently of the holding announced in *Jones*." (Footnotes omitted)); *Druery v. Thaler*, 647 F.3d at 544 (rejecting a federal habeas petitioner's reliance upon *Caldwell v. Mississippi* as a basis for challenging the Texas 10-12 Rule).

In his ninth claim, Petitioner argues the Supreme Court's holdings in *Ring v. Arizona* and *Apprendi v. New Jersey* mandate imposing the burden upon the prosecution of disproving beyond a reasonable doubt the existence of mitigating evidence warranting a life sentence.  The Fifth Circuit has repeatedly rejected this same argument.  *See, e.g., Blue v. Thaler*, 665 F.3d at 669 (" '[N]ot asking the jury to find an absence of mitigating circumstances beyond a reasonable doubt' is perfectly consistent with *Ring* and *Apprendi* because "a finding of mitigating circumstances reduces a sentence from death, rather than increasing it to death.' " (quoting *Granados v. Quarterman*, 455 F.3d 529, 536-37 (5th Cir.), *cert. denied*, 549 U.S. 1081 (2006)); *Paredes v. Quarterman*, 574 F.3d at 292 ("neither *Ring* nor *Apprendi* 'require[s] the State to prove beyond a reasonable doubt the absence of mitigating circumstances.' "); *Ortiz v. Quarterman*, 504 F.3d 492, 505 (5th Cir. 2007) ("The Texas death penalty scheme does not violate *Apprendi* or *Ring* by failing to require the State to prove beyond a reasonable doubt the absence of mitigating circumstances."), *cert. denied*, 553 U.S. 1035 (2008).

The Texas Court of Criminal Appeals' alternative rejections on the merits of Petitioner's third through ninth claims herein during Petitioner's first state habeas corpus proceeding were neither contrary to, nor involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States nor based on an unreasonable determination

of the facts in light of the evidence presented in the Petitioner's state trial court and initial state habeas corpus proceedings. Petitioner's procedurally defaulted third through ninth claims herein do not warrant federal habeas corpus relief.

## VI. <u>Request for an Evidentiary Hearing</u>

Petitioner requests an evidentiary hearing to further develop the factual bases for his claims herein. Under the AEDPA, the proper place for development of the facts supporting a claim is the state court. *See Hernandez v. Johnson*, 108 F.3d 554, 558 n.4 (5th Cir.) (holding the AEDPA clearly places the burden on a petitioner to raise and litigate as fully as possible his federal claims in state court), *cert. denied*, 522 U.S. 984 (1997). Furthermore, where a petitioner's claims have been rejected on the merits, as was the case for Petitioner's *Atkins* claim, further factual development in federal court is effectively precluded by virtue of the Supreme Court's holding in *Cullen v. Pinholster*, ___ U.S. at ___, 131 S. Ct. at 1398-1400 (holding an evidentiary hearing is unnecessary when a state court has rejected a claim on the merits and federal habeas review of that rejection is governed by §2254(d)(1)). Thus, petitioner is not entitled to a federal evidentiary hearing on any of his claims herein which were rejected on the merits by the state courts, either on direct appeal or during Petitioner's first or second state habeas corpus proceedings. *See Woodfox v. Cain*, 772 F.3d 358, 368 (5th Cir. 2014) ("The Supreme Court has clarified that when a claim is adjudicated on the merits, for the purposes of review under § 2254(d)(1), the record is limited to the one before the state court, even if the state court issued a summary affirmance."), *cert. filed*, *April 27, 2015, no.* 14-1288).

Likewise, where a federal habeas corpus petitioner's claims lack merit on their face, further factual development is not necessary. *See Register v. Thaler*, 681 F.3d 623, 627-30 (5th Cir. 2012) (recognizing District Courts possess discretion regarding whether to allow factual development, especially when confronted with claims foreclosed by applicable legal authority). "In cases where an applicant for federal habeas relief is not barred from obtaining an evidentiary hearing by 28 U.S.C. § 2254(e)(2), the decision to grant such a hearing rests in the discretion of the district court." *Richards v. Quarterman*, 566 F.3d 553, 562 (5th Cir. 2009) (quoting *Schriro v. Landrigan,* 550 U.S.465, 468 (2007)). "In determining whether to grant a hearing, under Rule 8(a) of the habeas Court Rules 'the judge must review the answer [and] any transcripts and records of state-court proceedings... to determine whether an evidentiary hearing is warranted.' " *Richards v. Quarterman*, 566 F.3d at 562-63 (*quoting Hall v. Quarterman,* 534 F.3d 365, 368 (5th Cir.2008) (*in turn quoting Schriro,* 550 U.S. at 473)). In making this determination, courts must consider whether an evidentiary hearing could "enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Richards v. Quarterman*, 566 F.3d at 563 (*quoting Schriro,* 550 U.S. at 474).

Petitioner's first claim was fully litigated in the state habeas court where it was rejected on the merits and, therefore, *Cullen v. Pinholster* forecloses further factual development of Petitioner's *Atkins* claim. The same is true for Petitioner's lone exhausted ineffective assistance claim. Petitioner procedurally defaulted on his unexhausted ineffective assistance claims. Petitioner also procedurally defaulted on his third through ninth claims and has made no effort to allege any facts showing his state appellate counsel rendered ineffective assistance by failing to raise these frivolous claims on direct appeal. Likewise, Petitioner's assertion of intellectual disability was refuted by the

almost twenty hours of recorded telephone conversations this Court reviewed in detail.  Petitioner

has not satisfied the fundamental miscarriage of justice exception to the procedural default doctrine.

Because Petitioner's unexhausted ineffective assistance claims all fail to satisfy either prong of the

*Strickland* analysis, they are procedurally defaulted and not "substantial" for purposes of the *Ryan*

*v. Martinez* exception to the procedural doctrine.  Petitioner is not entitled to an evidentiary hearing

for the purpose of developing any of his procedurally defaulted claims.

## VII. <u>Certificate of Appealability</u>

Under the AEDPA, before a petitioner may appeal the denial of a habeas corpus petition filed

under Section 2254, the petitioner must obtain a CoA.  *Miller-El v. Johnson*, 537 U.S. 322, 335-36

(2003); 28 U.S.C. §2253(c) (2).  Likewise, under the AEDPA, appellate review of a habeas petition

is limited to the issues on which a CoA is granted.  *See Crutcher v. Cockrell*, 301 F.3d 656, 658 n.10

(5th Cir. 2002) (holding a CoA is granted on an issue-by-issue basis, thereby limiting appellate

review to those issues); *Lackey v. Johnson*, 116 F.3d 149, 151 (5th Cir. 1997) (holding the scope of

appellate review of denial of a habeas petition limited to the issues on which CoA has been granted).

In other words, a CoA is granted or denied on an issue-by-issue basis, thereby limiting appellate

review to those issues on which CoA is granted.  *Crutcher v. Cockrell*, 301 F.3d at 658 n.10; 28

U.S.C. §2253(c) (3).

A CoA will not be granted unless the petitioner makes a substantial showing of the denial

of a constitutional right.  *Tennard v. Dretke*, 542 U.S. 274, 282 (2004); *Miller-El v. Johnson*, 537

U.S. at 336; *Slack v. McDaniel*, 529 U.S. 473, 483 (2000); *Barefoot v. Estelle*, 463 U.S. 880, 893

(1983).  To make such a showing, the petitioner need *not* show he will prevail on the merits but,

rather, must demonstrate that reasonable jurists could debate whether (or, for that matter, agree) the petition should have been resolved in a different manner or that the issues presented are adequate to deserve encouragement to proceed further. *Tennard v. Dretke*, 542 U.S. at 282; *Miller-El v. Johnson*, 537 U.S. at 336.  This Court is required to issue or deny a CoA when it enters a final Order such as this one adverse to a federal habeas petitioner. *Rule 11(a), Rules Governing Section 2254 Cases in the United States District Courts*.

The showing necessary to obtain a CoA on a particular claim is dependent upon the manner in which the District Court has disposed of a claim. "[W]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy §2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller-El v. Johnson*, 537 U.S. at 338 (*quoting Slack v. McDaniel*, 529 U.S. at 484); *accord Tennard v. Dretke***,** 542 U.S. at 282.  In a case in which the petitioner wishes to challenge on appeal this Court's dismissal of a claim for a reason not of constitutional dimension, such as procedural default, limitations, or lack of exhaustion, the petitioner must show jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* whether this Court was correct in its procedural ruling. *See Slack v. McDaniel*, 529 U.S. at 484 (holding when a district court denies a habeas claim on procedural grounds, without reaching the underlying constitutional claim, a CoA may issue only when the petitioner shows that reasonable jurists would find it debatable whether (1) the claim is a valid assertion of the denial of a constitutional right and (2) the district court's procedural ruling was correct).

In death penalty cases, any doubt as to whether a CoA should issue must be resolved in the petitioner's favor. *Avila v. Quarterman*, 560 F.3d 299, 304 (5th Cir.), *cert. denied*, 558 U.S. 993 (2009); *Bridgers v. Dretke*, 431 F.3d 853, 861 (5th Cir. 2005), *cert. denied*, 548 U.S. 909 (2006). Nonetheless, a CoA is not automatically granted in every death penalty habeas case. *See Miller-El v. Cockrell*, 537 U.S. at 337 ("It follows that issuance of a COA must not be *pro forma* or a matter of course.").

Reasonable minds could not disagree with this Court's conclusions that (1) the state habeas court's denial on the merits of Petitioner's *Atkins* claim was consistent with both clearly established Supreme Court precedent and objectively reasonable in light of the evidence before the state habeas court during Petitioner's most recent state habeas corpus proceeding, (2) all of Petitioner's unexhausted ineffective assistance claims are procedurally defaulted and fail to satisfy either prong of *Strickland* analysis, (3) the state habeas court's rejection on the merits of Petitioner's lone exhausted ineffective assistance claim was consistent with both clearly established Supreme Court precedent and objectively reasonable in light of the evidence before the state habeas court during Petitioner's first state habeas corpus proceeding, and (4) all of Petitioner's facial constitutional challenges to the Texas capital sentencing scheme are both procedurally defaulted and lacking in merit.

Accordingly, it is hereby **ORDERED** that:

1.   All relief requested in Petitioner's amended federal habeas corpus petition, filed November 7, 2014 *(ECF no. 57)*, is **DENIED**.

2.   Petitioner is **DENIED** a Certificate of Appealability on all claims herein.

3.  Petitioner's request for an evidentiary hearing is **DENIED**.

4.  All other pending motions are **DISMISSED AS MOOT**.

SIGNED this 31st day of August, 2015.

_____

XAVIER RODRIGUEZ

UNITED STATES DISTRICT JUDGE